1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
2               FORT WORTH DIVISION

3  UNITED STATES OF AMERICA,   )  **Case No. 4:08-cr-165-A**
                  )     (4:08-mj-196)
4       Plaintiff,      )
                  )
5  v.                )  Fort Worth, Texas
                  )  September 30, 2008
6  RANDALL WOLFORD,         )
                  )  PRELIMINARY HEARING
7       Defendant.      )  DETENTION HEARING
  _____)

8

9             TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE CHARLES BLEIL,
10       UNITED STATES MAGISTRATE JUDGE.

11  APPEARANCES:

12  For the Government:      Alex Lewis
                     ASSISTANT UNITED STATES ATTORNEY
13                   Burnett Plaza, Suite 1700
                     801 Cherry Street, Unit #4
14                   Fort Worth, TX  76102-6882
                     (817) 252-5200
15

    For the Defendant:      Danny D. Burns
16                   115 N. Henderson Street
                     Fort Worth, TX  76102-1940
17                   (817) 870-1544

18  Court Recorder:         Becky J. Fitzhugh
                     UNITED STATES DISTRICT COURT
19                   510 W. 10th Street
                     Fort Worth, TX  76102
20                   (817) 850-6690

21  Transcription Service:    Kathy Rehling
                     209 Bay Circle
22                   Coppell, TX  75019
                     (972) 304-1998

23

24

      Proceedings recorded by electronic sound recording;
25      transcript produced by transcription service.

1              FORT WORTH, TEXAS - SEPTEMBER 30, 2008 - 9:36 A.M.

2              THE COURT:  Please be seated.  We're here in regard

3    to the United States versus Randall Howard Wolford, and we've

4    previously set this date and time for a preliminary hearing

5    and a detention hearing.  Is the Government ready?

6              MR. LEWIS:  The Government is ready, Your Honor.

7              THE COURT:  And is the Defendant?

8              MR. BURNS:  The Defendant's ready, Your Honor.

9              THE COURT:  Very well, Mr. Lewis.  You may proceed.

10             MR. LEWIS:  Thank you, Judge.  The Government calls

11   Sergeant Tom Milner to the stand.

12             THE COURT:  Sergeant Milner, would you please raise

13   your right hand and be sworn by the Clerk?

14              THOMAS MILNER, GOVERNMENT'S WITNESS, SWORN

15             THE COURT:  Please have a seat on the witness stand.

16             MR. LEWIS:  Permission to proceed, Judge?

17             THE COURT:  Granted.

18             MR. LEWIS:  Thank you, sir.

19                         DIRECT EXAMINATION

20   BY MR. LEWIS:

21   Q   Would you please state your name for the record?

22   A   Thomas Milner.

23   Q   Where are you employed?

24   A   Sansom Park Police Department.

25   Q   How long have you been employed with the Sansom Park

1  Police Department?

2  A    Five years.

3  Q    What are your duties?

4  A    I'm a detective sergeant assigned to the Criminal

5  Investigations Division.

6  Q    With the Criminal Investigation unit, do you investigate

7  crimes on the computer?

8  A    Yes.

9  Q    And tell us about that.

10  A    We do on-line crimes where we go in and we go undercover

11  posing as children, trying to generate on-line solicitation

12  cases of children.

13  Q    Now, do you have any kind of training in computers?

14  A    Yes.

15  Q    What kind of training, briefly?

16  A    I've been to the Tarrant County District Attorney's

17  Office seminar on on-line cases.  That's pretty much it,

18  other than what's been taught there.

19  Q    That and your experience in handling these cases?

20  A    Yes.

21  Q    This isn't your first on-line solicitation case?

22  A    No, it's not.

23  Q    In fact, tell us briefly how an on-line solicitation case

24  works.  What happens?

25  A    Basically, what happens is we go into a chat room.  I use

1   Yahoo Messenger.  I usually go into a Texas room that's

2   Romance, and just sit there idle until someone starts talking

3   to us.  They'll go in and look at the profile to see how old

4   we are or where we live, and then they'll determine whether

5   or not they want to talk to us.

6   Q   Okay.  Now, Sergeant, you're one of the case agents on

7   this case against Mr. Wolford.  Is that correct?

8   A   Yes, I am.

9   Q   Are you working this with ICE?

10  A   Yes.

11  Q   Okay.  Now, Sergeant, tell us how this case got started.

12  A   On March 20, 2008, I was inside of a chat room, sitting

13  there idle, trying to generate a case.  Several people were

14  speaking with me, which is sending instant messages outside

15  of the actual room itself that only I can view and they can

16  view.  And one of the people that talked to me that day was a

17  screen name Lighmanntx.

18  Q   Okay.  Now, you mentioned earlier that you entered a

19  Yahoo chat room.  Is that correct?

20  A   Yes.

21  Q   Now, tell us briefly about Yahoo chat rooms, or any other

22  internet service provider that provides access to chat rooms.

23  A   Yahoo is a service where people can go on-line and chat

24  with one another, have discussions.  Once you go on-line, you

25  could be talking to somebody here locally, you could be

1   talking to someone in Indonesia, you could be talking to

2   someone in Canada.

3   Q    So, the communication, once you get on-line on this

4   Internet chat room, basically, a region, state, nation --

5   A    It's worldwide.  Worldwide.

6   Q    Okay.  Is it similar to a phone company when you pick up

7   the phone?

8   A    Yes.

9   Q    You're connected to everywhere?

10  A    Right.

11  Q    All right.  Now, how would people know that you were

12  posing -- or, you were 13 years old on this chat room?

13  A    Well, my profile has a picture.

14  Q    What's a profile?

15  A    A profile is -- you can click onto it, and it's kind of

16  like a saved Web page that has your bio, which is your

17  picture if you want to put one up, has your age, where you're

18  from, your sex, and anything else you want to put in there,

19  hobbies or whatever you want to let people know about.

20  Q    Now, on March 20th of 2008, can you tell us what your

21  profile looked like?

22  A    Same as it does today.  It has a picture of a 13-year-old

23  girl, and it says that I'm 13 from Texas.

24  Q    Okay.  Now, on March 20th of 2008 when you got on-line

25  posing as a 13-year-old, did you have anybody wanting to talk

1  to you?

2  A    Several individuals.

3  Q    You already mentioned one of those was Mr. Wolford?

4  A    That's correct.

5  Q    Okay.  And tell us -- we're going to get to the final end

6  result of how he knew, but what did you do in the beginning

7  of the investigation to try to track down who was talking to

8  you?

9  A    At the beginning, we really just chatted.  We do

10 sometimes get a grand jury subpoena for the IP address.  In

11 this case, it wasn't necessary because of the end result.

12 Q    Okay.   Now, this conversation with the Defendant on

13 March 20th of 2008, kind of tell us how it started.  Tell us

14 how it went.

15 A    He initiated the conversation, said hello, asked where I

16 was from.  Stated that he was living in the mountains and

17 used to be from the same area.  I asked if he ever came back

18 to the area, and at that point he started asking if I was law

19 enforcement or worked for Perverted Justice or *Dateline* or

20 anything like that.  He did not believe that I was 13.  He

21 believed that I was a police officer.

22 Q    Okay.  And what did you -- did he accuse you of being law

23 enforcement?

24 A    Yes, he did.

25 Q    And did he mention any feelings he had toward law

1  enforcement that were on-line trying to catch predators?

2  A   He did.  He stated that I should be working on murderers,

3  rapists, burglars and things of that nature, not working on

4  pervs.

5  Q   Were you able to convince him that you weren't law

6  enforcement?

7  A   Yes.

8  Q   And how was that?

9  A   I told him that I had talked to other adults.  He asked

10 who the other adults were.  I told him I didn't tell on them.

11 He said that that showed that I was mature for my age.  And

12 then the conversations went further, and I told him that they

13 sent me pictures, and one guy had shown me a video of him

14 masturbating and I thought it was gross, and he got a little

15 more comfortable.

16 Q   So, you were able to somewhat make him less nervous in

17 chatting with you?

18 A   Yes.  He stated I was getting there in making him more

19 comfortable, but not quite there.

20 Q   Okay.  Now, it didn't stop him from talking to you,

21 though?

22 A   No.

23 Q   He continued to chat with you?

24 A   Yes, he did.

25 Q   And how did that chat go?

Milner - Direct                            8

1  A    We talked about the sexual part.  I had let him know that

2  I had sex once before with a 20-year-old boy.  He wanted to

3  know the details of it.  He then discussed what he would do

4  to me sexually if he had the opportunity.

5  Q    What, after the conversation that you had with him

6  telling him that you had had a sexual encounter with an older

7  man, what were the details that he told you, posing as a 13-

8  year-old, that he was going to do to you?

9  A    He indicated that he wanted to lick my vagina.

10 Q    Okay.  Did he want to have sexual intercourse with you?

11 A    Yes.

12 Q    Did he want to rub you?

13 A    Yes.

14 Q    And he wanted to let you know how it felt to have a

15 tongue on it?

16 A    Yes.

17 Q    Now, "on it" is referring to what?

18 A    Vagina.

19 Q    Now, is it a crime in the State of Texas for an adult

20 male to have sexual relations, whether it be oral or genital

21 sex, with a 13-year-old?

22 A    Yes, it is.

23 Q    Okay.  Now, on that night, is that basically the last

24 thing that was said?

25 A    No.

1  Q   Okay.  What else happened that day in that chat?

2  A   I have to refer back.  He talked about family.  He wanted

3  to know -- I told him that my mother wasn't home much, that

4  she was at work.  I told him she was a nurse's aide and

5  discussed family and whether or not I had a father at home

6  and things like that.

7  Q   And that is important later on down the road in other

8  chats.  Isn't that right?

9  A   Yes.

10 Q   Okay.  Now, you did mention something earlier that he

11 mentioned that he wasn't in the area.  Is that correct?

12 A   That's correct.

13 Q   He was in the mountains?

14 A   Correct.

15 Q   All right.  There's no mountains around Dallas/Fort

16 Worth?

17 A   No.

18 Q   Okay.  Is that a typical thing to mention, --

19 A   Yes, it is.

20 Q   -- in your experience on-line with predators?

21 A   Yes, it is.  They try to make the children feel safe that

22 they're not in the area.

23 Q   Okay.  And why is that?

24 A   Because it could scare them that the possibility of an

25 encounter is close.

Milner - Direct                          10

1   Q    So, the on-line predators say that they're far away in

2   order to maybe gain their trust a little bit better?

3   A    That's correct.

4   Q    Now, a couple of days later, contact is made with the

5   Defendant and yourself again.  Isn't that right?

6   A    Yes.

7   Q    Now, who contacted who?

8   A    Every time, he's contacted me or left me on-line

9   messages.

10  Q    Okay.  So, he's contacting you?

11  A    Right.

12  Q    And you're the 13-year-old girl?

13  A    That's correct.

14  Q    Okay.  Now, how did he contact you?

15  A    What happened was the first night he asked about becoming

16  friends, which means you can add the person as a contact.

17  And in doing so, you can see when the other person is on-

18  line, or you can just click on their name and send them a

19  message even if they're not on-line, and when they sign in

20  that message will be waiting for them.

21  Q    Okay.  So, you can bypass the chat room where everybody

22  starts chatting, and you can go directly to the person you

23  want to talk to?

24  A    Correct.

25  Q    And that's what happened from here on out?

1  A    It was all instant messaging from here on out.

2  Q    Okay.  And who contacted who?

3  A    The Defendant contacted me.

4  Q    Every time?

5  A    Every time.

6  Q    All right.  Well, what happened the next time he

7  contacted you?  What did he want?

8  A    He wanted a picture.

9  Q    Okay.  Why did he want a picture?

10  A    To verify that I was 13 years old.

11  Q    And what did you say?

12  A    I told him that I couldn't get any other pictures.  He

13  wanted a nude picture.  I wasn't able to do that.

14  Q    Well, why did he want a nude picture?

15  A    To show that I wasn't law enforcement and to show that I

16  was who I said I was.

17  Q    Okay.  Now, at some point in time, does a Web cam come

18  into the picture?

19  A    It does.  And I explained to him that my mother was low

20  income, and we wouldn't be able to purchase one.  He offered

21  to either have one sent to me --

22  Q    Go ahead.

23  A    -- from a supply house, or have one purchased, and I

24  could go to the store and pick it up.  It would be in my

25  name.

1  Q   Okay.  Now, this mention of Web cams, did the Defendant

2  have a Web cam?

3  A   Yes, he did.

4  Q   Okay.  Tell us how a Web cam works.

5  A   A Web cam is hooked up to the computer and it displays a

6  live image of whatever's going on in the room or wherever

7  it's pointed.

8  Q   Okay.  And did the Defendant show any live camera --

9  A   He did.

10  Q   -- action from his end to the 13-year-old girl?

11  A   Yes, he did.

12  Q   And what was that?

13  A   He masturbated on the video, and I was able to capture

14  the picture of the chat log as well as his screen with both

15  names showing that it's the same person and showing him

16  masturbating to the chat.

17  Q   So, the chat is going on at the same time the live camera

18  feed is something you see on your screen?

19  A   Correct.

20  Q   And you press "Print" and it prints out that screen for

21  that time?

22  A   I'm able to print it and save it to the hard drive of the

23  computer, yes.

24  Q   Okay.  Or "Save."  I should say print or save.

25  A   Yes.

Milner - Direct                              13

1  Q   Okay.  And so he wants you to get a Web cam.  Is that

2  right?

3  A   Correct.

4  Q   But you're unable to.  How does he come up to solve that

5  problem?

6  A   He says that he'll have it sent from a supply house

7  direct to any address I want, or he'll have it purchased at a

8  store that I can go pick it up prepaid.

9  Q   And that's so you can send images of yourself?

10 A   Correct.

11 Q   Now, in the undercover investigation, it wouldn't make

12 much sense for you to get on camera, would it?

13 A   I don't think he'd be interested anymore.

14 Q   Okay.  So, how are you able to put off acquiring the free

15 Web cam?

16 A   Well, I let him know that I didn't think I could hide it

17 from my mother.

18 Q   Okay.  And that seemed to work?

19 A   Yes.

20 Q   Now, prior to the Web cam conversation, did the Defendant

21 mention any Web sites to you as a 13-year-old girl?

22 A   He did.

23 Q   And what was that?

24 A   I believe it's called Hideaway.  I'd have to review it.

25 It was a Web site supposedly of a girl masturbating using a

1    hairbrush.  I was able to go to that site and capture the

2    image and save it to the hard drive.  I was also able to see

3    that there were other pornographic films inside there, inside

4    that site.

5    Q   Now, during the chats, did he specifically mention that

6    video that you mentioned earlier?

7    A   He did.  He also provided me the link when I couldn't

8    find it.

9    Q   Okay.  So, he wanted you to see that video of the girl

10   using the hairbrush?

11   A   Correct.

12   Q   Okay.  And then after that you talked about the Web cam.

13   Is that right?

14   A   Yes.

15   Q   Okay.  So, after you talk about the video and then the

16   Web cam, what's next, Officer?

17   A   There's a point where he wants us to call him.

18   Q   Okay.  Now, before the call, is there any other

19   additional talk of sexually graphic activity taking place?

20   A   Yes.

21   Q   Same kind of thing as before, isn't that right, --

22   A   Yes.

23   Q   -- where he wants to do certain sexual things to you,

24   posing as a 13-year-old girl?

25   A   Yes.  That's pretty much every time we talk.

Milner - Direct                                    15

1   Q    Okay.  Now, after that, he talks about a meeting.  Is

2   that right?

3   A    Yes.

4   Q    Okay.  What happens then?

5   A    Well, he doesn't make the meeting.

6   Q    Okay.  But is a meeting talked about?

7   A    Yes.

8   Q    Okay.  And what has to happen prior to him meeting you?

9   A    He wants to have verification of who I am, that I'm not

10  law enforcement.  And that's one of the --

11  Q    Okay.  Now, the Web cam didn't work.

12  A    Right.

13  Q    And does he ever mention in the chats that he's not going

14  to meet until something happens?

15  A    Correct, until he verifies the age or sees me.

16  Q    Okay.  So, does he mention that more than once during the

17  chats?

18  A    Yes.

19  Q    And why is that?  Why does he mention that he's not going

20  to meet you until he sees or hears you?

21  A    He wants me to prove that I'm not law enforcement.

22  Q    And does he know that it's wrong to meet 13-year-old

23  girls?

24  A    Yes.  He repeatedly tells me that it's a felony just to

25  talk to me.

1    Q   Okay.  So, he knows that --

2    A   Yes.

3    Q   -- he's in violation of the law?

4    A   Yes.

5    Q   And he knows it could get a lot worse for him if, in

6    fact, you are in law enforcement?

7    A   Correct.

8    Q   Okay.  So, prior to the meeting, what else happens or

9    what else is done to try to verify who you say you are?

10   A   He provides me with a cell phone number to call him.

11   Q   And how does he do that?

12   A   He gives me the number over the instant messaging.

13   Q   So, he provides his own phone number via the instant

14   messaging?

15   A   Yes.

16   Q   Now, later you were able to verify that phone number as

17   being his?

18   A   Yes.  He possessed that phone on him when he was

19   arrested.

20   Q   Okay.  Because you called the number and the phone rang?

21   A   Yes.

22   Q   All right.  So, he provides the number.  What happens

23   next?

24   A   The phone call is made to his cell phone.

25   Q   Who makes the phone call?

1   A    Our undercover decoys.  One of our police dispatchers.

2   Q    And I'm assuming she's a female?

3   A    She is.

4   Q    Okay.  And what happens -- or, what was the main point of

5   this phone call taking place?

6   A    He just wants to verify that she's who she says she is, a

7   young girl.

8   Q    Okay.  And you were able to tape this phone call?

9   A    The phone call was recorded.  There was actually two

10  calls that day.  The first call was very brief, and he

11  indicated he wanted to call her back at that number so that

12  she wouldn't have to pay for the call being that it was from

13  a pay phone.  And then he called back to the number.

14  Q    Okay.  So, you were able to tape both phone calls?

15  A    Yes, I was.

16  Q    Now, and to be fair, there's no sexually graphic

17  conversation that takes place during the phone calls.  Is

18  that right?

19  A    No.

20  Q    Okay.  But is that the point of the phone call?

21  A    No, it's not.

22  Q    Okay.  Now, once the phone call is made, is the Defendant

23  satisfied with who you say you are?

24  A    He seems to be.

25  Q    And why is that?

Milner - Direct                              18

1    A    Because he's talked to her and believes that she's a 13-

2    year-old girl.

3    Q    Okay.  So, after the phone call is made, does he contact

4    -- who contacts who?

5    A    He contacts us again.

6    Q    On-line?

7    A    Yes.

8    Q    Okay.  And what does he say?

9    A    We set up a meeting.

10   Q    Okay.  So, he's definitely willing to meet, then, at that

11   point in time?

12   A    Yes.

13   Q    Okay.  Now, what are the details of the meeting?

14   A    We were going to meet at a McDonald's.  He states that

15   he'll get us a large Coke because we drink Coke.  And we tell

16   him what we'll be wearing.

17   Q    Now, this large Coke, was that mentioned in an earlier

18   chat --

19   A    Yes.

20   Q    -- about what you --

21   A    We talked about Coke.

22   Q    About what?

23   A    We talked about beverages, soft drinks.  Because some

24   people from this area will say, you know, "Coke," meaning Dr.

25   Pepper or "Coke" meaning Sprite.  I indicated I like Coca-

1  Cola Coke.

2  Q    Okay.  So, what are the details on the meeting?  Is there

3  a certain time of the day that you're supposed to meet him?

4  A    We were supposed to meet at 11:00 a.m. at the McDonald's

5  at Ephriham and Jacksboro Highway.

6  Q    Now, is that during a school day?

7  A    Yes.

8  Q    And what -- how are you making arrangements to meet him

9  on a school --

10  A    I had been off-line for a few days and told him I wasn't

11  feeling well but I had gotten better.  And he asked me to

12  skip school.  I told him I'd just tell my mother I was sick,

13  and when she went to work I'd go meet him.

14  Q    Whose idea was it to tell the mother that you were sick?

15  A    It was his.

16  Q    Okay.  So, it was his idea for you to tell your mother

17  that you're sick and you're going to stay home?

18  A    Right.

19  Q    When, in fact, he really wants to meet you?

20  A    Correct.

21  Q    The first meeting, though, does it take place?

22  A    No.  No, he gets on-line afterwards and tells me he's

23  been involved in an auto accident and couldn't make it.

24  Q    Okay.  Now, even prior to that set of meetings, though,

25  does he mention that he shouldn't have any more conversations

1    with you?

2    A    Yeah, there's a few times where he says, "We shouldn't do

3    this" and "This isn't a good idea."

4    Q    And, in fact, one time he even says, "I'm not going to

5    contact you anymore.  Good luck in your life," or something

6    along those lines?

7    A    That's correct.

8    Q    Now, is that typical in your line of work, for something

9    like that to happen?

10   A    Yes, it is.

11   Q    Why is that?

12   A    A lot of times they want to see if the officers are going

13   to go ahead and get the IP address and come to their house

14   and arrest them.  And then they'll wait a couple days, and

15   once they see that nothing's happened they'll get back on-

16   line and start talking again once they feel more comfortable

17   that nothing's going to happen to them.

18   Q    So, is it kind of like a cool-off period?

19   A    It's a cooling period.

20   Q    And that happens a lot in your line of work?

21   A    Yes, it does.

22   Q    Okay.  But about how many days later is this cool-off

23   period?

24   A    It's less than a week.  Sometimes it's months before

25   people contact me again, but it's less than a week.

Milner - Direct                              21

1    Q    Less than a week in this case?

2    A    Yes.

3    Q    And who contacts who?

4    A    He contacts me again.

5    Q    And that's when a meeting is set up?

6    A    A meeting is set up again.

7    Q    Okay.  And then I think that's the point in time where he

8    doesn't show up.  Is that correct?

9    A    No, he --

10   Q    Because he's sick?  Or he gets in a wreck, I believe, I

11   believe you mentioned.

12   A    He gets in a wreck, right.

13   Q    Okay.  Then what happens?

14   A    There's some conversation again, and another meeting is

15   set.

16   Q    And what day is it set for?

17   A    It is set for May the 1st.

18   Q    Or is it April 30th?

19   A    April 30th.  I'm sorry.  Yes.

20   Q    April 30, 2008?

21   A    Yes.

22   Q    And you're supposed to meet where?

23   A    The same place, at the McDonald's at Ephriham and

24   Jacksboro Highway.

25   Q    That's in Fort Worth?

1   A    It is.

2   Q    Okay.  Now, at this point in time, what do you do behind

3   the scenes to ensure that the meeting is going to take place?

4   A    To ensure that it's going to take place?

5   Q    Or what preparations does the police department do --

6   A    Okay.

7   Q    -- before the meeting?

8   A    Okay.  We have an officer inside the McDonald's, already

9   placed inside.  We have a surveillance officer sitting across

10  the street watching the McDonald's.  And I dropped off the

11  decoy up the street and had visual contact with her the whole

12  time while she approached the McDonald's on foot.

13  Q    Okay.

14  A    We've also told him what she will be wearing -- shirt,

15  pants -- and what time she will arrive.

16  Q    Okay.  And in preparations of the meet -- well, what time

17  is the meeting supposed to take place?

18  A    11:00.

19  Q    And what time do you drop off the decoy, so to speak?

20  A    About 10:45.

21  Q    Okay.  And she walks to the police -- walks to the

22  McDonald's?

23  A    Yes.

24  Q    What happened?

25  A    About halfway across the parking lot, a white Excursion

Milner - Direct                                   23

1   pulls up and stops and makes contact with her.  At that

2   point, she raises her right arm in the air, which is the

3   signal that he's made contact.

4       The vehicle sits there for a minute as she enters the

5   McDonald's.  I'm on the phone with the officer inside, and

6   she approaches the other undercover officer and states that

7   he made contact, that's him, and then he takes off down

8   Jacksboro Highway and I follow him.

9   Q   Okay.  Now, when your undercover employee -- it's the

10  same individual that made the undercover call?

11  A   That's correct.

12  Q   Okay.  Whenever she's approached by the Defendant, is

13  there any conversation that takes place?

14  A   Yes.  He says to her, "Hi, Jen.  Get in."  She says,

15  "I've got to go to the restroom."

16  Q   Okay.  He says, "Hi, Jen."  Is that the name that you

17  were using posing as the undercover?

18  A   Yes.  That's the screen name I use.  I go by the name of

19  "Jen."

20  Q   Okay.  So, the officer -- there's no way that the officer

21  is going to get in the car.  Is that correct?

22  A   No.

23  Q   Okay.  So then the Defendant leaves the scene?

24  A   Yes.

25  Q   And what happens next?

 1  A    He's followed.  We're waiting for marked units to get

 2  there.  They're taking a little longer than they should.  He

 3  gets caught in traffic at Northwest 21st and Jacksboro

 4  Highway.  And at that point, a felony takedown is initiated

 5  and he's placed in custody.

 6  Q    And you do that, is that correct?

 7  A    Yes.

 8  Q    You asked the Defendant to go ahead and exit the vehicle?

 9  A    I did.

10  Q    And did he do so?

11  A    He did.

12  Q    Okay.

13         MR. LEWIS:  Permission to approach, Judge?

14         THE COURT:  Granted.

15  BY MR. LEWIS:

16  Q    Officer, I'm going to show you what's been marked as

17  Government Exhibit 1.  Do you recognize that?

18  A    That's a photograph I took on the day of the arrest.

19  Q    What does it depict?

20  A    It shows a cup on the driver's side, it looks like for

21  the driver, and a large Coke that was recently purchased that

22  was still cool to the touch in the passenger's side.

23  Q    Okay.  And that was what the Defendant said he would have

24  waiting for the 13-year-old girl.  Is that correct?

25  A    That's correct.

1   Q    Does this picture fairly and accurately depict the inside

2   of that vehicle on April 30th of 2008?

3   A    Yes, it does.

4          MR. LEWIS:  I would ask that Exhibit 1 be entered

5   into evidence.

6          THE COURT:  Any objection, Mr. Burns?

7          MR. BURNS:  No, Your Honor.  No objection.

8          THE COURT:  It is admitted.

9          MR. LEWIS:  Thank you, sir.

10      (Government Exhibit 1 is received into evidence.)

11   BY MR. LEWIS:

12   Q    Now, other than the big Coke that was in there waiting

13   for the 13-year-old girl, did you notice anything else about

14   the interior of the car that would cause you suspicion in

15   this investigation?

16   A    I did.

17   Q    And what was that?

18   A    There was a Garmin GPS that was turned on, mounted to the

19   windshield, that had the McDonald's with a pinpoint on it on

20   Jacks... the same address.

21   Q    And briefly, I believe everybody knows what a GPS unit

22   is, but briefly tell us what a GPS unit is.

23   A    A GPS unit is what you use for directions to get to

24   different locations.  You can type in an address and it will

25   pinpoint that address and give you directions as you're

Milner - Direct                                      26

1   driving to get there.

2   Q    Okay.  So, it's like a computer map?

3   A    Yes.

4   Q    And you type in where you want to go and it gives you

5   arrows and directions on how to get there?

6   A    That's correct.

7   Q    And the McDonald's was the final destination in that GPS

8   unit that day?

9   A    Yes, it was.

10  Q    Okay.  Now, at that point in time during the arrest of

11  the Defendant -- do you see the Defendant in the courtroom?

12  A    I do.

13  Q    And would you please describe to the Court what he is

14  wearing?

15  A    He's wearing blue shoes and an orange jumpsuit.

16         MR. LEWIS:  I'd ask the record to reflect the

17  identification of the Defendant, Judge.

18         THE COURT:  The record will so reflect.

19  BY MR. LEWIS:

20  Q    Now, this is the same individual that you arrested that

21  day.  Is that correct?

22  A    Yes, it is.

23  Q    And this is the same individual that had the phone on him

24  that you tested to make sure it was the same phone number

25  given on the on-line chats?

1   A   Yes, it is.

2   Q   Okay.  Now, you arrested this individual and read him his

3   Miranda rights to him?

4   A   I did.

5   Q   And he briefly agreed to speak with you.  Is that

6   correct?

7   A   Briefly.

8   Q   What did he have to say?

9   A   I asked him, obviously, "You know at this time that the

10  13-year-old you were talking to was myself?" and he said,

11  "Yes."  I asked him if the images I displayed to him and the

12  images he displayed to me would still be on his computer.

13  Yes, they are.  I asked if he would give consent to search to

14  retrieve the computer.  He agreed to do so with his fiancé

15  present.  And there was a discussion about -- I think that

16  was it.

17  Q   Okay.  Now, the discussion about the pictures that were

18  sent via Web cam from him to you, the masturbation pictures,

19  did he say those were him?

20  A   I don't know if I asked.

21  Q   Okay.  But he did state that the pictures that were sent

22  were of him?

23  A   Yes.  Yes.

24  Q   Okay.  How many other pictures were sent of him to you?

25  A   I think there was one or two of him.

1  Q    Okay.  And they were, in fact, his face?

2  A    Yeah.  One was a full body where he was standing on a

3  bridge over the mountains that he stated was in Germany.

4  Q    Okay.  But he, in fact, said that that was him?

5  A    Yes.

6  Q    Okay.  And that's basically how the conversation ended

7  that day.  Is that correct?

8  A    Yes.

9  Q    Okay.  Now, the second part of your investigation led you

10 to search his computer?

11 A    We obtained a search warrant for the computer, for the

12 cell phone, and for the GPS.

13 Q    And we don't need to talk about the GPS or the phone at

14 this point in time.  Let's talk about the computer.

15 A    Okay.

16 Q    Did you do the forensic examination of the computer?

17 A    No, I did not.

18 Q    Someone else did?

19 A    Yes.

20 Q    Who was that?

21 A    Kyle Gibson with the Tarrant County District Attorney's

22 Office Computer Forensic Lab.

23 Q    And so you and Mr. Gibson were working this case together

24 at that point in time?

25 A    Yes, we were.

1  Q    And what were the results of Mr. Gibson's forensic search

2  of the computer?

3  A    The chats that we had that I turned in to the District

4  Attorney's Office were also on his computer.   The pictures

5  and -- that I displayed and that I received were also on his

6  computer.   And there was also in excess of ten child porn

7  pictures depicted on his computer.

8  Q    Okay.   So, whenever you found the chat that you were

9  having with him on the computer, you definitely knew you had

10 the right person, --

11 A    Correct.

12 Q    -- in your mind?

13 A    Yes.

14 Q    And then the other items just are other items to show

15 that this was not an accident.   Is that correct?

16 A    Correct.

17 Q    Now, several times during the chats from March 20th to

18 April 30th of 2008 -- about how many different times did you

19 all chat within that time period?

20 A    Maybe eight or nine.

21 Q    Okay.   And during those eight or nine conversations,

22 several times during the course of those conversations, did

23 you ever mention your age?

24 A    Yes.

25 Q    Okay.   And your age was 13?

Milner - Direct                          30

1   A    That's correct.

2   Q    It was always 13?

3   A    Yes.

4   Q    And several times during the course of those

5   conversations, did he admit that there would be serious

6   trouble for him if you turned out to be law enforcement?

7   A    Yes.

8   Q    And at this point in time during the course of your

9   investigation, did you find out that the Defendant had been

10  involved in another on-line sting operation?

11  A    I did.

12  Q    And what on-line sting operation was that?

13  A    It was a sting in Murphy, Texas by *Dateline NBC*,

14  Perverted Justice with Chris Hansen.

15  Q    Okay.  And kind of tell us -- give me two sentences on

16  what happened in that investigation.

17  A    It was the same thing.  He went to meet a young girl age

18  13 at a house, and it was an undercover sting.  *Dateline* was

19  waiting when he arrived, and Chris Hansen did an interview

20  with him.

21  Q    Now, were you able to -- you haven't been able to view

22  every minute of that tape, but you've seen a good portion of

23  that tape of the interview with Mr. Hansen.  Is that correct?

24  A    Yes, I have.

25  Q    You also were able to view the police interview that

1  occurred after that.  Is that correct?

2  A    That's correct.

3          MR. LEWIS:  Permission to approach again, Judge?

4          THE COURT:  Granted.

5  BY MR. LEWIS:

6  Q    Let me show you what's been marked as Government Exhibit

7  2.  It's a disc, right?

8  A    Yes, sir.

9  Q    Okay.  Have you viewed this disc?

10  A    I have.

11  Q    And can you tell us what's on the disc?

12  A    It is a conversation between Mr. Wolford and Mr. Chris

13  Hansen.  And then it's also a conversation between Mr.

14  Wolford and two detectives from the Murphy Police Department.

15  Q    And the part that's on the disc, does it fairly and

16  accurately depict what occurred, to the best of your

17  knowledge, during the course of that investigation, on-line

18  sting operation?

19  A    Yes, I believe so.

20  Q    Okay.

21          MR. LEWIS:  And Judge, at this point in time, I

22  would offer to play the actual clips from that on-line sting

23  operation.  I've provided a copy to defense counsel.  I don't

24  know if they've had an opportunity to view it.  However, I

25  think it's important to view this, or I can have the agent

1   continue to talk about it.

2       The reason why the Government feels it's important at

3   this point in time to play this is due to the fact that, as

4   part of the detention aspect of the Government's motion, we

5   would argue that this is showing the Court that not only has

6   this happened one time, but it's happened another time, as

7   far as the detention hearing is concerned.  And so that's the

8   reason why the Government would move to offer to play this at

9   this point in time.

10          THE COURT:  Any objection?

11          MR. BURNS:  Well, Your Honor, the objection that I

12  have at this point is we just got it.  I haven't had a chance

13  to see it.

14      I recall that particular incident.  I know there were

15  some legal problems with that.  I, of course, have not had

16  the opportunity to investigate that.  And my agreeing to

17  allow it to be introduced into evidence at this point may

18  waive some constitutional right that my client has in the

19  future, you know, should he go to trial in this case.  And so

20  I would object at this point.

21          MR. LEWIS:  The Government would agree that this is

22  limited only to the probable cause detention hearing aspect,

23  Judge.  And I would not take his waiver at all of any future

24  possibilities on this issue.

25          THE COURT:  I'm going to withhold any ruling on an

 1  objection.  I will allow it to be shown, and I will allow you

 2  to object after you've seen it also.  But this is only for

 3  purposes of this preliminary hearing and detention hearing.

 4          MR. LEWIS:  Yes, sir.  I understand.  And that's the

 5  only -- that's only what it's used for, Judge.

 6          THE COURT:  Very well.  About how long?

 7          MR. LEWIS:  It's about five minutes total, sir.

 8  BY MR. LEWIS:

 9  Q   The first, I believe, and correct me if I'm wrong, Agent,

10  the first two minutes is the interview at the house, and then

11  the next two and half minutes is the interview of the

12  Defendant with the police officers?

13  A   That would be correct.

14          MR. LEWIS:  And defense counsel is welcome to sit

15  here as long as he's not in your way to see the video, Judge.

16  I didn't want to bring a screen in and play it --

17          THE COURT:  That's all right.  If you will just

18  leave me a little pathway I can see that.  And you may want

19  to leave a pathway for the witness also.

20          MR. LEWIS:  Not a problem.  In fact, we can move

21  another chair over if you want, or I can stand off to the

22  side.  It doesn't matter.

23          MR. BURNS:  I meant if the Court wanted the

24  Defendant to come up to -- whatever the Court wants to do.

25  That is fine with me.  I don't know -- however the Court

Milner - Direct                                34

1    wants to proceed.  I really don't --

2            THE COURT:  Would you like for your client to --

3            MR. BURNS:  I'd waive, Your Honor.

4            THE COURT:  Very well.

5        (Counsel confer.)

6        (Video recording played from 10:09 a.m. to 10:11 a.m.)

7    BY MR. LEWIS:

8    Q   Now, the second interview is going to start in seven

9    seconds.  Is that correct, Agent?

10   A   That's correct.

11           THE COURT:  What was the date of those interviews?

12           MR. LEWIS:  It was back in 200...

13           THE WITNESS:  Six.

14           MR. LEWIS:  ...6, sir.

15       (Video recording played from 10:11 a.m. to 10:14 a.m.)

16           THE COURT:  I will admit Government's Exhibit 2.

17       (Government Exhibit 2 is received into evidence.)

18                    EXAMINATION BY THE COURT

19           THE COURT:  And I'll ask the witness:  was that

20   Murphy, Texas?

21           THE WITNESS:  Yes, sir.

22           THE COURT:  Is that in Collin County?

23           THE WITNESS:  Yes, sir.

24           THE COURT:  Is that the offense that he was arrested

25   for and then not prosecuted on?

```
 1                THE WITNESS:  Yes, sir.

 2                THE COURT:  Thank you.

 3                MR. LEWIS:  Nothing further at this time, Judge.

 4                THE COURT:  Very well.  Mr. Burns?

 5                          CROSS-EXAMINATION

 6   BY MR. BURNS:

 7   Q   The "Jen" that he met at the McDonald's, how old was she?

 8   A   She's 19.

 9   Q   When you were on-line, you were role-playing, were you

10   not?

11   A   Yes, sir.

12   Q   Did you do any kind of investigation regarding other

13   chats or other information that that name -- what do you call

14   it?  What kind of a name did you call that that you sign on

15   with?

16   A   I'm not sure of your question, sir.

17   Q   Okay.  What name was he using in the chat room?

18   A   Originally, it was Lighmanntx.

19   Q   Okay.  And is that lime, L-I-M-E?

20   A   L-I-G-H-M-A-N.

21   Q   And then Texas like the state?

22   A   It's M-A... L-I-G-H-M-A-N-N-T-X @yahoo.com.

23   Q   And did you check any other conversations or chats or

24   people that were contacted by that name?

25   A   Yes, we did.
```

Milner - Cross                              36

1   Q    And did you have any other solicitations?

2   A    We had some other offenses, yes.

3   Q    What were those?

4   A    There was a lady that he talked to quite a bit, Kelly

5   Hannon, Hannon Kelly.  Talked to her.  She was an adult, but

6   talked about her doing sexual things to her six-year-old

7   daughter and allowing him to do so.

8        In the meantime, the subject's husband got a hold of the

9   chats and sent Mr. Wolford an e-mail telling him how sick his

10  wife and Mr. Wolford were.  We haven't tracked them down at

11  this point.

12  Q    Okay.  Anybody else or anything else?

13  A    There were other chats.  I'm not sure of all the details.

14  I didn't do the forensic analysis.

15  Q    Any other contact or statements about children or

16  anything of that nature?

17  A    Not that I'm aware of.

18  Q    The person that he was talking to was an adult.  Is that

19  correct?

20  A    Believed to be, portrayed to be, yes.

21  Q    Do you have any information otherwise, that she was or

22  wasn't?

23  A    No, sir.

24  Q    Did you find any other on-line names that he used?

25  A    There was one that was displayed to me called "Justme"

1  and once we got added as a friend the other name pulled up,

2  and I mentioned to him that now it says "Justme" instead of

3  "Lighmanntx," and he said, "That's the other name that I

4  use."

5  Q   Did you do any kind of research on that?

6  A   Both of them were sent to the exploited children's

7  network, and we haven't heard anything back.

8  Q   So you don't have any other information --

9  A   No.

10 Q   -- of contact with them?

11 A   Not at this time.

12 Q   And, in fact, on the one that you did have with the adult

13 female who was married, there never was any contact there,

14 physical contact, that you're aware of?

15 A   I can't testify to that either way.

16 Q   Okay.  How many computers had the chat line stuff on it?

17 A   I believe there were two in the apartment that had chats

18 on it.  Actually, there were more than two, but only two that

19 Mr. Wolford appeared to be chatting on.

20 Q   Of everything you seized, is there anything else that you

21 recall that had any type of criminal activity or appeared to

22 be contact with minor children?

23 A   Not at the apartment, no.

24 Q   Well, anyplace else with him?

25 A   I don't know.  That's the only place we searched.

1    Q    You took a total of four computers.  Is that correct?

2    A    That's correct.

3    Q    Six jump drives.  Is that correct?

4    A    There were several jump drives.  I'd have to look to see

5    what the exact number were.

6    Q    Okay.  Anything else you found on the jump drives or any

7    other computers that --

8    A    I believe one of them had, I think it was nine child porn

9    pics.

10   Q    When you say "child porn," are they --

11   A    I did not view the images myself.  That's from the

12   forensic analysis that was provided to me by the DA's Office,

13   the computer crime lab.

14   Q    Did they indicate to you whether it was pictures of

15   children engaged in contact, sexual conduct, or just --

16   A    They did not say.

17   Q    -- just nude pictures?

18   A    Unknown.

19   Q    Okay.  Other than the Tarrant County District Attorney's

20   Office, have you had anybody else check the computers out?

21   A    No.

22   Q    You're aware that the Collin County District Attorney's

23   Office decided not to prosecute on any of the cases that --

24   on the case that you just showed the Judge or any of the

25   others that came out of that.  Is that correct?

```
 1  A   Yes, I am.

 2  Q   Are you aware of the legal problem that was on that?

 3  A   I had information relayed to me when I contacted them,

 4  yes.

 5  Q   Okay.  What was the legal problem?

 6  A   They said that the -- they declined to prosecute because

 7  they thought there might have been an issue with venue,

 8  because they weren't sure where the chats occurred, whether

 9  they were actually done in Collin County or done outside of

10  the State of Texas, since Dateline was involved.

11  Q   Well, what about the people that came down?  Why didn't

12  they prosecute them?

13  A   I don't know.

14  Q   But nobody got prosecuted on that.  Is that correct?

15  A   Not that I'm aware of.

16          MR. BURNS:  That's all I have, Your Honor.  I'll

17  pass the witness.

18          MR. LEWIS:  Nothing further for the Government, sir.

19  This is our only witness, Your Honor.

20          THE COURT:  Very well.  Officer Milner, you're

21  excused as a witness.

22      (Witness steps down.)

23          THE COURT:  Mr. Burns?

24          MR. BURNS:  Your Honor, the only thing we would have

25  would be -- other than the report that the Court -- Pretrial
```

1   Services report the Court has, if I may make a short proffer

2   on behalf of Mr. Wolford.

3           THE COURT:  Certainly.

4           MR. BURNS:  Mr. Wolford, Your Honor, has been

5   gainfully employed, as shown in the report.  He has indicated

6   his ability to get a job.  He can stay within the Northern

7   District of Texas without a problem.  He can live, not with

8   his wife, who -- pardon me, excuse me -- his fiancé, but he

9   could live at his mother's address in 2754 Jordan Valley

10  Road.  That he can conduct his work on the oil rigs and get

11  ready for trial or sentencing, whatever, you know, comes

12  about on this case, and be able to prepare himself and his

13  family and his wife for whatever happens.

14      We would point out, Your Honor, that he can have a job

15  and work without any contact of any type of Internet.  He

16  would need to use an input computer, where he could only put

17  things in for his daily reports.  But other than that, he

18  wouldn't have any -- he could not have any access to

19  computers.

20      Obviously, he agrees to any type of condition that he not

21  have contact with minors under the age of 18, and is more

22  than willing, Your Honor, to wear an ankle bracelet or

23  anything else that the Court would deem able to allow him to

24  continue to work, support his family, pay his lawyers, and

25  prepare for the future, Your Honor.

```
 1        The Court will recall he did also -- when these charges

 2   were filed, he was in another state.  He flew home

 3   immediately and turned himself in, as again reflected by the

 4   report.  Therefore, we would submit to the Court that there

 5   are conditions that the Court could impose upon him that

 6   would ensure the safety of the community, ensure his

 7   appearance.  He's not going to run.  If he was going to run,

 8   Your Honor, I submit it would have been when they -- they

 9   called him.

10        But -- and with that proffer, Your Honor, we would rest.

11             THE COURT:  Thank you, Mr. Burns.

12        Does the Government wish to be heard in argument?

13             MR. LEWIS:  Just briefly, Judge.

14        According to 18 U.S.C. 3142(e), if the judicial officer

15   finds that there's probable cause to believe that the person

16   committed an offense for which this offense does qualify for,

17   it shall be presumed that no condition or combination of

18   conditions will reasonably assure the appearance of the

19   person as required and the safety of the community.

20        And I think that's what the heart of the matter is for

21   the Government's asking for detention in this case, Judge.

22   Due to the fact that this individual took the next step --

23   it's not just possession of child pornography we're talking

24   about.  It's not pornography we're talking about.  It's

25   talking about the next step in the process, and that's going
```

1   out and meeting someone that he hopes is underage, this 13-
2   year-old girl.

3       He was hoping to meet a 13-year-old girl.  In fact, when
4   the undercover decoy approached the McDonald's, he said,
5   "Hey, Jen, come over here."  He recognized her as being a
6   female, was hoping beyond hope that this was the 13-year-old
7   girl he'd been chatting with.  And when she walked in the
8   restaurant, he knew that it was not the scenario that he'd
9   hoped it had been or hoped it would be, and he drove off.

10      But the whole reason why the Government presented the
11  evidence of the other on-line investigation, Judge, is to
12  show you that this is not the first time that he has traveled
13  out of his way to meet a 13-year-old girl.  This is the
14  second time.  And the safety of the community, it is at risk,
15  the Government feels, if this individual is let out on bond.
16  And I don't believe there are any conditions that will stop
17  this individual from hoping to meet 13-year-old girls so he
18  can have sexual intercourse with them.  I don't think there's
19  any conditions out there that could be set forth for that.

20      If being on national television and not being charged
21  with it, eventually, if not being on national television
22  isn't enough to scare you from ever doing this again, nothing
23  will.  And that's the whole point of me showing this tape to
24  you, Judge, because it happened again, and it happened in a
25  pretty short amount of time.  It only happened roughly a year

1  or two, at most, later, that he's -- this is the second time

2  that we know of.  And the Government feels that detention is

3  appropriate in this case.

4            THE COURT:  Thank you.  Mr. Burns?

5            MR. BURNS:  Your Honor, simply the fact that he did

6  show up, he's not going anywhere.  He can be kept off of

7  computers if it was dramatically conditioned, Your Honor,

8  allowing him to work and, like I said, to get ready for

9  whatever.  He hasn't shown any indication that he was going

10 to flee, or he would have gone when he knew the charges were

11 out.  He wouldn't have come down and turned himself in.

12     He has a place to live.  He can be excluded from any

13 children, from any contact on the Internet.

14     And with those, Your Honor -- and there's no other

15 indications from their research that he has attempted to

16 contact anyone else who was not an adult.

17     Talk and fantasies is one thing, Your Honor, but there's

18 no activity that they've seen that there was any type of a

19 criminal offense.

20     Therefore, we would ask the Court to consider allowing

21 him out, putting a monitor on him, possibly, and to require

22 him not to have any contact with anyone under the age of 17

23 without, you know, adult supervision around, and that he not

24 have any computers with access to the Internet.

25     Allowing him only to go to work and with a strict curfew

1  to keep him at home other than when he's going to work, we

2  believe would be adequate -- and, of course, you know talk to

3  his lawyers -- would be adequate to ensure both the safety of

4  the public and his appearance, Your Honor.  And we'd ask the

5  Court to set those conditions.

6          THE COURT:  Thank you, Mr. Burns.

7      I do find probable cause to believe that the Defendant

8  committed the offense alleged in the criminal complaint.  And

9  that does give rise to presumptions under 18 U.S.C. 1201 and

10 2251 that he is a risk of nonappearance and a danger to

11 others, and I do not find that he has rebutted those

12 presumptions.

13     And I'm also concerned about the nature and circumstances

14 of this offense and the prior conduct, the lack of

15 significant ties to the community, and mental health issues

16 that have at least been touched on in presentence

17 investigation.  And one thing that struck me was that there

18 was a depression diagnosis and a prescription, and that the

19 Defendant didn't think he needed that.

20     I thought that was a little unusual, Mr. Wolford.

21 Because if you had a problem like that, it's a serious

22 problem.  And there are medications that can help.

23     But in any event, I will order that the Defendant be

24 detained pending further court proceedings.

25     Are there any other matters to be considered in

1    connection with this hearing?

2            MR. LEWIS:  The Government would request to remove

3    the exhibits, Judge, unless the Court wishes to have them for

4    their file.  It doesn't matter.  Either way, I've got copies.

5    But that would be the only thing from the Government, sir.

6            THE COURT:  I will grant that request, and you can

7    talk with Ms. Harbaugh --

8            MR. LEWIS:  Yes, sir.

9            THE COURT:  -- at the conclusion of the hearing.

10   Mr. Burns?

11           MR. BURNS:  Nothing more at this time, Your Honor.

12           THE COURT:  Then we are adjourned.

13           THE CLERK:  All rise.

14       (Proceedings recessed at 10:32 a.m.)

15                          --oOo--

16

17

18                          CERTIFICATE

19       I certify that the foregoing is a correct transcript

20   from the electronic sound recording of the proceedings in the

21   above-entitled matter.

22

23   _____        _____

24   Kathy Rehling                            Date
     Certified Electronic Court Transcriber
25   CET**D-444

```
1                              INDEX

2
     PROCEEDINGS                                          2
3
     WITNESSES

4
     Government's Witnesses    Direct Cross Redirect Recross Court
5
     Thomas Milner            2    35                      34
6
     EXHIBITS
7
     Government's Exhibits                  Identified Received
8
     1     Photograph                          24        25
9    2     Disc                                31        34

10   GOVERNMENT RESTS                                     39

11   DEFENDANTS REST                                      41

12   ARGUMENT
     - By Mr. Lewis on behalf of the Government           41
13   - By Mr. Burns on behalf of the Defendant            43

14   RULINGS                                              44

15   END OF PROCEEDINGS                                   45

16   INDEX                                                46

17

18

19

20

21

22

23

24

25
```