```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF TEXAS
 2                        FORT WORTH DIVISION

 3  UNITED STATES OF AMERICA     .  CRIMINAL ACTION NO.
                                 .  4:08-CR-165-A
 4  VS.                          .
                                 .
 5  RANDALL WOLFORD                 December 15, 2008
                                 .  11:38 a.m.
 6  .  .  .  .  .  .  .  .  .  .  .

 7                              VOLUME 1B
                    TRIAL TRANSCRIPT OF PROCEEDINGS
 8            BEFORE THE HONORABLE JOHN H. McBRYDE
               UNITED STATES DISTRICT JUDGE, and a jury.

 9
    APPEARANCES:
10  For the United States:       Mr. Alex C. Lewis
                                 Assistant United States Attorney
11                               801 Cherry Street, Suite 1700
                                 Fort Worth, Texas  76102
12                               (817) 252-5200

13                               Ms. Aisha Saleem
                                 Assistant United States Attorney
14                               1100 Commerce Street, Third Floor
                                 Dallas, Texas  75242-1699
15                               (214) 659-8600

16  For Defendant Wolford:       Mr. Danny D. Burns
                                 Attorney at Law
17                               115 North Henderson Street
                                 Fort Worth, Texas  76102
18                               (817)870-1544

19                               Ms. Randy W. Bowers
                                 Randy Bowers Attorney at Law
20                               3505 Airport Freeway
                                 Fort Worth, Texas  76111
21                               (817) 348-8094

22  Official Court Reporter:     Eileen M. Brewer
                                 501 West Tenth Street, Room 424
23                               Fort Worth, Texas  76102-3637
                                 (817) 850-6661

24
    Proceedings recorded by mechanical stenography, transcript
25  produced by computer-aided transcription.
```

```
 1                        I N D E X

 2              GOVERNMENT'S DIRECT EVIDENCE

 3                                           Voir
                Direct   Cross  Redirect  Recross  Dire  Court
 4  WITNESSES:
    Tom Milner       8      46      49
 5  Lauren Pitts    50      58
    Kyle Gibson     59      73
 6  Jimmy Patterson 82      --

 7  GOVERNMENT RESTS        92
    MOTION: BY MR. BURNS    92      DENIED     92
 8


 9              DEFENDANT'S DIRECT EVIDENCE

10                                           Voir
                Direct   Cross  Redirect  Recross  Dire  Court
11  WITNESSES:
    D'Ann Steadham  93      97      99
12
    DEFENDANT RESTS        100
13  GOVERNMENT CLOSES      100
    DEFENDANT CLOSES       100
14
    CLOSING:  MR. LEWIS    104
15  CLOSING:  MR. BURNS    108
    CLOSING:  MR. LEWIS    111
16  VERDICT                128

17

                GOVERNMENT'S DOCUMENTARY EVIDENCE
18
    No.         Description                Offered   Admitted
19  GX-1     Profile of "Jenn"               10        10
    GX-2     Defendant's Profile             13        13
20  GX-3     Chat Dialogue                   15        15
    GX-4     Photo, Minor Female             20        20
21  GX-5     Photo, Minor Female             21        21
    GX-6     Photo, Minor Female             21        21
22  GX-7     Screen Capture                  22        22
    GX-8     Screen Capture of hidebehind    26        26
23  GX-9     Screen Capture of hidebehind    26        26
    GX-10    Screen Capture                  29        29
24  GX-11    Screen Capture                  29        29
    GX-12    Screen Capture                  29        29
25  GX-13    Screen Capture                  29        29
```

U.S. DISTRICT COURT

```
 1                        I N D E X

 2

 3            GOVERNMENT'S DOCUMENTARY EVIDENCE CONTINUED

 4  No.             Description              Offered   Admitted
    GX-14     Screen Capture                   29        29
 5  GX-15     Photo, Defendant's Vehicle       39        39
    GX-16     Photo, Drinks in Defendant's     39        39
 6                Vehicle
    GX-17     Photo of GPS Unit                40        41
 7  GX-18     GPS Unit                         41        41
    GX-19     Defendant's Cell Phone           42        42
 8  GX-21     Transcript of Audio Recording    45        45
                  Between Defendant and T. Milner
 9  GX-23     Transcript of Phone Conversation 53        53
    GX-25     Photo of McDonald's              55        56
10  GX-26     Photo of McDonald's              55        56
    GX-27     Defendant's Computer             60        60
11  GX-28     Defendant's External Storage     60        60
                  Drive
12  GX-29     Image Sent From Milner to        61        61
                  Defendant
13  GX-30     Defendant's Favorites Folder     62        63
    GX-31     Online Conversations Between     65        65
14                Milner and Defendant
    GX-32     Online Conversations Between     68        69
15                Defendant and "kelli_halin"
    GX-33     Online Conversation Between      68        69
16                Defendant and "april01972"
    GX-34     Online Conversation Between      68        69
17                Defendant and "amandaga367"
    GX-35     Online Conversation Between      68        69
18                Defendant and "chaotiker666"
    GX-36     Online Conversation Between      68        69
19                Defendant and "your_dessire_4real"
    GX-37     Child Pornography Image          71        71
20  GX-38     Child Pornography Image          71        71
    GX-39     Child Pornography Image          71        71
21  GX-40     Child Image                      71        71
    GX-41     Child Pornography Image          71        71
22  GX-43     Transcript of Video, Murphy,     86        86
                  Texas
23

24

25
```

U.S. DISTRICT COURT

```
 1                    P R O C E E D I N G S,

 2              THE COURT:  Okay.  At this time I'll ask that the

 3   defendant stand while the indictment is read.

 4              MR. LEWIS:  Permission to read the indictment, sir?

 5              THE COURT:  Yes.

 6              MR. LEWIS:  United States of America versus Randall

 7   Wolford, Case No. 4:08-CR-165-A.  Indictment.  Grand jury

 8   charges, Count 1:  Enticement of a child.  Violation of 18

 9   U.S.C., Section 2422(b).

10       On or between March 18, 2008, and May 1st, 2008, in the

11   Fort Worth Division of the Northern District of Texas and

12   elsewhere, the defendant, Randall Wolford, did knowingly use a

13   facility and means of interstate commerce, the Internet, to

14   attempt to knowingly persuade, induce, and entice an individual

15   whom he believed was 13 years old, to engage in sexual activity

16   for which a person can be criminally charged under Texas state

17   law, that is, a violation of Section 22.011, Texas Penal Code,

18   which makes it a crime to intentionally and knowingly cause the

19   penetration of the anus or sexual organ of a child, a person

20   younger than 17 years of age, not the spouse of the actor, by

21   any means, or to cause the sexual organ of a child to contact

22   the mouth or sexual organ of another person, including the

23   actor, in violation of Section 22.021, Texas Penal Code, which

24   makes it a crime to commit the offense referenced in relation to

25   Section 22.011, Texas Penal Code, under circumstances involving
```

1    a child under 14 years of age.

2              THE COURT:  Okay.  How does the defendant plead to the

3    offense charged by the indictment, guilty or not guilty?

4              THE DEFENDANT:  Not guilty.

5              THE COURT:  Okay.  Y'all can be seated.

6         Call your first witness.

7              MR. LEWIS:  Judge, opening statement?

8              THE COURT:  Oh, yes.  You want to make an opening

9    statement?  Go ahead.  You can, if you'd like.

10             MR. LEWIS:  Thank you, sir.  Permission to go ahead

11   and do that, sir?

12             THE COURT:  You may proceed.

13             MR. LEWIS:  Okay.  Thank you, sir.

14        On March 20th of 2008, Sergeant Tom Milner with the Sansom

15   Park Police Department got online, posing as a 13-year-old girl.

16   Using the Internet and going to Yahoo Messenger Chat Rooms, he

17   was contacted, while he was posing as a 13-year-old girl, by the

18   defendant, Randall Wolford.  Now, over the course of the next

19   month, month or so, 40 days, several conversations took place

20   between Officer Tom Milner as a 13 year old and the defendant,

21   Mr. Wolford.

22        During the course of the conversations, the defendant asked

23   Officer Milner if she, posing as "Jenn" or "Jennifer," would be

24   interested in engaging in sexual activity with him.  In fact, he

25   stated that he wanted to do -- or wanted to perform oral sex

1  with a 13-year-old girl and wanted to perform genital-to-genital

2  sexual intercourse with a 13-year-old girl, all in violation of

3  Texas law.  It's a felony.

4      And to do that, he attempted to entice her and persuade her

5  to do so by using words, as well as pictures, to accomplish that

6  goal.  After assurances were made during the course of that time

7  between March 20th and the end of April, a meeting was set up.

8  A meeting was to take place here in Fort Worth at a local

9  McDonald's where "Jenn" was going to show up wearing a certain

10 outfit.  The defendant showed up because he believed that a

11 13-year-old girl would be waiting for him.

12     A decoy, also working with the Sansom Park Police

13 Department, showed up, had a brief conversation with the

14 defendant, and when she didn't agree to go with him, she walked

15 inside the McDonald's.  She turned to let the other officers

16 know that he was here, and she turned to point to where he was

17 at and he was gone.

18     Officer Milner was watching the entire thing happen, the

19 entire thing take place.  He arrested the defendant.  A brief

20 statement occurred afterwards.

21     Several items were found within the car, and you'll hear

22 about them.  One was a Coke that was waiting for 13-year-old

23 "Jenn."  Another was a GPS unit that had that McDonald's address

24 typed into it so he wouldn't get lost.

25     Ladies and gentlemen, at the end of the evidence, the

1  government is going to prove to you beyond a reasonable doubt

2  that the defendant, between March 18th of 2008 and May 1st of

3  2008, used the Internet to entice, persuade, or induce, and

4  attempted to do so, to someone who he believed was 13 years old.

5  And he did that because he wanted to engage in sexual activity

6  with that 13-year-old girl, which is in violation of state law.

7  And this occurred here in Fort Worth.

8      I'm going to ask you to find him guilty after all the

9  evidence has been presented.  Thank you.

10         THE COURT:  Does the defendant wish to make an opening

11  statement?

12         MR. BURNS:  Just shortly, Your Honor.

13      Ladies and gentlemen of the jury, I anticipate the evidence

14  is going to show you on the date in question that Mr. Randall

15  Wolford was visiting and chatting with various people in an

16  adult chat room.  That, in fact, he did strike up a conversation

17  with an individual who had a profile that they were younger than

18  that.  The evidence will show you, though, ladies and gentlemen,

19  that on numerous occasions -- or on other occasions, I should

20  say, that Mr. Wolford had, in fact, talked to other adults and

21  that there was game playing that one was younger than the other

22  and, in fact, had met one of the individuals he talked to and

23  has an ongoing friendship with that individual.  That individual

24  being D'Ann Steadham.

25      That the evidence will show you, ladies and gentlemen, that

MILNER - DIRECT - LEWIS

1  from the government's own witnesses and exhibits, that

2  Mr. Wolford did not believe that the people he was talking to,

3  who claimed to be underage on the Internet, were, in fact,

4  underage.

5      At the end of the evidence, ladies and gentlemen, we're

6  going to ask you to look at all the evidence, including the

7  defense evidence, and we'll ask you for a proper verdict of not

8  guilty in this case.  Thank you.

9          THE COURT:  Okay.  Pull that back around and call your

10  first witness.

11          MR. LEWIS:  Yes, sir.  Your Honor, the government

12  would call Sergeant Tom Milner to the stand.

13          THE COURT:  For the information of the jury, all the

14  witnesses appeared before me this morning before the jury panel

15  came into the courtroom.  I administered the oath to all of the

16  witnesses at that time, and all the witnesses will be testifying

17  under oath, though you won't see me administering it.

18      Okay.  You can be seated.  And you may proceed.

19          MR. LEWIS:  Thank you, Judge.

20                      TOM MILNER,

21      having been duly sworn, testified as follows:

22                   DIRECT EXAMINATION

23  BY MR. LEWIS:

24  Q.   Please state your name for the record.

25  A.   Tom Milner.

MILNER - DIRECT - LEWIS

```
1    Q.   Where are you employed?

2    A.   I'm with the Sansom Park Police Department.

3    Q.   How long have you been working with the Sansom Park police?

4    A.   Five years.

5    Q.   What are your duties with the Sansom Park Police

6    Department?

7    A.   I'm a detective sergeant in charge of the investigation

8    division.

9    Q.   Do you have any training in computers?

10   A.   I do have some, yes.

11   Q.   And how to chat on the Internet?

12   A.   Excuse me?

13   Q.   How to talk on the Internet?

14   A.   That was part of it, yes.

15   Q.   And how to pose as someone who you're really not.

16   A.   Yes.

17   Q.   Are you one of the case agents on the case against the

18   defendant today?

19   A.   I am.

20   Q.   Now, Sergeant Milner, how did this case get started?

21   A.   I was on the Internet March 20th, 2008, sitting in a Yahoo

22   chat room.  Basically, I went onto a Yahoo website, or an

23   Internet site, and entered one of the rooms.  And the room was

24   under the category of "Romance," Rooms 4 and 10.

25   Q.   And who were you supposed to be?
```

MILNER - DIRECT - LEWIS

1  A.    My profile says I'm a 12-year-old girl, and when asked, I

2  tell them I've had a birthday and now I'm 13.

3  Q.    Would you please turn to Exhibit No. 1 in that folder.

4  A.    Yes, sir.

5  Q.    Do you recognize Exhibit 1?

6  A.    Yes, I do.

7  Q.    What is it?

8  A.    That's the profile that I have created through Yahoo

9  Messenger with the photograph of the undercover that I use.

10  Q.    Does it fairly and accurately depict your profile as it

11  appears on Yahoo?

12  A.    Yes, it does.

13  Q.    Has it been altered or edited in any way?

14  A.    No.

15         MR. LEWIS:  At this point in time, Your Honor, the

16  government offers Exhibit 1 into evidence.

17         THE COURT:  It's received.

18  BY MR. LEWIS:

19  Q.    Now, once you enter a Yahoo chat room, does someone else

20  have to also enter a Yahoo chat room to talk with you?

21  A.    Not necessarily.  Well, they have to get onto Yahoo.  They

22  don't actually have to be in that chat room, but they do have to

23  be on the Internet.  They do have to be connected to Yahoo.

24  Q.    So they also have to be on the Internet; is that correct?

25  A.    Yes.

MILNER - DIRECT - LEWIS

1  Q.   During your course of conversation -- Well, did anybody

2  talk to you that day?

3  A.   Yes, sir.  There were several individuals.

4  Q.   And was one of them Mr. Wolford?

5  A.   Yes.

6        THE COURT:  Let me clarify something.  You say "talk"

7  to you.  You mean communicate over the Internet?

8        THE WITNESS:  Yes, sir.  There's a room, is what they

9  call them, where several individuals can go in.  It will usually

10  hold up to 50.  At that time you can talk within the room or you

11  can click on the person and view their profile or you can click

12  on them and send an instant message that's just between you and

13  that subject.

14        THE COURT:  Some of us may be less intelligent from a

15  computer standpoint than the others, and I just want to be sure

16  there's no misunderstanding that the talking to doesn't mean

17  you're literally using your mouth to talk to somebody.  You're

18  sending messages over the Internet is what you're talking about.

19        THE WITNESS:  That's correct, Your Honor.

20        THE COURT:  And when you talk about rooms, you're

21  talking about there being something on the Internet where a lot

22  of people send messages to each other.  Is that what you're

23  talking about?

24        THE WITNESS:  Yes, Your Honor.

25        THE COURT:  Okay.  Go ahead.

1          MR. LEWIS:  Thank you, sir.

2   BY MR. LEWIS:

3   Q.   Now, the individual who contacted Mr. Wolford, what did he

4   have to say?

5   A.   He began by asking me about my age.  I stated that I was

6   13, not 12.  Stated that he was also from the D/FW area but had

7   moved away to the mountains.

8   Q.   Now, did Mr. Wolford have a profile?

9   A.   Yes, he did.

10  Q.   Again, tell us what a profile is.

11  A.   A profile is just a page.  You have a screen name that's

12  assigned to you that you created with your Yahoo mail.  And when

13  you sign in, you can create a page showing your name, your age,

14  your gender, whether you're married, single, any other

15  information you want to give, on hobbies, and you can display a

16  photograph.

17  Q.   And so you were able to view his profile.

18  A.   Yes.

19  Q.   Now, please turn to Exhibit 2.

20  A.   (Witness complies.)

21  Q.   Do you recognize that?

22  A.   Yes.  That's the profile of the subject that began speaking

23  with me on the 20th.

24  Q.   Has it been changed or altered in any way?

25  A.   No.

1           MR. LEWIS:  The government offers Exhibit 2 into

2    evidence, Your Honor.

3           THE COURT:  It's received.

4    BY MR. LEWIS:

5    Q.    You stated before that you were talking with -- There are

6    many people in the chat room.

7    A.    Yes.

8    Q.    Did you just talk with the defendant?

9    A.    No.

10   Q.    At what point in time did that occur?

11   A.    Can you rephrase that?

12   Q.    At what point in time were you speaking with the defendant?

13   A.    Once he sent an instant message to me.

14   Q.    Now, instant messaging, is that a private communication

15   between you and another person, or can a lot of people see

16   what's going on?

17   A.    No.  It would just be myself and the person on the other

18   end.

19   Q.    And when we say "communication" or "talk," we mean what,

20   exactly?  What do you mean?

21   A.    Typed words inside of a small box that displays on the

22   screen of your computer.

23   Q.    You're not actually using your voice to talk to them.

24   You're typing back and forth.

25   A.    That's correct.

MILNER - DIRECT - LEWIS

1  Q.   Now, please turn to Exhibit 3, please.

2  A.   (Witness complies.)

3  Q.   Do you recognize Government Exhibit 3?

4  A.   Yes.

5  Q.   What is it?

6  A.   That is the chat log between myself and Mr. Wolford.

7       THE COURT:  Those are all the messages going to and

8  from you and Mr. Wolford?

9       THE WITNESS:  When you get on Yahoo Messenger, one of

10 the things you can do is archive your chats, which means the

11 computer stores everything you type and everything you received.

12 This is a transcript from Yahoo Messenger of what was said back

13 and forth and the time and date of each line that was sent to me

14 and sent back to him.

15      THE COURT:  What period of time does this cover?

16      THE WITNESS:  This is over the course of a month.

17      THE COURT:  Okay.

18 BY MR. LEWIS:

19 Q.   And the first date is on March 20th, 2008?

20 A.   That is correct.

21 Q.   And the last date was when?

22 A.   The 30th of April.

23 Q.   2008?

24 A.   That's correct.

25 Q.   Now, Government Exhibit 3, has it been changed or altered

MILNER - DIRECT - LEWIS

1  in any way?

2  A.   No.

3  Q.   Is the conversation, many of the conversations, you've had

4  with the defendant during that course and time?

5  A.   Excuse me?

6  Q.   This is the conversation, the various conversations, you've

7  had with the defendant over a course of time.

8  A.   That is correct.  This would be our conversations.

9          THE COURT:  Are these all of the Internet

10  communications you had with the defendant during the time period

11  you've mentioned?

12          THE WITNESS:  Yes, sir.

13          MR. LEWIS:  Government offers Exhibit 3 into evidence,

14  Judge.

15          THE COURT:   It's received.

16  BY MR. LEWIS:

17  Q.   Let's start with March 20th of 2008.  How did that

18  conversation go?

19  A.   It started off with the normal beginnings of "hello."  He

20  indicated that he was from the same area but had moved to the

21  mountains.  Then I asked him if he ever came back to visit.  He

22  asked me why would I ask if he came back to visit.  I said, "I

23  was curious."  He said, "Would you be curious because maybe

24  you're with a watchdog group, law enforcement, or maybe even

25  Perverted-Justice?"

MILNER - DIRECT - LEWIS

1   Q.    And so what did you respond to him when this happened?

2   A.    I told him that I was not law enforcement, that I was a

3   13-year-old little girl, and he did not believe me at first.

4   Q.    What did you do to assure him of your 13-year-old identity?

5   A.    As the conversation went on, he told me that I should be

6   out catching murderers, drug dealers, or drunk drivers, because

7   they kill more people than pervs do.  And then he stated --

8   asked me about talking with others.  I told him that I talked

9   with other men.  He said to give me one of their names.  I

10  stated, "No, I don't tell on them because you might be

11  Dateline."  He said, "I'm not Dateline."

12      At that point I told him that they exchanged pictures with

13  me.  He said, "What kind of pictures?"  I said, "They show me

14  their stuff."  He said, "What do you mean, 'their stuff'?"  I

15  said, "Some who show me their penises.  One of them had showed

16  me a video of him masturbating."  He said, "You're getting

17  there.  I'm getting more comfortable."  I said, "What do you

18  mean, 'getting there'?"  He said, "You know what I mean."

19          THE COURT:  Now, how can they see pictures at each end

20  of the --

21          THE WITNESS:  When we're speaking on the screen, on

22  the computer screen, you can click a photo share and it opens a

23  box beside it that you can pull a picture up and display it to

24  that person.  And in the bottom corner it shows the picture that

25  they're viewing and the picture you're viewing.  Or you can hit

MILNER - DIRECT - LEWIS

1  a send button and send it as a file, and they can save it to

2  their computer and view it.

3          THE COURT:  Well, do you have to have special

4  equipment at each end in order to transmit a live picture from

5  what's going on at one end to the other end?

6          THE WITNESS:  No, Your Honor.  It's part of Yahoo's

7  service.  You just put the picture there and display it.

8          THE COURT:  In other words, if I'm sitting and

9  talking, so to speak, by typing in messages with somebody, I can

10  arrange it where they can see my face and see who they're

11  talking to?

12          THE WITNESS:  Yes, Your Honor, but that would be

13  through a web cam.  This is actually just through what's on a

14  laptop.  If you have a picture in a jpeg form or some type of

15  form saved on your computer, you can put that in a box to allow

16  the subject on the other end to view that while you're speaking.

17          THE COURT:  That's a picture that's already stored in

18  the computer; is that correct?

19          THE WITNESS:  Yes, Your Honor.

20          THE COURT:  But if it's something live, something

21  that's happening right then where you want the person at the

22  other end to see what's happening, do you have to have some kind

23  of special equipment for that?

24          THE WITNESS:  Yes, Your Honor.  You would have to have

25  a web cam.  That would be additional equipment.

U.S. DISTRICT COURT

MILNER - DIRECT - LEWIS

```
 1              THE COURT:  Well, did you and Mr. Wolford have a web
 2   cam?
 3              THE WITNESS:  Mr. Wolford did, yes, Your Honor.
 4              THE COURT:  And by having that, does that enable him
 5   to convey to you, so to speak, what's going on where he is?
 6              THE WITNESS:  Yes, Your Honor.  I'm able to view him
 7   live.
 8              THE COURT:  Because of him having that special
 9   equipment.
10              THE WITNESS:  Yes, Your Honor.  I can view his web cam
11   and see what he's doing at that specific time.
12              THE COURT:  Does he have to turn something on and off
13   for you to be able to view him?
14              THE WITNESS:  Yes, Your Honor.  He did indicate that
15   he had to turn that on for me.
16              THE COURT:  Okay.  Go ahead.
17              MR. LEWIS:  Thank you, sir.
18   BY MR. LEWIS:
19   Q.   Let's talk about pictures.  Did, in fact, you send some
20   pictures of yourself to the defendant?
21   A.   Yes, I did.
22   Q.   Please turn to Government Exhibit 4.
23   A.   (Witness complies.)
24   Q.   Now, Officer, when I say pictures of you, I mean your
25   undercover identity.
```

1   A.   Yes.

2   Q.   Okay.  Would you please -- Do you recognize Government

3   Exhibit 4?

4   A.   Yes.  It's one of the photographs I use in an undercover

5   capacity.

6   Q.   And what is it?

7   A.   It is a picture of a 10- or 11-year-old girl.

8   Q.   And what is she wearing and what is she holding?

9   A.   She's wearing a pair of shorts and looks like a T-shirt,

10  and she's holding a stuffed animal.

11           THE COURT:  Is that something you sent to the

12  defendant the first time y'all talked?

13           THE WITNESS:  Yes, Your Honor.

14           THE COURT:  Okay.

15       Did you offer Exhibit 3?

16           MR. LEWIS:  I believe so.  I did, sir.

17           THE COURT:  Okay.

18           MR. LEWIS:  If I did not, I offer it again.

19           THE COURT:  No, that's okay.  If you've already

20  offered it, I assume it's been received.

21           MR. LEWIS:  Yes, sir.

22  BY MR. LEWIS:

23  Q.   Has this photo been altered in any way whatsoever from the

24  time that you sent it to the defendant?

25  A.   No, sir.

1    MR. LEWIS:  Government offers Exhibit 4 into evidence,

2  Your Honor.

3    THE COURT:  It's received.

4  BY MR. LEWIS:

5  Q.   Sergeant Milner, take a look at Government's Exhibit 5 and

6  6, if you wouldn't mind?

7  A.   (Witness complies.)

8  Q.   Do you recognize those?

9  A.   Yes.  Those are the other two photographs that I use in an

10  undercover capacity.

11  Q.   And can you describe Government Exhibit 5.

12  A.   Government Exhibit 5 is a young girl, approximately 11

13  years old, in jean shorts and a tank top, standing on the beach.

14  Q.   Government Exhibit 6, can you describe that?

15  A.   Yes.  That is a Lifetouch school photograph from the

16  '06/'07 year of a girl in sweat pants with a Hollister T-shirt

17  of a 13-year-old girl.

18  Q.   And how do you know that this girl is 13?

19  A.   Because I know the girl personally.

20    THE COURT:  When were Exhibits 4 and 5 -- pardon me --

21  5 and 6 sent?  Was that the first day that you carried on this

22  conversation with the defendant?

23    THE WITNESS:  Your Honor, 4, 5, and 6 were all sent

24  the first day.

25    THE COURT:  Okay.

MILNER - DIRECT - LEWIS

1          MR. LEWIS:  Government would offer 5 and 6 into

2    evidence, Your Honor.

3          THE COURT:  They're received.

4    BY MR. LEWIS:

5    Q.   Those are the pictures that were made available to the

6    defendant, correct?

7    A.   That is correct.

8    Q.   And we'll talk about web cam and live video feed in a

9    second, but did you receive any pictures in return from the

10   defendant?

11   A.   I did receive one photograph, yes.

12   Q.   Please turn to Government Exhibit 7.

13   A.   (Witness complies.)

14   Q.   Do you recognize that?

15   A.   Yes, I do.

16   Q.   What is it?

17   A.   That's a picture of the defendant.  He stated he was in

18   Germany at the time of the photograph.

19   Q.   And you received this image from the individual you were

20   talking to.

21   A.   Yes.  This is what I described earlier.  You have the chat

22   on the left side; you're able to open a window on the right

23   side.  If you look at the bottom of the photograph, it shows all

24   the photographs displayed, which is the one in the bottom, right

25   corner.  It says, "Friend's View."  Defendant was viewing his

1  own photo at that time.

2  Q.   Has this been changed or altered or edited in any way?

3  A.   No, sir.

4         MR. LEWIS:  Offer Government Exhibit 7 into evidence,

5  Judge.

6         THE COURT:  It's received.

7  BY MR. LEWIS:

8  Q.   Now, once you trade these beginning pictures, how does the

9  conversation go then?

10 A.   Conversation the first day, basically just talking back and

11 forth about family, wants to know about my mom and dad.  Told

12 him I didn't have a father.  He said he didn't want to make me

13 feel bad, but everybody should grow up with a dad.  Told him my

14 mom worked two jobs to make ends meet.  We didn't have a phone

15 at home.  We talked a little bit about things we like, talked

16 about soft drinks.  Told him I liked Coca-Cola, was one of the

17 soft drinks that I liked.

18 Q.   At some point the conversation changed.  Would that be

19 correct?

20 A.   Yes.

21 Q.   How did it change?

22 A.   When I told him about -- Trying to make him more relaxed

23 that I was not law enforcement, I did tell him that I had sex a

24 year ago when I was 12 years old with a 20-year-old.  He wanted

25 to know the details of that sexual encounter.  I made them

1    brief.  He stated he also wanted to do the same thing to me the

2    20-year-old did, which was penetrate my vagina.

3    BY MR. LEWIS:

4    Q.    He stated that on the chats?

5    A.    Yes.

6    Q.    Is it a crime in the State of Texas for an adult to have

7    sexual intercourse with a 13-year-old girl?

8    A.    Yes, it is.

9    Q.    How does the conversation take place?  How does it

10   continue?

11   A.    There's a little more conversation about that, that day.

12   He tells me to be careful because what some of the other men

13   might want from me.  And he talked about what they might be

14   doing while they're talking to me, and that's something that he

15   might be doing right now.

16   Q.    Meaning what?

17   A.    Masturbating.

18   Q.    So what happened next?

19   A.    That pretty much ended the conversation.  It lasted for a

20   little over an hour.  In fact, the next time we chatted, he

21   commented in the chat that we'd spoke for over an hour that

22   night.

23   Q.    What happened the next time y'all chatted?

24   A.    He wanted me to go to a video website called

25   hidebehind.com.

MILNER - DIRECT - LEWIS

1   Q.   Why did he want you to do that?

2   A.   He wanted me to see a girl masturbating with a hairbrush

3   and inserting it in her vagina.

4   Q.   What information did he provide for you to be able to do

5   such a thing?

6   A.   He told me where the site was and then provided me a link

7   to get there.

8   Q.   Now, you say "link," what does that mean?

9   A.   At the top -- When you're on the Internet, at the top

10  there's an address where you've been, a URL.  You're able to

11  copy that and if you paste it in and then hit space bar, it will

12  put a line underneath and then you can send it to the person.

13  And when they click on it, it will take you directly to that

14  site.

15  Q.   Is that what he did?

16  A.   Yes.

17  Q.   Why did he want you to see this site?

18  A.   He wanted me to see the activity that he wanted.

19  Q.   Which was what?

20  A.   Which was the masturbation of the young girl.

21  Q.   Please turn to Exhibits 8 and 9.

22  A.   (Witness complies.)

23  Q.   Do you recognize Exhibits 8 and 9?

24  A.   I do.

25  Q.   And tell us what they are.

MILNER - DIRECT - LEWIS

1  A.    These are the websites that he asked me to go to --

2  provided the link to, and this is the captions of the hairbrush

3  masturbation videos.

4  Q.    Is this a screen capture of what you were seeing?

5  A.    This is a screen capture, like I printed the screen of my

6  computer at the time and saved it.

7  Q.    Can you briefly tell us in a little bit more detail what a

8  "screen capture" is?

9  A.    Sure.  I'm able to capture whatever is going on at the

10 time, so if I have five or six windows -- In fact, on Exhibit 9,

11 if you look at the bottom, you can see four or five people that

12 I'm talking with at the same time.  It shows that Yahoo, I'm

13 connected to it, I have off-line messages waiting, I have two

14 subjects blue lit up that I'm having conversations that they

15 have something that I haven't responded to.  And the other three

16 are people that I'm talking to, but there's nothing waiting for

17 me.  And then it shows "hidebehind."  It's click, and that's the

18 video that's displayed up, so I can capture everything on the

19 computer screen at one time and save it.

20 Q.    So you're seeing something on the computer screen and you

21 press "print."

22 A.    Print.  And then I save it to a folder.

23 Q.    And Government's Exhibits 8 and 9, have they been changed

24 or altered in any way since you pressed print that day?

25 A.    No, sir.

1          MR. LEWIS:  Government offers Exhibits 8 and 9 into

2     evidence, Your Honor.

3          MR. BURNS:  And we would object, Your Honor, on the

4     grounds that any probative value it would have would be

5     outweighed by its prejudicial effect, and it's also an

6     extraneous act, Rule 404.

7          THE COURT:  I'll overrule the objection.  I'm

8     satisfied that the probative effect of these exhibits far

9     outweighs any prejudicial effect, at least inappropriate

10    prejudicial effect, so they're received.

11         MR. LEWIS:  Thank you, sir.

12    BY MR. LEWIS:

13    Q.  So after you go to this website, how does the conversation

14    take place?  The conversation meaning chats between you and the

15    defendant take place?

16    A.   Correct.  He talks about how he'd like to see me do that

17    and that he might turn his web cam on for me.

18         THE COURT:  Is this still happening during the first

19    conversation?

20         THE WITNESS:  No, sir.  We've moved on to the second.

21         THE COURT:  This is the second conversation.

22         THE WITNESS:  Yes, sir.

23         THE COURT:  How many days after the first one was this

24    one?

25         THE WITNESS:  I believe it was the next day, within a

MILNER - DIRECT - LEWIS

```
1    day or two.
2            THE COURT:  Okay.
3    BY MR. LEWIS:
4    Q.   You just mentioned web cam, I believe?
5    A.   I'm sorry?
6    Q.   You just mentioned web cam, I believe?
7    A.   Yes.
8    Q.   What is a web cam?
9    A.   A web cam is a video that's attached to your computer, and
10   it allows just like a surveillance camera would be in a room,
11   but it's attached to your computer and it feeds it back to the
12   computer to the Internet and back to whoever is on the other end
13   viewing it that you allow to view it.
14   Q.   So you're able to watch in real time some videos.
15   A.   Correct.
16   Q.   Is that what happened next with you and the defendant?
17   A.   Yes.  He did provide a link to his web cam.
18   Q.   So he provided a link.
19           THE COURT:  That's the second conversation still?
20           THE WITNESS:  Yes.  I believe so.
21           THE COURT:  Okay.
22   BY MR. LEWIS:
23   Q.   And so what happened when you clicked on that link to his
24   web cam?
25   A.   It's actually a box that opened up and, you know, would you
```

1   like to allow this to happen when he sends it to you.  Yes.

2   Q.   What did you see?

3   A.   I seen a web cam of a male masturbating.

4   Q.   Turn your attention to Government's Exhibits 10, 11, 12,

5   13, and 14.

6   A.   (Witness complies.)

7   Q.   Do you recognize Government's Exhibits 10 through 14?

8   A.   I do.

9   Q.   What is Government Exhibit 10?

10  A.   It is a conversation between the defendant and myself.  And

11  if you'll look at the top of the square box, it also shows the

12  same user name "Just Me AK Lightman Texas" (phonetics), which is

13  the defendant's web cam, and he has his pants down and is

14  masturbating.

15          THE COURT:  The conversation that is shown above the

16  photograph, the image on one of them is alongside the image on

17  the other.  Are those things that are being said back and forth

18  as the person at your end was seeing the image?

19          THE WITNESS:  Yes, Your Honor.  This is while the

20  video is playing, we are conversing back and forth.

21  BY MR. LEWIS:

22  Q.   And the image that you're seeing goes along with the

23  conversation, the chats, the typed words that you're having with

24  the defendant.

25  A.   Yes, that's correct.

1          MR. LEWIS:  I would offer Government's Exhibit --

2    BY MR. LEWIS:

3    Q.    Now, Government's Exhibits 10, 11, 12, 13, and 14, have

4    they been changed or altered in any way since that day you took

5    these screen captures?

6    A.    No, sir.

7          THE COURT:  They're received.

8          MR. BURNS:  Objection, Your Honor.  We'd also have the

9    extraneous and collateral matter and the 404(b), weighing -- or

10   403, prejudicial effect outweighing the probative value of the

11   pictures, not necessarily the conversation.

12         THE COURT:  I'll overrule the objections.  Do you want

13   me to give any special instruction on the 404 part now or leave

14   that until the final charge?

15         MR. BURNS:  Well, on the --

16         THE COURT:  I think this is part of the offense

17   conduct.  I don't know that there is a special instruction

18   required.  As far as the 403 objection is concerned, I'm

19   satisfied that the probative value of these photographs is not

20   outweighed by the prejudicial effect.  In fact, the probative

21   value far outweighs any potential inappropriate prejudice, so

22   I'll overrule that objection.

23         MR. LEWIS:  May I continue, sir?

24         THE COURT:  They're received in evidence.

25         MR. LEWIS:  Thank you, sir.

MILNER - DIRECT - LEWIS

```
 1            THE COURT:  You may proceed.

 2            MR. LEWIS:  Thank you.

 3  BY MR. LEWIS:

 4  Q.   Officer Milner, take a look at Government Exhibit 12,

 5  please, and 13 and 14.  What's the conversation like as these

 6  screen captures have been captured by you?

 7  A.   The defendant is telling me what he would like to do to me.

 8  Q.   Which is what?

 9  A.   He would like to open my legs, stick his tongue in me, pull

10  me on top of him, and pull my pants down, my panties, too, and

11  then asked me to get naked.

12  Q.   During the course of the conversation, is it clear to you

13  -- or what is clear to you that he wants to do to you?

14  A.   He wants to have sex, oral and vaginal sex.

15  Q.   Now, after these screen captures are taken, how does the

16  conversation go next?

17  A.   We talk about possibly meeting, but he will not meet

18  anybody that he hasn't seen a picture of or a web cam.

19  Q.   Does he say that?

20  A.   Yes.  He said he will not meet anybody he hasn't seen on

21  cam.

22  Q.   Why does he say that?  Does he tell you?

23  A.   He wants to verify my identity as a 13-year-old little

24  girl.  He doesn't actually say that that's what it is.

25            MR. BURNS:  Well, I object to his speculation, Your
```

MILNER - DIRECT - LEWIS                                    31

1  Honor, and guessing as to what passed through the mind of the

2  accused.

3            THE COURT:  Well, I'm sorry.  What was the question?

4            MR. LEWIS:  The question was how did he know why he

5  wanted to just have done -- I can rephrase the question.

6            THE COURT:  Yes.  Don't speculate as to what might

7  have been going through his mind.

8            THE WITNESS:  Yes, Your Honor.

9            THE COURT:  So I'll sustain the objection to whatever

10 extent there's that sort of speculation.

11 BY MR. LEWIS:

12 Q.   At some point in time, did he want you to have a web cam?

13 A.   Yes.

14 Q.   Did he say why?

15 A.   No.

16 Q.   After the screen capture has taken place, what happens?

17 A.   I told him that I could not get a web cam.  He told me he

18 could mail one to me.  I told him I wasn't comfortable with

19 giving my address out.  So he stated he would have one at a

20 warehouse prepaid for.  I could go pick it up.

21 Q.   What happened next?

22 A.   The web cam idea wasn't working out.  He stated that maybe

23 we could talk on the phone.  So he provided me with his cell

24 phone number.

25 Q.   Now, at some point in time during the chats, did he say he

MILNER - DIRECT - LEWIS

1   was leery of meeting you?

2   A.   Throughout the whole chat, he was leery that I was law

3   enforcement or a watchdog group.

4   Q.   In fact, he said that during the chats.

5   A.   Yes.

6   Q.   So what happened when he talked about the telephone call?

7   A.   We set up a time to have a telephone conversation.  I told

8   him that my mother had a cell phone.  We didn't have a phone at

9   home, and I'd have to go to a pay phone.  So we were going to

10  call him when I got out of school.

11  Q.   How did you know who you were supposed to call?

12  A.   He provided his cell phone number.

13  Q.   So what did you do at that point in time?

14  A.   I had one of our female dispatchers place the call from the

15  pay phone to the number that was given.

16  Q.   Why did you have her make the call?

17  A.   Because I don't think he would be interested anymore if he

18  heard me on the other end.

19  Q.   So does that call, in fact, take place?

20  A.   It does.

21  Q.   Now, after the phone call takes place, how does the

22  conversation -- how did the chat -- the following conversations,

23  how did they go then?

24  A.   It gets sexual in nature again.  And at one point he was

25  not able to reach me, so he said, "This might not be a good

1    idea.  Maybe we shouldn't do this.  I've changed my mind."

2    Q.   When you say "sexual in nature again," what sexual acts are

3    you talking about?

4    A.   Talking about vaginal sex and oral sex.

5    Q.   That the defendant wants to have with you.

6    A.   Correct.

7    Q.   The 13 year old.

8    A.   Yes.

9    Q.   And you mentioned the -- What happened then, after that

10   next part of the conversation?

11   A.   He left a message when he couldn't reach me that it wasn't

12   a good idea, and he changed his mind.  We probably shouldn't

13   meet.

14   Q.   Then what happens?

15   A.   When you send a message to someone who is not currently

16   online, it leaves a message for the next time they sign in, so I

17   responded to it and told him, "That's fine.  We don't have to

18   meet."  But that he didn't offend me with his graphic-in-nature

19   conversation.

20   Q.   What happens then?

21   A.   A meeting is set up.

22   Q.   Who contacts who?

23   A.   He contacts me.

24   Q.   How long after the conversation in which he says he's not

25   going to do this?

MILNER - DIRECT - LEWIS

1  A.   A couple of days.  Less than a week.

2  Q.   And you say he contacts you?

3  A.   Yes.

4  Q.   Now, all throughout the entire investigation, from March

5  20th until the end of April, who contacts who?

6  A.   He contacts me.  At one point he even asks me if I wanted

7  to add him as a friend, which would allow us to know when one

8  another is online.  When I didn't do that, then he went ahead

9  and added me and asked permission for him to do so and I said

10  yes.

11  Q.   So you never reached out to him.

12  A.   Not other than responding to his offline messages that he

13  left.

14  Q.   You mentioned that a meet was set up.

15  A.   Yes.

16  Q.   What does that mean?

17  A.   That means we picked a destination to go and meet one

18  another face-to-face.

19  Q.   During the chat conversations, was he excited about meeting

20  you?

21  A.   Yes.  But he was also worried.

22  Q.   Worried about what?

23  A.   Worried about me being a law --

24            MR. BURNS:  Objection, Your Honor, as to passing upon

25  the mind frame of somebody else.

MILNER - DIRECT - LEWIS

1              THE COURT:  I will sustain that objection.

2    BY MR. LEWIS:

3    Q.   From reading the chat --

4              THE COURT:  Did he say what he was worried about?

5              THE WITNESS:  Yes, Your Honor, he does.

6              THE COURT:  What did he say he was worried about?

7              THE WITNESS:  He said he was worried about me being

8    law enforcement.

9              THE COURT:  Okay.

10   BY MR. LEWIS:

11   Q.   Now, at some point in time, did he request a different kind

12   of picture from you?

13   A.   Yes.  He also states that that's one of the reasons why he

14   requested a nude picture, was to make sure that I wasn't law

15   enforcement.

16   Q.   A nude picture of who?

17   A.   Myself, being a 13-year-old girl.

18   Q.   And you never complied with that request.

19   A.   No.

20   Q.   So the meet is set up for what date?

21   A.   Unknown, the date.  I'd have to refer back to it.

22   Q.   Was it toward the end of April?

23   A.   Yes, it was.

24   Q.   And how many meets were set up between you and the

25   defendant?

MILNER - DIRECT - LEWIS

1  A.   Two.

2  Q.   Let's talk about the first one.  What happened on the first

3  meet?

4  A.   The first one, he did not show up.

5  Q.   In his chats, did he give a reason why?

6  A.   He stated he was in an automobile accident, and he could

7  provide a copy of the accident report and the insurance, if I

8  did not believe him.

9  Q.   So what happened next?

10 A.   Another meet is set up for the 30th of April.

11 Q.   Now, do you have any details on what you're going to be

12 wearing that day?

13 A.   Yes.  I provided the details that I would be wearing a pink

14 Hollister sweatshirt.

15 Q.   What time were you all supposed to meet?

16 A.   11:00.

17 Q.   In the morning?

18 A.   Yes, sir.

19 Q.   So what happens then?

20 A.   We went to the meet.

21 Q.   Who is "we"?

22 A.   Myself, Chief White was inside the McDonald's doing

23 surveillance.  Dispatcher Pitts, who was the decoy, was dropped

24 off on Ephriham Street, approximately a block away, where I

25 could have visual until she got to the parking lot.  And she

MILNER - DIRECT - LEWIS

1  proceeded to walk down Ephriham Street south towards McDonald's.

2  Q.   Now, Lauren Pitts is the same decoy you used to make the

3  phone call?

4  A.   That's correct.

5  Q.   So tell us what happened.

6  A.   As I approached Jacksboro Highway from Ephriham, I noticed

7  her coming across the parking lot from the west side going to

8  the east side.  I made the traffic light, did a U-turn, pulled

9  into the parking lot, observed a white SUV pulling up by the

10  front of the McDonald's where she was walking.  She stopped.  It

11  appeared there was conversation.  I couldn't hear anything.

12      She gave the signal that we told her to give if she made

13  contact with the suspect, which was a wave, and she waved her

14  hand in the air.  She went inside the McDonald's.  The vehicle

15  drove off.  I was in contact with the other officer inside the

16  building.  She approached him and said the subject had called

17  her by name, "Hi, Jenn," and that was --

18          MR. BURNS:  Objection, Your Honor, as to what somebody

19  else says.  Denial of confrontation.

20          THE COURT:  You didn't hear him say, "Hi, Jenn"?

21          THE WITNESS:  No, sir, I did not.

22          THE COURT:  Okay.  The jury will disregard that

23  testimony.  That's hearsay.

24  BY MR. LEWIS:

25  Q.   As the vehicle takes off, what do you do?

MILNER - DIRECT - LEWIS

1  A.   I followed the vehicle eastbound on Jacksboro Highway.

2  Q.   What happens?

3  A.   At Northwest 21st Street and Jacksboro Highway, Mr. Wolford

4  was placed in custody.

5  Q.   Now, during the conversation, the online chats, the talking

6  that you did prior to this meeting, was there any mention of

7  what would be waiting for you --

8  A.   Yes.

9  Q.   -- as a 13-year-old girl?

10  A.   Yes.

11  Q.   And what was that?

12  A.   A large Coca-Cola.

13  Q.   After you arrested the defendant, did you have a chance to

14  look inside the vehicle?

15  A.   I did.

16  Q.   Was there anyone else in the vehicle?

17  A.   No.

18  Q.   Please turn your attention to Government Exhibit 15.

19  A.   (Witness complies.)

20  Q.   Do you recognize Government Exhibit 15?

21  A.   I do.

22  Q.   What is it?

23  A.   It's a picture of the inside of the defendant's vehicle,

24  displaying a large Coca-Cola in the passenger-side cupholder.

25  Q.   Would you please turn to Government Exhibit 16, please.

MILNER - DIRECT - LEWIS

```
1   A.    (Witness complies.)

2   Q.    Can you tell us what that is?

3   A.    It's a closer view of the large Coca-Cola.

4   Q.    Now, where is the -- Have these been changed or altered in

5   any way, or do they fairly and accurately depict what you saw

6   that day?

7   A.    No, they have not been changed; and, yes, it does depict

8   what was seen that day.

9         MR. LEWIS:  Government offers Exhibits 15 and 16 into

10  evidence, Your Honor.

11        THE COURT:  They're received.

12  BY MR. LEWIS:

13  Q.    Now, Government Exhibit 16, how many drinks are depicted?

14  A.    Two.

15  Q.    I draw your attention to Government Exhibit 17.

16  A.    (Witness complies.)

17  Q.    Do you recognize Government Exhibit 17?

18  A.    I do.

19  Q.    What is it?

20  A.    It is a Garmen GPS that was affixed to the windshield of

21  the defendant's vehicle.

22  Q.    And can you tell us what a GPS is?

23  A.    It's a navigation system to allow you to get from one place

24  to another.  It will give you directions and tell you how to get

25  there the fastest route.
```

MILNER - DIRECT - LEWIS

1  Q.   Now, at some point in time in the chats, did the defendant

2  state that he was from North Texas?

3  A.   Yes.

4  Q.   But, also, he didn't know his way around Fort Worth as well

5  as he would like?

6  A.   Well, when we first began chatting, he stated he was not

7  from North Texas.  He was and he'd moved.  Then later in the

8  chat, he stated he was.  And I asked him why it was that he told

9  me he wasn't if he was.  And he stated he didn't want me to not

10 chat with him knowing that he was that close.  And that's in the

11 chat.

12 Q.   The picture of the GPS unit in Government Exhibit 17, what

13 is the GPS unit showing?

14 A.   It is showing the area of the McDonald's.  The one street

15 with the north symbol sign is River Oaks Boulevard.  When it

16 crosses the north side of Jacksboro Highway, it becomes Ephriham

17 Street.  That's the 2200 block of Jacksboro Highway.

18 Q.   In Fort Worth, Texas?

19 A.   Yes, sir.

20 Q.   The image depicted in Government Exhibit 17, does it fairly

21 and accurately depict the GPS unit as it appeared to you that

22 day after the defendant's arrest?

23 A.   Yes, it does.

24       MR. LEWIS:   Government offers Government Exhibit 17

25 into evidence, Judge.

MILNER - DIRECT - LEWIS

1              THE COURT:  It's received.

2    BY MR. LEWIS:

3    Q.   Now, Officer Milner, I believe you have Government Exhibit

4    18 with you?

5    A.   Yes, I do.

6    Q.   Can you tell us what that is?

7    A.   Actually, 18 is marked as a GPS unit.

8    Q.   Right.  That's what I was getting at there.  Do you

9    recognize Government Exhibit 18?

10   A.   Yes.  This is the actual Garmen GPS that I removed from the

11   vehicle on the day of the arrest.

12             MR. LEWIS:  I would offer Government Exhibit 18 into

13   evidence, Judge.

14             THE COURT:  It's received.

15   BY MR. LEWIS:

16   Q.   Officer Milner, Government Exhibit 19, can you tell us what

17   that is?

18   A.   Yes.  It's a Motorola cell phone.

19   Q.   And where did you get that?

20   A.   It was taken off the defendant's person at the time of the

21   arrest.

22   Q.   How do you know it's the defendant's?

23   A.   It's the same number that we called -- that Dispatcher

24   Pitts called that day.  We called the number and it rang.

25   Q.   So a couple of weeks prior when you were making the phone

MILNER – DIRECT – LEWIS

1  call, you were given a number, a phone number.

2  A.   Yes.

3  Q.   Is that the same number you dialed?

4  A.   Yes.

5  Q.   What happened when you dialed that number?

6  A.   It rang.

7  Q.   That phone rang.

8  A.   Yes.

9  Q.   And that phone was found where?

10  A.   On the defendant's person.

11       MR. LEWIS:  Government offers Exhibit 19 into

12  evidence, Judge.

13       THE COURT:  It's received.

14  BY MR. LEWIS:

15  Q.   Did you have a chance to talk to the defendant after you

16  arrested him?

17  A.   I did, briefly.

18  Q.   What did he have to say?

19       MR. BURNS:  Objection, Your Honor.  May we approach?

20       THE COURT:  Okay.

21  (Bench conference with lead attorneys:)

22       MR. BURNS:  Your Honor, he was under --

23       THE COURT:  What's the point?

24       MR. BURNS:  Mr. Wolford was under arrest at the time.

25  They do read him his Miranda rights.  He starts talking to them,

U.S. DISTRICT COURT

MILNER - DIRECT - LEWIS

1    however.  The Court states -- 20 and 21, Your Honor, both show

2    his invocation of his right to counsel and his invocation of the

3    right to remain silent, so under the Fifth and Sixth Amendment,

4    Your Honor, it would be improper for the jury to receive that

5    information and we would object to it.

6            THE COURT:  Well, did he answer the questions or

7    engage in the conversation you're offering after he was given

8    his Miranda warnings?

9            MR. LEWIS:  Yes, Judge.  And at one point in time he

10   does say, "I think I want my attorney now."  I've instructed my

11   witness not to mention anything about that, and this is the

12   first time I've heard of wanting to strike testimony from a

13   transcript.  It was my intent to offer them into evidence.  I

14   can -- we can just have -- briefly talk about it.

15           THE COURT:  Anything he said after he said he wanted

16   his attorney, don't offer it into evidence.

17           MR. LEWIS:  Yes, sir.

18           MR. BURNS:  We would object to offering that he said,

19   "I want my attorney."

20           MR. LEWIS:  We're not going to get into that.

21           THE COURT:  Well, including that.  But don't offer

22   that or anything after it.

23           MR. LEWIS:  I will want to somewhat lead him toward

24   that to make sure we don't fall into a misstep, if that's okay

25   with the Court.

MILNER - DIRECT - LEWIS

1              THE COURT:  Well, do you have a transcript?

2              MR. LEWIS:  I do.

3              THE COURT:  Well, don't ask him what was said.  Just

4    use the transcript and take out the part that shouldn't be in

5    there.

6              MR. LEWIS:  I'll do that, sir.

7              MR. BURNS:  And, Your Honor, just -- I did make an

8    objection in the written objections that specifies this -- I

9    mean. . .

10             THE COURT:  That does what?

11             MR. BURNS:  I gave him notice that we were objecting

12   to this prior.

13             THE COURT:  Well, the government apparently doesn't

14   want to say anything about it.

15             MR. BURNS:  Yes, sir.

16             MR. LEWIS:  I'll just get the transcript, and we'll

17   take out the bad parts.

18             THE COURT:  Yes.

19        (End of bench conference.)

20   BY MR. LEWIS:

21   Q.   Officer Milner, would you please turn to Government Exhibit

22   20 and 21, please.

23             THE COURT:  Twenty won't be received.  We've already

24   discussed that.

25             MR. LEWIS:  Yes, sir.

MILNER - DIRECT - LEWIS

1          THE COURT:  So there's no point in identifying that.

2  BY MR. LEWIS:

3  Q.   Exhibit 20, Officer Milner.  Do you recognize Government

4  Exhibit 20 -- 21?

5  A.   Twenty-one?

6          MR. LEWIS:  Sorry, Judge.

7  A.   Yes.

8  BY MR. LEWIS:

9  Q.   Can you tell us what that is?

10  A.   It's a transcript of the audio conversation between myself

11  and the defendant.

12  Q.   Does it fairly and accurately depict the words that were

13  spoken that day?

14  A.   Yes, sir.

15  Q.   Has it been edited in any way?

16  A.   No, sir.

17          MR. LEWIS:  The government offers Exhibit 21 into

18  evidence, Your Honor.

19          THE COURT:  It's received with the instructions that

20  we've already discussed.

21      This conversation occurred how long after he was arrested?

22          THE WITNESS:  Within the hour.

23          THE COURT:  Okay.  And was he given his so-called

24  Miranda warnings before you had this conversation with him?

25          THE WITNESS:  Yes, sir.

MILNER - CROSS - BURNS

1              THE COURT:  Okay.

2   BY MR. LEWIS:

3   Q.   After the conversation took place, were you able to acquire

4   the computer that was used by the defendant in this case?

5   A.   Yes, sir.

6   Q.   And what did you do with the computer after you acquired

7   it?

8   A.   I took it to the Tarrant County District Attorney's

9   computer forensic lab.

10              MR. LEWIS:  Nothing further at this time, Your Honor.

11              THE COURT:  Do you have any questions of this witness,

12  Mr. Burns?

13              MR. BURNS:  Just a few, Your Honor.

14                          CROSS-EXAMINATION

15  BY MR. BURNS:

16  Q.   In regards to the first chat room, that was what was

17  considered an adult-style chat room?

18  A.   That's correct.

19  Q.   And the second chat room that y'all -- that you made

20  reference to, the "hide something" --

21  A.   Hidebehind.com.

22  Q.   That also was an adult-only chat room?

23  A.   That's correct.

24  Q.   The female dispatcher that you had talking with Mr. Wolford

25  over the phone is an adult, is she not?

MILNER - CROSS - BURNS

1  A.   That's correct.

2  Q.   Do you know approximately how old she is?

3  A.   She's 19 years of age.

4  Q.   And she is also the same person who came and talked to him

5  at the McDonald's; is that correct?

6  A.   That is correct.

7  Q.   Now, in regards to the pay phone that was used, how far

8  from the McDonald's was that pay phone?

9  A.   Mile and a half, maybe.  That's a guess.

10  Q.   Could it have been a little -- Do you know approximately

11  how far it would be from the school?

12  A.   The pay phone is in the 5700 block, and the McDonald's is

13  in the 2200 block.

14  Q.   A video was sent to you in a package -- I mean, it's -- Let

15  me rephrase that.  When somebody is on the Internet with you and

16  they've got a video camera, they can send you a video

17  displaying, can they not?

18  A.   Can you rephrase that, sir?

19  Q.   If you're on one computer and you don't have a camera or

20  anything on your computer, but another person has a computer and

21  they have a web camera on their computer, they can send you a --

22  pardon me -- a live video, if you will; is that correct?

23  A.   That's correct.

24  Q.   And the way you receive it, though, is in a, what you call

25  a little package, or something, that you have to click on to

1    accept it?

2    A.    Yes.  You do have to accept the invitation to view it.

3    Q.    In the conversations that you were having back and forth,

4    was there any of the, sort of, shorthand dialog that children

5    use on their cell phones?

6    A.    I think there was some LOLs, which is laugh out loud, but

7    not a whole lot, no.

8    Q.    Did Mr. Wolford actually send a web cam to an address for

9    you or to a place where you could pick it up?

10   A.    No, sir.

11   Q.    When you stopped the vehicle and you looked in --

12   Specifically, I'm referring you to the pictures in the car,

13   Government's Exhibit 15 and 16.  Did you check to see whether or

14   not the black cup there or the travel holder was empty?

15   A.    No, sir, I did not.

16   Q.    Did you check to see whether or not the McDonald's

17   Styrofoam cup there had been drank out of?

18   A.    Whether it had been drank out of?

19   Q.    Yes.

20   A.    No, I did not.

21   Q.    It had some sort of liquid in it; is that correct?

22   A.    Yes.  The line was visible through the Styrofoam.  You can

23   see the outline in the photograph.

24   Q.    It's a little lower than the top; is that correct?

25   A.    Yes.

MILNER - REDIRECT - LEWIS

1  Q.   When you get into the chat room, do you have to make any

2  type of certification to Yahoo that you are above the age of 18?

3  A.   Yes, you do.

4  Q.   And on that hidebehind or website, it has the same

5  requirement, does it not?

6  A.   I believe so, yes.

7  Q.   What is put on a profile -- Is that what you call the thing

8  where you put your picture?

9  A.   Personal information?

10  Q.   Yes.

11  A.   Yes, sir.

12  Q.   Okay.  What would you put on the profile -- I mean, you can

13  just put anything, can you not?

14  A.   That's correct.

15  Q.   And, in fact, you talked to Mr. Wolford about the fact that

16  he didn't put his true age on there either; is that correct?

17  A.   That's correct.

18        MR. BURNS:  May I have just a moment, Your Honor?

19     (Defense counsel confer.)

20        MR. BURNS:  That's all I have, Your Honor.  I'll pass

21  the witness.

22        THE COURT:  Any other questions?

23        MR. LEWIS:  Just one question.

24                    REDIRECT EXAMINATION

25  BY MR. LEWIS:

U.S. DISTRICT COURT

PITTS - DIRECT - LEWIS

1   Q.   The man that you arrested that day that showed up at

2   McDonald's; is he in the courtroom?

3   A.   Yes, sir.

4   Q.   Would you please describe to the Court what he's wearing.

5   A.   He's wearing a blue-striped tie, black coat, white shirt,

6   sitting in the middle of the defense table.

7           THE COURT:  He's identified the defendant.

8           MR. LEWIS:  Thank you, sir.  Nothing further from the

9   government, sir.

10          THE COURT:  Okay.  You can step down.

11      Call your next witness.

12          MR. LEWIS:  Yes, Your Honor.  Lauren Pitts.

13          THE COURT:  Who is your next witness?

14          MR. LEWIS:  Lauren Pitts, Your Honor.

15          THE COURT:  You may proceed.  Try to avoid, to the

16  extent possible, duplicating or going over the same thing that

17  the other witness testified to.

18          MR. LEWIS:  Yes, Your Honor.

19          THE COURT:  You can be seated.

20                          LAUREN PITTS,

21      having been duly sworn, testified as follows:

22                      DIRECT EXAMINATION

23  BY MR. LEWIS:

24  Q.   Please state your name.

25  A.   Lauren Pitts.

PITTS - DIRECT - LEWIS

```
 1   Q.   How old are you?

 2   A.   Nineteen.

 3   Q.   Where are you currently employed?

 4   A.   North Richland Hills Police Department.

 5   Q.   And what do you do with the North Richland Hills Police

 6   Department?

 7   A.   Dispatch.

 8           MR. BURNS:   I'm sorry, Your Honor.   Could you ask her

 9   to speak a little more into the microphone.   I'm having a hard

10   time hearing her.

11   BY MR. LEWIS:

12   Q.   You can just pull it up if you need to.

13           THE COURT:   Just speak toward the microphone.   You

14   don't need to lift it up.

15           MR. LEWIS:   Thank you, sir.

16   BY MR. LEWIS:

17   Q.   I'm going to turn your attention back to April 15 of this

18   year, 2008.   Where were you employed then?

19   A.   The Samson Park Police Department.

20   Q.   What did you do with Samson Park?

21   A.   Dispatch.

22   Q.   Now, did you have a meeting with Sergeant Tom Milner around

23   April 15th of 2008?

24   A.   Yes.

25   Q.   What was going to happen?
```

PITTS - DIRECT - LEWIS

1    A.    I was going to make a phone call so that the man that I was

2    calling knew that I was a female and I was not with law

3    enforcement.

4    Q.    And in order to prepare for this phone call, what did you

5    do?  Did you review anything?

6    A.    Yes.  The dialog between him and the man he was talking to

7    on the computer.

8    Q.    I turn your attention to Exhibit 23.  I think if you just

9    flip it over to Exhibit 23.

10   A.    (Witness complies.)

11   Q.    Do you recognize Exhibit 23?

12   A.    Yes.

13   Q.    And what is it?

14   A.    The transcripts of my phone call.

15   Q.    Okay.  And, in fact, can you tell us what happened that day

16   when you made that phone call?

17   A.    There were two calls.  The first one was short.  He just

18   said that he'd call me back so I wouldn't waste my money.  The

19   second one, just talked about where we were going to meet, what

20   time, and what we were going to do.

21   Q.    And is that accurately depicted within the transcript

22   that's before you in Government Exhibit 23?

23   A.    Yes.

24   Q.    Has it been altered or edited in any way whatsoever?

25   A.    No.

PITTS - DIRECT - LEWIS

1   Q.    Those are the words that were spoken that day.

2   A.    Yes.

3            MR. LEWIS:   Government offers Exhibit 23 into

4   evidence, Your Honor.

5            THE COURT:   It's received.

6   BY MR. LEWIS:

7   Q.    What did you talk about?  You mentioned the fact that you

8   were trying to establish a meet time.  What time of the day were

9   y'all supposed to meet?

10  A.    I offered to meet after 3:00.

11  Q.    Why is that?

12  A.    So I would be done with school.  And then he offered -- he

13  suggested that I skip school to meet in the morning.

14  Q.    Why did he want to meet in the morning?

15  A.    He wanted to meet so it wasn't so hot and he didn't sweat

16  in his bed.

17  Q.    Is that something that he said in the transcript?

18  A.    Yes.

19  Q.    After you established the time of day that you were going

20  to meet, did you establish where you're going to meet next?

21  A.    Yes.

22  Q.    Where is that?

23  A.    At McDonald's.

24  Q.    Do you know which McDonald's?

25  A.    Here in Fort Worth.

PITTS - DIRECT - LEWIS

1   Q.   What's going to happen at the meet at McDonald's between

2   you and this man you're talking to on the phone?

3          THE COURT:  What did y'all decide in your telephone

4   conversation would happen when you met at McDonald's?

5          THE WITNESS:  We went back and forth about what we

6   were going to do.  He said, "What do you want to do?"  "I don't

7   care.  What do you want to do?"  And then he said, "It's just a

8   word.  Just say it."  So I said, "Have sex."  And he said,

9   "Okay.  If that's what you want to do."

10  BY MR. LEWIS:

11  Q.   Now, at any point in time did he state that he was worried

12  that you were not who you said you were, maybe you were law

13  enforcement?

14  A.   Yes.

15  Q.   And going back to wanting to meet in the morning, was he

16  also concerned about who might see you all after 3:00 o'clock?

17  A.   Yes.

18  Q.   What did he say?

19  A.   He was afraid that my friends might see me if I went after

20  school with him.

21  Q.   So is that another reason to meet earlier in the day?

22  A.   Yes.

23  Q.   And did he, in fact, tell you how maybe you should go about

24  skipping school that day?

25  A.   He said we should meet early so it would look like I was

PITTS - DIRECT - LEWIS

1    going to school.  Instead, I would go to the McDonald's.

2    Q.    Were you trying to fool anybody else other than your

3    friends about meeting earlier in the morning?  Were you

4    concerned about your mother?

5    A.    Oh, yes.

6          THE COURT:  Well, you have offered the transcript in

7    evidence, so the jury will have all that to look at if they want

8    to.  Let's don't take up a lot of time saying what's on it.

9          MR. LEWIS:  Yes, sir.

10   BY MR. LEWIS:

11   Q.    Would you please turn to Exhibit 25 and 26.

12   A.    (Witness complies.)

13   Q.    Do you recognize Government's Exhibit 25 and 26?

14   A.    Yes.

15   Q.    Can you tell us what they are?

16   A.    The McDonald's we met at.

17   Q.    Do both images fairly and accurately depict the McDonald's

18   as it appeared that day?

19   A.    Yes.

20   Q.    Time of the meet?

21   A.    Yes.

22   Q.    And that was the end of April, is that correct, 2008?

23   A.    Yes.

24         MR. LEWIS:  Government offers Exhibit 25 and 26 into

25   evidence, Your Honor.

PITTS - DIRECT - LEWIS

1              THE COURT:  They're received.

2    BY MR. LEWIS:

3    Q.   What was the plan on that day that the meet was supposed to

4    occur?  What did you do?

5    A.   I dressed in the clothes that he was told by Sergeant

6    Milner that I'd be wearing.

7    Q.   Which was what?

8    A.   A pink sweatshirt and blue jeans.

9    Q.   What did you do?

10   A.   I -- Sergeant Milner dropped me off about one or two blocks

11   away, and I walked to the McDonald's.  As I was walking inside,

12   he pulled up behind me and said, "Hey, Jenn."  So I turned

13   around and I waved and I walked towards his car.

14   Q.   What kind of car was it?

15   A.   It was a white Ford Excursion.

16   Q.   Okay.  And he said, "Hey, Jenn"?

17   A.   Yes.

18   Q.   Why would he say, "Hey, Jenn"?

19   A.   That was the name of the girl online.

20   Q.   That was the 13 year old.

21   A.   Yes.

22              THE COURT:  Let's don't keep repeating the same thing

23   over and over again.  Let's streamline this.

24              MR. LEWIS:  Yes, sir.

25   BY MR. LEWIS:

PITTS - DIRECT - LEWIS

1    Q.    What happened next?

2    A.    I walked over to the truck.  He said something to the

3    effect of come on, let's go.  I said I'd be right back.  I had

4    to go to the bathroom.  And I walked inside the McDonald's.

5    Q.    Now, this man who said, "Hey, let's go," is he here in the

6    courtroom?

7    A.    Yes.

8    Q.    Can you please describe to the Court what he's wearing.

9    A.    It's a black suit and a blue tie.

10          MR. LEWIS:  Ask the record to reflect the

11   identification of the defendant by the witness.

12          THE COURT:  What table is he seated at?

13          THE WITNESS:  The one to the left of the prosecutor.

14          THE COURT:  She's identified the defendant.

15          MR. LEWIS:  Thank you, sir.

16   BY MR. LEWIS:

17   Q.    So you say you'll be right back.  Then what happens?

18   A.    I walked into the McDonald's and told the officer inside

19   that he had made contact.  And then when I turned to show him

20   where he was, he wasn't there anymore.  He drove off.

21          MR. LEWIS:  Nothing further from the government, sir.

22          THE COURT:  Do you have any questions of this witness,

23   Mr. Burns?

24          MR. BURNS:  Just a few.

25          THE COURT:  Okay.

PITTS - CROSS - BURNS

```
 1                        CROSS-EXAMINATION
 2   BY MR. BURNS:
 3   Q.    When you went up to see Mr. Wolford in the truck, how old
 4   were you at that time?
 5   A.    Nineteen.
 6   Q.    Was there any mention about a Coke or anything at that
 7   time?
 8   A.    About a Coke?
 9   Q.    Yeah.
10   A.    Not to me.
11   Q.    Was there any talk about your age or anything at that time?
12   A.    No.
13   Q.    Do you remember the precise date that you met Mr. Wolford?
14   A.    The date?
15   Q.    Yes.
16   A.    April 30th.
17   Q.    Of 2008?
18   A.    Yes.
19             MR. BURNS:  That's all I have, Your Honor.  Pass the
20   witness.
21             THE COURT:  Can she be excused as a witness?
22             MR. LEWIS:  Yes, sir.
23             THE COURT:  You can step down.
24             MR. LEWIS:  Oh, I'm sorry.  I spoke for the
25   government.  I didn't want to speak for --
```

GIBSON - DIRECT - LEWIS

59

```
 1          MR. BURNS:  I was just going to say no objection.

 2          THE COURT:  You're excused as a witness.  Thank you.

 3     Do you have another short witness?

 4          MR. LEWIS:  Should be, sir, yes.

 5          THE COURT:  Okay.  Call another short witness.

 6          MR. LEWIS:  Kyle Gibson.

 7          THE COURT:  You may proceed.

 8          MR. LEWIS:  Thank you, sir.

 9                         KYLE GIBSON,

10     having been duly sworn, testified as follows:

11                      DIRECT EXAMINATION

12  BY MR. LEWIS:

13  Q.   Would you please state your name for the record.

14  A.   Kyle Gibson.

15  Q.   Where are you employed?

16  A.   With the Tarrant County District Attorney's Office.

17  Q.   What do you do with the Tarrant County District Attorney's

18  Office?

19  A.   I'm a computer forensic examiner and investigator.

20  Q.   I'm going to turn your attention to Government Exhibit 27.

21  I believe it is down beneath where your feet are.

22  A.   Yes, sir.

23  Q.   Do you recognize Government Exhibit 27?

24  A.   Yes.  It's a laptop computer that was turned over to our

25  office by Sansom Park Police Department.
```

GIBSON - DIRECT - LEWIS                                    60

1  Q.   And you were to able to look through the computer; is that

2  correct?

3  A.   Correct.

4  Q.   Would you please also turn your attention to Government

5  Exhibit 28.

6  A.   (Witness complies.)

7  Q.   Do you recognize Government Exhibit 28?

8  A.   Yes, sir.  It's an external hard drive.

9  Q.   Of those items, have they been altered or changed in any

10 way since you last examined them?

11 A.   No.

12        MR. LEWIS:  I offer 27 and 28 into evidence, Your

13 Honor.

14        THE COURT:  They're received.

15 BY MR. LEWIS:

16 Q.   You did the forensic examination on both items?

17 A.   Yes, sir.

18 Q.   What does that entail?

19 A.   Basically we remove the hard drive, make a forensic image

20 of the hard drive, and then examine that image so the original

21 item remains intact.  We use forensic software to do that.

22 Q.   I'll turn your attention to Government Exhibit 29.  It's in

23 the folder.

24 A.   (Witness complies.)

25 Q.   Do you recognize Government Exhibit 29?

GIBSON - DIRECT - LEWIS

1  A.   It's an image I recovered off the laptop.

2  Q.   You recovered off that laptop, Government Exhibit 27?

3  A.   Yes, sir.

4  Q.   And what is that image?

5  A.   It's an image that Sansom Park Police Department uses in

6  their investigation.

7  Q.   And what is it of?

8  A.   It's an image of a young girl.

9  Q.   Does it fairly -- Is it in the same condition as once you

10  received it and found it on that computer?

11  A.   Yes, it is.

12        MR. LEWIS:   The government offers Exhibit 29 into

13  evidence.

14        THE COURT:   It's received.

15  BY MR. LEWIS:

16  Q.   Please turn to Government Exhibit 30.

17  A.   (Witness complies.)

18  Q.   Do you recognize what Government Exhibit 30 is?

19  A.   It's a list of the favorites off the laptop computer.

20  Q.   And when you say "favorites," what is that?

21  A.   Basically on Internet Explorer, websites you like to

22  frequent or want to visit again, you can mark those.  That way

23  you don't have to type in the name of the website again.

24  Q.   Is that why they're called favorites?

25  A.   Yes.

GIBSON - DIRECT - LEWIS

1  Q.    Government Exhibit 30 is favorites found where?

2  A.    I'm sorry.  I don't understand the question.

3  Q.    Where did you find Government Exhibit 30?

4  A.    Oh, underneath the user name of Randy Wolford on the laptop

5  computer.

6         THE COURT:  Why would you put in a list of favorites?

7  Just makes it easier to get there if you want to get there?

8         THE WITNESS:  Yes, sir.  So that way you don't have to

9  go back and search for it.  A lot of times people will mark,

10  say, their personal -- their bank websites and things like that.

11  There's a drop-down menu on Internet Explorer that you can hit,

12  drop it down, and just select whatever you want to name it or it

13  can name it, itself.

14        THE COURT:  And these things that are shown on Exhibit

15  30, they're things that the defendant had in his computer as

16  being places he wanted to go to rapidly?

17        THE WITNESS:  Correct.

18        THE COURT:  Well, how do you get there?

19        THE WITNESS:  Well, basically what would happen is

20  when you open up Internet Explorer, you can click on the

21  favorites button.  It will drop down, and this list would

22  appear.  And then you could just click on whatever item on that

23  list, and it would take you to that particular website.

24        THE COURT:  Okay.

25        MR. LEWIS:  Government would offer Exhibit 30 into

GIBSON - DIRECT - LEWIS                                          63

1    evidence, Judge.

2              THE COURT:  It's received.

3              MR. BURNS:  Your Honor, we would object.  These are

4    not illegal websites.  Therefore --

5              THE COURT:  They're not what?

6              MR. BURNS:  They're not illegal websites.  It's not

7    child porn and therefore --

8              THE COURT:  This is not what?  I'm sorry.

9              MR. BURNS:  It's not child pornography.

10             THE COURT:  I guess like you, I'm having a hard time

11   hearing sometimes.

12             MR. BURNS:  I'm sorry, Your Honor.  That's true.  Your

13   Honor, these are not child pornography.  These are basically

14   First Amendment sites, and we would object for that reason.

15   These are adult websites.

16             MR. LEWIS:  Judge, I can --

17             THE COURT:  Let me have the attorneys come up here a

18   minute.

19        (Bench conference with lead attorneys:)

20             THE COURT:  I think, Mr. Burns, you've just about

21   talked me into changing my ruling on the images that I've ruled

22   we should not receive in evidence.  Apparently Mr. Burns is

23   taking the position that his client only looked at adult

24   material, so I'm changing my ruling on the photographs that I

25   said you could not receive in evidence.  And I overrule your

GIBSON - DIRECT - LEWIS

1    objection.

2              MR. LEWIS:  All right, sir.

3              MR. BURNS:  What we're arguing about, Judge, is --

4              THE COURT:  I'm overruling your objection, and I'm

5    changing my ruling on the images that I previously said will not

6    be received in evidence, because I'm satisfied now that the

7    probative effect, bearing in mind the contention the defendant

8    has taken, outweighs any prejudicial effect to those exhibits.

9    So if you need to develop anything through this witness, you can

10   do so.

11             MR. LEWIS:  I will do so.  Thank you, sir.

12             THE COURT:  You can be seated.

13             MR. BURNS:  Note our exception.

14             ME. LEWIS:  Thank you, sir.

15        (End of bench conference.)

16             MR. LEWIS:  Your Honor, I believe I offered Exhibit 30

17   into evidence?

18             THE COURT:  It's received.

19             MR. LEWIS:  Thank you, sir.

20   BY MR. LEWIS:

21   Q.   Mr. Gibson, please look at Government's Exhibit 30 and the

22   fourth from the bottom favorite.  Can you tell us what that is?

23   A.   It says hidebehind.com.

24   Q.   Thank you.  I'm going to turn your attention to Government

25   Exhibit 31.

1   A.   (Witness complies.)

2   Q.   Do you recognize that?

3   A.   It's a chat log recovered from the laptop.

4   Q.   Is there anything about that chat log -- Who's the chat log

5   with?

6   A.   It's between Lightman TX and to Good Girl 12.

7   Q.   And do you know who the Good Girl 12 is?

8   A.   It's the undercover account used by Sansom Park Police

9   Department.

10  Q.   Is that Tom Milner?

11  A.   Sergeant Milner, yes, sir.

12  Q.   And this is the chat that was found on the defendant's

13  computer.

14  A.   Correct.

15  Q.   Has it been changed or altered in any way whatsoever from

16  when you found it on the defendant's computer?

17  A.   No.

18          MR. LEWIS:  Government offers Exhibit 31 into

19  evidence.

20          THE COURT:  It's received.

21      Let me have the attorneys come up here a minute.

22      (Bench conference with lead attorneys:)

23          THE COURT:  Is that the same -- are those the same

24  conversations that appear in Exhibit 3?

25          MR. LEWIS:  Yes, sir.

GIBSON - DIRECT - LEWIS                                    66

```
 1              THE COURT:  Are they all the same?
 2              MR. LEWIS:  Yes, sir.  It is -- A majority of them are
 3   the exact same images depicted like the beginning of April.
 4              THE COURT:  You don't need to whisper.
 5              MR. LEWIS:  I'm sorry.  It's the same conversation.
 6   It just shows that it was on his computer as well as on our
 7   guy's computer.
 8              THE COURT:  Okay.  I just want to be sure.  You may
 9   want to make that clear to the jury.
10              MR. BURNS:  Your Honor, while we're here, I anticipate
11   the state is going to offer Exhibits 32, 33, 34, 35, and 36.
12              THE COURT:  Are those the defendant's conversations?
13              MR. LEWIS:  Yes, sir.  And I do plan on offering --
14   Oh, I'm sorry to interrupt, Mr. Burns.
15              MR. BURNS:  They're additional -- The conversation is
16   not with Mr. Milner.  These are extraneous and collateral.
17   They're with other people, adult people, unrelated to this
18   offense, and we would object, Your Honor.
19              THE COURT:  Well, I haven't read those.  What are
20   they?
21              MR. LEWIS:  They are chats, online chats, found on the
22   defendant's computer he has with other individuals.  I did not
23   plan on reading through them at all.  What I planned on getting
24   through this witness would be, what is that conversation about.
25   It's about having sex with children.  What is this conversation
```

GIBSON - DIRECT - LEWIS

1    about?  It's about training this little girl to have sex with

2    him, and these chats talk about having sex with children.  And I

3    think that's perfectly --

4            THE COURT:  What's wrong with that?

5            MR. BURNS:  Well, Your Honor, I think it's clearly

6    these are by adults.  It didn't happen.  They're extraneous and

7    collateral.  Any probative value --

8            THE COURT:  Considering the position the defendant has

9    taken now, that he thinks these are adults, I'm going to

10   overrule that objection.

11           MR. LEWIS:  Thank you, sir.

12           MR. BURNS:  Note our exception.

13       (End of bench conference.)

14   BY MR. LEWIS:

15   Q.   Going back to Government Exhibit 31 and comparing it to

16   Government Exhibit 3, have you been able to determine if that

17   is, in fact, the same conversation that has been taking place?

18   A.   It begins on a different date than Exhibit 3.  May I pull

19   this out?

20   Q.   Yes, please do.

21           THE COURT:  Well, if he's going to have to compare

22   those to see if they're the same conversations, we may as well

23   take a break.

24       Is there something you can get to that this witness has to

25   offer before he does that and that he can do that during the

GIBSON - DIRECT - LEWIS

1   lunch break?

2          MR. LEWIS:  Certainly, Your Honor.  I can move on.

3          THE COURT:  Okay.

4   BY MR. LEWIS:

5   Q.   Mr. Gibson, would you please look at Government's Exhibit

6   32, 33, 34, 35, and 36.

7   A.   (Witness complies.)

8   Q.   Do you recognize those items?

9   A.   They're additional chat sessions.

10  Q.   And when you say "additional chat sessions," what does that

11  mean?

12  A.   They're between Lightman TX and other individuals.  Not to

13  Good Girl 12.

14  Q.   Between the defendant and some other people.

15  A.   Correct.

16  Q.   What do they talk about?  What is the conversation -- Okay.

17  When reviewing those, have they been altered in any way since

18  you viewed them on the defendant's laptop?

19  A.   No.

20  Q.   They haven't been altered or edited in any way whatsoever.

21  A.   No.

22          MR. LEWIS:  Offer Government's Exhibits 32, 33, 34,

23  35, and 36 into evidence, Your Honor.

24          MR. BURNS:  We renew the objections, Your Honor, we

25  made at the bench.

GIBSON - DIRECT - LEWIS

69

1          THE COURT:  They're received.  I overrule the

2    objections.

3    BY MR. LEWIS:

4    Q.   Government Exhibit 32, Mr. Gibson, can you briefly tell us

5    what is occurring in that conversation between the defendant and

6    someone else?

7    A.   Basically they discuss having a female slave and then

8    having children that would also be slaves.

9    Q.   What kind of slaves?

10   A.   Just regular service slaves and sexual slaves.

11   Q.   Government Exhibit 33, can you tell me the gist of that

12   conversation?

13   A.   It's about incest between fathers and daughters.

14   Q.   On Government Exhibit 34, also found on the defendant's

15   computer, what is the gist of that conversation?

16   A.   I believe it's about training small children.

17   Q.   To do what?

18   A.   For sex.

19   Q.   Government Exhibit 35 --

20          MR. BURNS:  I object to what he believes, Your

21   Honor.

22          MR. LEWIS:  We can have this read through, Judge, if

23   you want.

24          THE COURT:  Pardon?

25          MR. BURNS:  He doesn't -- He's speculating as to what

U.S. DISTRICT COURT

GIBSON - DIRECT - LEWIS

1    it says, Your Honor.  We object to that.

2              THE COURT:  I thought you were telling us what it

3    says.

4              MR. LEWIS:  Judge, we can have him read through it.

5    I'm just trying to get to --

6              THE COURT:  Were you accurately summarizing some of

7    the parts of those conversations?

8              THE WITNESS:  Yes, sir.  They discuss different sexual

9    acts with children and adults.

10             THE COURT:  Okay.  The jury will have the actual

11   transcripts, so they can see exactly what it says.

12             MR. LEWIS:  Yes, sir.

13   BY MR. LEWIS:

14   Q.   Government Exhibit 35, Mr. Gibson, can you tell me the gist

15   of that conversation?

16   A.   It's a conversation, again, between Lightman TX and another

17   person where Lightman TX basically states he's been dealt with

18   for rape of a minor.

19   Q.   Government Exhibit 36, that conversation?  What does that

20   involve?

21   A.   Again, it involves training children for sex.

22   Q.   To do what?

23   A.   For sex with their mothers and fathers.

24   Q.   Please turn your attention to Government's Exhibits 38 --

25   I'm sorry, 37, 38, 39, 40, and 41.

GIBSON - DIRECT - LEWIS

```
 1   A.    (Witness complies.)

 2   Q.    Do you recognize Government's Exhibits 37 through 41?

 3   A.    Yes, I do.

 4   Q.    And can you tell us what they are?

 5   A.    They're images that I recovered off the --

 6         MR. BURNS:  Your Honor, we renew the objections we

 7   previously made to these exhibits.

 8         THE COURT:  Okay.  Thirty-seven through what?

 9         MR. LEWIS:  Forty-one, Your Honor.  I believe.  Yes,

10   sir.  Thirty-seven through 41.

11   BY MR. LEWIS:

12   Q.    Now, these images, have they been altered in any way since

13   you found them on the defendant's computer?

14   A.    No.

15   Q.    Do they fairly and accurately depict the images as they

16   appeared on the computer that day when you looked through the

17   defendant's computer?

18   A.    Yes.

19         MR. LEWIS:  Your Honor, I'd offer 37, 38, 39, 40, and

20   41 into evidence, Your Honor.

21         MR. BURNS:  Same objections.

22         THE COURT:  They're received.  And I'll make the same

23   ruling I made before in response to the objections.  That is,

24   the most recent ruling after I changed it.

25         MR. LEWIS:  Yes, Your Honor.
```

GIBSON - DIRECT - LEWIS

1   BY MR. LEWIS:

2   Q.   What is Government Exhibit 37?  What does it depict?

3   A.   It depicts a minor child performing oral sex on an adult

4   male.

5   Q.   Government No. 37 and Government No. 38, what does that

6   depict?

7   A.   Same thing but a different girl.

8   Q.   Government 39?

9   A.   It looks like a young female who's bound, gagged, with a

10  marker inserted into her vagina.

11  Q.   Government Exhibit 40?

12  A.   It's a young male or female getting a spanking with a

13  paddle.

14          THE COURT:  And where were these found?  Where were

15  these images found?

16          THE WITNESS:  Most of them were found on the laptop,

17  but a couple of them were on the storage drive, external storage

18  drive.

19  BY MR. LEWIS:

20  Q.   Both items belonging to the defendant?

21  A.   Correct.

22  Q.   Government Exhibit 41, what does that image depict?

23  A.   It depicts an adult male holding down a young female with

24  his penis in his hand and in her mouth.

25          MR. LEWIS:  Nothing further at this time, Judge.  The

U.S. DISTRICT COURT

GIBSON - CROSS - BURNS

1    jury has the transcripts, and they'll be able to compare the

2    transcripts, if need be.  Nothing further for this witness at

3    this time.

4              THE COURT:  Okay.  Do you have any questions of this

5    witness?

6              MR. BURNS:  I have a few, Your Honor.

7              THE COURT:  Okay.

8                            CROSS-EXAMINATION

9    BY MR. BURNS:

10   Q.   In regards to Government's Exhibits 37 through 41, did you

11   find that those images had been opened more than once?

12   A.   I have no way to verify that.

13   Q.   When someone sends you a package of pornography, whether

14   it's adult or child, do you have any way of knowing what's in

15   that package until you open it?

16   A.   No.

17   Q.   Once it's on your computer, there is -- Excuse me.  Let me

18   -- Once it's on your computer, there is a way that you can

19   determine how many times that particular --

20             THE COURT:  How many times somebody has looked at it?

21   BY MR. BURNS:

22   Q.   -- that jpeg has been opened.

23             THE COURT:  You want to find out how many times

24   somebody has looked at it?

25             MR. BURNS:  Yes.

GIBSON - CROSS - BURNS

1  BY MR. BURNS:

2  Q.   Can you tell?

3          THE COURT:  Can you tell that?

4          THE WITNESS:  I don't believe there's a way to tell

5  exactly how many times something has been viewed or hasn't been

6  viewed because there's so many different ways to open a file,

7  and different software and things like that, so I don't think

8  there's a way to track that.

9  BY MR. BURNS:

10 Q.   Whether or not it's been opened and viewed on several

11 occasions or just one, is there any way of determining that?

12 A.   The difference, no, sir.

13 Q.   None of those photographs were put into anything called a

14 favorites or anything of that nature, were they?

15 A.   No.

16 Q.   And did you determine on state's exhibits -- I mean,

17 Government Exhibits 31, 32, 33, 34, 35, and 36 whether or not

18 the conversation was between two adults?

19 A.   I have no way to know that.  It's just a log that the

20 software does.

21 Q.   Do you have any way of determining who was actually on the

22 computer at that time?

23 A.   No.

24          MR. BURNS:  That's all I have.  I'll pass the witness.

25          MR. LEWIS:  Nothing further from the government, Your

1   Honor.

2          THE COURT:  Are you wanting to excuse him now?  You've

3   decided you're just going to let the transcripts speak for

4   themselves, so to speak?

5          MR. LEWIS:  Yes, Your Honor.

6          THE COURT:  Can he be excused as a witness?

7          MR. LEWIS:  From the government, sir, yes.

8          MR. BURNS:  We have no objection.

9          THE COURT:  You're excused as a witness.  Thank you.

10         MR. GIBSON:  Thank you.

11         THE COURT:  Okay.  We're going to take a lunch break.

12  We'll be back at 10 after 2:00.  And remember the instructions I

13  gave you about talking to people and so on.

14     (Jury out, 1:11 p.m.)

15         THE COURT:  How much more do you have, Mr. Lewis?

16         MR. LEWIS:  Your Honor, at this point in time, the

17  government would be requesting to offer the evidence of two

18  other witnesses, and that pertains to the 404(b) evidence, Your

19  Honor.  One witness will talk about the videotape that occurred

20  that night in Murphy, Texas, in November of 2006.  The other

21  witness will talk about the interview he gave post-arrest during

22  that Murphy, Texas, interview.  Those would be the only two

23  witnesses the government has left, sir.

24         THE COURT:  Okay.  See y'all, what, ten after 2:00.

25         MR. LEWIS:  Yes, sir.

1          (Court in recess, 1:13 p.m. until 2:12 p.m.)

2          (On record, no defendant, no jury:)

3              THE COURT:  We have a little bit of a problem.  Y'all

4    can be seated.  I didn't realize it, but one of the jurors has

5    been asleep all morning, apparently.

6              MR. BURNS:  Yes, Your Honor.

7              THE COURT:  Did y'all realize that?

8              MR. BURNS:  I just was told.  I didn't realize it

9    until I was told just a minute ago.

10             MR. LEWIS:  Same here, Judge.

11             THE COURT:  Well, I don't think we can have a juror

12   that doesn't know what went on through the trial.  So I'm going

13   to suggest we excuse her and replace her with the alternate.

14        Do you have any problem with that, Mr. Lewis?

15             MR. LEWIS:  No, sir.  Which juror was it?  Do you

16   know, sir?

17             THE COURT:  No. 4.

18             MR. LEWIS:  Okay, sir.

19             THE COURT:  Let me see what the name is.  Janis Sheen.

20             MR. LEWIS:  Yes, Your Honor.  No objection from the

21   government, sir.  I was told the same thing after we broke.

22             THE COURT:  Okay.  Do you have any problem with that,

23   Mr. Burns?

24             MR. BURNS:  No, Your Honor.  I mean, obviously she

25   can't be a juror.

```
1            THE COURT:  From your client's standpoint, it's fine
2   if they all slept through it.
3            MR. BURNS:  Yes, Your Honor.
4            THE COURT:  But I think as a practical matter, we
5   can't go on with the sleeping juror.
6        So, Charlie?
7            THE COURT SECURITY OFFICER:  Yes, sir.
8            THE COURT:  Go get Juror Sheen and tell her to come
9   into the courtroom.
10           COURT SECURITY OFFICER:  Sheen?
11           THE COURT:  Yes.  Janis Sheen.  She was the No. 4
12  juror.
13       (Brief pause.)
14           THE COURT:  Y'all can be seated.
15       While he's doing that, get your Court's charge and let me
16  mention a couple of things in there.  Look at page 11.
17       I was wrong in saying in our second telephone conference
18  Friday that the word "computer" is not in here.  It does appear
19  in there in the fourth line or fifth line down.  I eliminated
20  the definition of computer.  I don't think in this day and age
21  you need to define what a computer is.  So I'm just pointing
22  that out.  If anybody wants me to reinstate the definition of
23  the word "computer," we can give some thought to doing that.
24       (Defendant enters courtroom, 2:15 p.m.)
25           MR. LEWIS:  That's not a concern from the government's
```

```
 1    point of view.
 2              MR. BURNS:  I don't have any problem leaving it out,
 3    Your Honor.
 4              THE COURT:  Okay.  And then the next term is also on
 5    page 11.  Normally, I would not define "knowingly" beyond the
 6    first sentence that's in that paragraph.
 7         Ms. Sheen?
 8              JUROR SHEEN:  Yes, sir.
 9              THE COURT:  I'm told that you had a hard time staying
10    awake this morning.
11              JUROR SHEEN:  I did, Your Honor.
12              THE COURT:  And why don't you stand over there.  And I
13    don't mean to embarrass you, but we can't go on with a juror --
14              JUROR SHEEN:  You're not because I was going to say
15    something.
16              THE COURT:  Pardon?
17              JUROR SHEEN:  I was going to say something when we got
18    back.
19              THE COURT:  What is the problem?  Do you just work
20    late?
21              JUROR SHEEN:  I had a situation with a teenager last
22    night, so I only got like an hour and a half sleep.
23              THE COURT:  Okay.
24              JUROR SHEEN:  And it was so cold when I was in here
25    that. . .
```

```
1              THE COURT:  Well, I assumed it was something that

2   happened and it wasn't something you were being willful --

3              JUROR SHEEN:  No.

4              THE COURT:  I don't think it would be fair to you or

5   the parties.

6              JUROR SHEEN:  I could not sit in judgment today.

7              THE COURT:  Okay.

8   .          JUROR SHEEN:  And I do apologize to the Court.

9              THE COURT:  Okay.  You're excused.

10             MS. SHEEN:  Okay.  Thank you very much.

11             THE COURT:  We're substituting the -- there's an

12  alternate --

13             MS. SHEEN:  There was an alternate, yes.

14             THE COURT:  We're substituting the alternate for you.

15             MS. SHEEN:  Thank you.  I apologize again.

16             THE COURT:  Okay.

17      (Ms. Sheen leaves courtroom.)

18             THE COURT:  Back to where we were.  I don't -- I've

19  modified a little bit that second sentence that says the term

20  "knowingly" refers to the act of using, so on.  But I still

21  don't understand it.  And I wonder why we need it in there.

22  Normally I would just end it with the first sentence.

23             MR. BURNS:  Your Honor, I think it goes to the

24  specific knowledge that the defendant has to have.

25             THE COURT:  Well, do we need it in there?
```

1          MR. BURNS:  I do.

2          THE COURT:  The term "knowingly" refers to the act of

3    using a means or facility of interstate commerce.  So far,

4    that's nonsense.  That's not what knowingly refers to.  And then

5    it goes on, it refers to an awareness of the general nature and

6    character of the online conversations.  That's not what

7    knowingly refers to.  What is it you want it in there for,

8    Mr. Burns, to create confusion?

9          MR. BURNS:  Well, no, Your Honor.  It's to clear up

10   the confusion so the jury knows exactly what it is that they

11   have to find that the defendant, Mr. Wolford, knowingly did.

12   And to direct their attention to those requirements, Your Honor.

13         THE COURT:  Okay.  You want to say refers to the act

14   of using a means or facility of interstate commerce?  We've

15   already made clear that using an Internet is the use of the

16   facility of interstate commerce, so we don't need to say that

17   again.  So we take that part out, and let's see what's left.

18   "Knowingly" refers to an awareness or the general nature and

19   character of the online conversations.  What does that mean?  Is

20   this something Mr. Burns suggested?

21         MR. LEWIS:  Honestly, I cannot remember, sir.

22   I would state that I think the first sentence is going to cover

23   the definition of knowingly.

24         THE COURT:  Okay.  Well, I'm going to take out the

25   rest of that paragraph.  It just doesn't add anything other than

1    confusion.

2        So the paragraph will now read, it will just be the first

3    sentence, an act is done knowingly if done voluntarily and

4    intentionally and not because of mistake or accident or other

5    innocent reason.

6        Okay.  Now, those are the changes that appear to me to be

7    appropriate in the charge.

8        Now, my thought is we've already heard -- we've already

9    received 404-type evidence, and we're going to receive some

10   more.  I thought that I would wait until after we receive the

11   remaining -- the part about the news media doing what they did

12   before I give them this explanation.  And then I'm going to give

13   them the explanation about why the 404 evidence was received,

14   unless somebody wants me to do it at an earlier time.  I'll hear

15   from you if you do.  Otherwise, I'll just wait until we hear

16   that to give it.

17             MR. LEWIS:  Fine with the government, sir.

18             THE COURT:  Okay.  Why don't you get the jury in.

19             MR. LEWIS:  Your Honor, can I have the first witness

20   brought in, just sitting in the gallery, so we don't waste time?

21             THE COURT:  Yes.  Have your next witness come forward.

22             MR. LEWIS:  Go ahead and sit up there?

23             THE COURT:  Yes.

24             MR. LEWIS:  Okay.

25        (Jury in, 2:20 p.m.)

PATTERSON - DIRECT - LEWIS

```
 1            THE COURT:  Okay.  You may proceed.

 2            MR. LEWIS:  Thank you, Judge.

 3                      JIMMY PATTERSON,

 4         having been duly sworn, testified as follows:

 5                      DIRECT EXAMINATION

 6   BY MR. LEWIS:

 7   Q.   Would you please state your name for the record.

 8   A.   Jimmy Patterson.

 9   Q.   Where are you currently employed?

10   A.   Dallas County Constable's Office.

11   Q.   Back in November of 2006, where were you employed then?

12   A.   Rowlett Police Department.

13   Q.   Now, on November 2nd of 2006, were you hired off duty?

14   A.   Yes, I was.

15   Q.   And who hired you?

16   A.   Dateline NBC.

17   Q.   And what did they hire you for?

18            MR. BURNS:  Excuse me, Your Honor.  At this time,

19   based upon our conversations, we would object to this as being

20   extraneous, collateral 404, and the probative value being

21   outweighed by the prejudicial effect regarding --

22            THE COURT:  I overrule the latter part.  I don't think

23   the probative value is outweighed by the prejudicial effect.  I

24   think the opposite, that the probative value far outweighs the

25   prejudicial effect.
```

1      Now, what was the other objection?

2           MR. BURNS:  The 404(b), extraneous, collateral matter.

3           THE COURT:  Well, is this being offered for a limited

4   purpose?

5           MR. LEWIS:  It is, sir.  It is being offered for the

6   limited purpose to show that this -- the 404(b) requirements.  I

7   can state those out for you, sir, but that is the limited

8   purpose, yes.

9           THE COURT:  Okay.  I'll explain to the jury the

10  purpose for which it's being offered once the evidence is done,

11  so the jury will understand why it's being offered.

12      Go ahead.

13          MR. LEWIS:  Thank you, sir.

14  BY MR. LEWIS:

15  Q.   Where were you supposed to be on November 2nd, 2006?

16  A.   In a residence in Murphy, Texas.

17  Q.   And where were you in that residence?

18  A.   At this particular time, I was on the second floor of this

19  residence.

20  Q.   And what were you doing on the second floor?

21  A.   I was in one of the bedrooms that was set up with audio and

22  video equipment.

23  Q.   What was the audio/video equipment showing?

24  A.   It was just showing us the people that were showing up at

25  this particular house.

1   Q.   Now, these people that were showing up at a particular

2   house, why were they showing up at that particular house?

3   A.   Well, they were showing up to have a relationship with

4   minor children.

5   Q.   Now, was there, in fact, any minor children in the house?

6   A.   No, there was not.

7   Q.   Were there decoys?

8   A.   Yes.

9   Q.   And what was the premise of y'all being there?

10          THE COURT:  Who asked you to be there?

11          THE WITNESS:  Well, NBC Dateline is the one that asked

12   me to be there.

13          THE COURT:  And what were you supposed to do when you

14   were there?

15          THE WITNESS:  I was just providing security for the

16   producers and the people running this equipment.

17          THE COURT:  Okay.  And what happened while you were

18   there?

19          THE WITNESS:  This Randall Wolford showed up and spoke

20   with this -- who he thought was a 13-year-old girl.

21          MR. BURNS:  Objection, Your Honor, as to his passing

22   upon the mind frame of another.  He can't say as to what

23   Mr. Wolford thought.  We object to that.

24          THE COURT:  Well, do you have any reason -- Did

25   Mr. Wolford say anything to cause you to know that he thought it

1    was a 13-year-old girl?

2              THE WITNESS:  Yes, sir, he talked to Mr. Hansen, Chris

3    Hansen.

4              THE COURT:  In your presence?

5              THE WITNESS:  Yes, sir.  Well, I was upstairs watching

6    the video.

7              THE COURT:  You could hear what was being said?

8              THE WITNESS:  Yes, sir, I could.

9              THE COURT:  And Mr. Wolford said that he thought the

10   girl he was meeting was 13 years old?

11             THE WITNESS:  Yes, sir.

12             THE COURT:  Okay.  Go ahead.

13        I'll overrule the objection.

14             MR. BURNS:  Did the Court overrule my objection?

15             THE COURT:  I overruled the objection.

16   BY MR. LEWIS:

17   Q.   Now, would you please turn to Exhibit 43.  That's there in

18   the binder.

19   A.   Okay.

20   Q.   Do you recognize Exhibit 43?

21   A.   Yes, sir, I do.

22   Q.   And what is it?

23   A.   It's just a transcript of the conversation between

24   Mr. Wolford and the person who he thought was 13 and Mr. Hansen.

25             MR. BURNS:  Objection, Your Honor.  Can I have a

1  continued objection regarding his saying that Mr. Wolford

2  thought somebody was 13?

3            THE COURT:  Yes, you can have a continuing objection

4  as long as you reassert it each time.

5            MR. BURNS:  Yes, sir.  Can I reassert it now?

6            THE COURT:  You have reasserted it.  It's overruled.

7  BY MR. LEWIS:

8  Q.   Now, have you reviewed the video that occurred that night?

9  A.   Yes, I did.

10  Q.   And as you watched the video, the words were being spoken

11  by the three parties that you mentioned; is that correct?

12  A.   That's correct.

13  Q.   And the parties that were speaking that night are on the

14  transcript on Exhibit 43; is that correct?

15  A.   That's correct.

16  Q.   And the words that were spoken that night are fairly and

17  accurately depicted in Government Exhibit 43?

18  A.   Yes, sir.

19            MR. LEWIS:  Government offers Exhibit 43 into

20  evidence, Your Honor.

21            THE COURT:  Okay.  I'll receive Exhibit 43.  There is

22  a part that is not really part of the conversation, and I assume

23  it will be removed.

24            MR. LEWIS:  It has been, Judge, and I will remedy that

25  shortly.

PATTERSON - DIRECT - LEWIS

1              THE COURT:  And are you also offering that for the

2    limited purpose?

3              MR. LEWIS:  Limited purpose of showing 404(b)

4    evidence, yes, sir.

5              MR. BURNS:  And, again, Your Honor, we object to it.

6    That is extraneous, collateral, and a denial of confrontation.

7              THE COURT:  Okay.  You can be seated.

8         Are you offering that -- have you offered the document?

9              MR. LEWIS:  Government offers Exhibit 43 into

10   evidence, Judge.

11             THE COURT:  Okay.  It's received.

12        Let me explain something to the jury.  This information

13   that this witness has told us about is not what the defendant is

14   charged with in this lawsuit.  It's something that happened on

15   an earlier date.  You've heard other evidence about things that

16   are not things charged in this lawsuit.  I didn't let that

17   evidence come in to prove the character of the defendant to do

18   the thing he's charged with in this lawsuit.  I let all of that

19   evidence in for very limited purposes.

20        And you can consider that evidence of things that are not

21   charged in this lawsuit -- in this case for these limited

22   purposes.  If you find beyond a reasonable doubt from other

23   evidence in this case that the defendant committed the acts

24   charged in the indictment in this case, then you may consider

25   evidence of these other -- of this other conduct, allegedly

1    committed on other occasions, to determine whether the defendant

2    had the state of mind or intent necessary to commit the crime

3    charged in the indictment.  Whether the defendant had a motive

4    or the opportunity to commit the acts charged in the indictment.

5    Whether the defendant acted according to a plan or preparation

6    for commission of a crime as charged in the indictment.  Whether

7    the defendant committed acts for which he is on trial by

8    accident or mistake.

9         In other words, you can consider these other things,

10   including what this witness is talking about for those purposes,

11   but only for those purposes.

12        Okay.  You may proceed.

13        Is there any further instruction you want me to give?

14             MR. BURNS:  No, Your Honor.  But the Court overruled

15   my objection?

16             THE COURT:  I overruled your objection.  I'm just

17   trying to find out if there's any further instruction.

18             MR. BURNS:  No, Your Honor.

19             THE COURT:  Okay.  Go ahead.

20             MR. LEWIS:  Thank you, sir.

21   BY MR. LEWIS:

22   Q.   Mr. Patterson, tell us what happened that night.

23   A.   Mr. Wolford showed up, pulled into the driveway, walked up

24   to the house where the decoy was standing on the front porch.

25   They had a little brief conversation, something to the effect

PATTERSON - DIRECT - LEWIS

1  about she asked him if he had gotten lost.  And he said, no, he

2  found the house okay.

3       They went into the house, and in this living area is a pool

4  table and a little bar setting -- a bar.

5  Q.   I want to stop you right there.  At this point in time, who

6  all can you see is in the room?

7  A.   At that time the only people you can see in that room is

8  the decoy, the female decoy, and Mr. Wolford.

9  Q.   And is Mr. Wolford in the courtroom today?

10 A.   Yes, he is.

11 Q.   Would you describe to the Court what he's wearing and which

12 table he's sitting at.

13 A.   Dark-colored suit with a blue tie.  He's wearing glasses.

14 Only difference is he doesn't have his goatee today.

15          THE COURT:  Where do you see him?

16          THE WITNESS:  Oh, at the defendant's table.

17          THE COURT:  Okay.  He's identified the defendant.

18          MR. LEWIS:  Thank you, sir.

19 BY MR. LEWIS:

20 Q.   After the defendant speaks with this decoy, what happens

21 next?

22 A.   They have a conversation about doing it on the pool table,

23 or having sex on the pool table.  And Mr. Wolford even said that

24 he was good at that, having sex on the pool table.

25 Q.   Now, does someone else come into the picture to wish to

PATTERSON - DIRECT - LEWIS

1    speak to Mr. Wolford?

2    A.    Yes.

3    Q.    Who is that?

4    A.    Chris Hansen.

5    Q.    And not word for word, but what happens during the

6    conversation next?

7    A.    Well, the conversation at that point is Mr. Hansen asking

8    Mr. Wolford questions from a sheet that he had that was a chat

9    between this -- who he thought was 13 years old and himself.

10              THE COURT:   Himself being Mr. Wolford?

11              THE WITNESS:   Mr. Wolford, yes, sir.

12   BY MR. LEWIS:

13   Q.    Well, did Mr. Hansen ask why he was there?

14   A.    Yes.

15   Q.    What did Mr. Wolford say?

16   A.    To have a conversation with the 13 year old.

17   Q.    What else did Mr. Wolford say why he was there?

18   A.    That he was going to talk to the 13-year-old's mother.

19   Q.    Do you remember what time of day this was all occurring in?

20   Morning?  Evening?  Afternoon?

21   A.    It was in the evening.  It was after dark.

22   Q.    Did the defendant give any other reasons why he was there?

23   A.    To have sex with the 13 year old.

24   Q.    And that was expressed through Mr. Hansen's reading of the

25   chats?

1  A.   Correct.

2  Q.   And this is all in the transcript; is that correct?

3  A.   Yes.

4         MR. LEWIS:  Nothing further at this time, Your Honor.

5         THE COURT:  Do you have any questions for this

6  witness?

7         MR. BURNS:  No, Your Honor.

8         THE COURT:  Okay.  Can he be excused as a witness?

9         MR. LEWIS:  Yes, sir.

10         THE COURT:  You're excused as a witness.

11         MR. PATTERSON:  Thank you.

12         MR. LEWIS:  One other witness, Judge?

13         THE COURT:  Let me ask what that other witness -- let

14  me have y'all come up here a minute.

15     (Bench conference with lead attorneys:)

16         THE COURT:  Is the other witness going to testify to

17  the transcript of an interview with the defendant after this

18  episode?

19         MR. LEWIS:  Yes, sir.  The defendant basically states

20  that he was there to have sex with that girl, and he knew that

21  she was 13.  And that's the key part of that evidence, sir.

22         THE COURT:  Well, I thought you said this transcript

23  showed that.

24         MR. LEWIS:  Oh, well, yeah, it does, too, and the

25  chat.

PATTERSON - DIRECT - LEWIS

1              THE COURT:  If it's just redundant, saying the same

2    thing a different way, let's don't take up the time to do it.  I

3    assume the transcript says that.  I haven't read it.

4              MR. LEWIS:  The transcript that the next individual

5    will talk about?

6              THE COURT:  No.  The one that just went into evidence.

7              MR. LEWIS:  Yes.  They talk about, you know, the

8    reason why he was there, yes, sir.

9              THE COURT:  Okay.  Well, if it doesn't add anything,

10   let's don't call that witness.

11             MR. LEWIS:  Yes, sir.  I can make the announcement

12   from the podium, sir, that the government would rest.

13             MR. BURNS:  Your Honor, since we're here and he's

14   going to rest, we would simply move for -- they're not going to

15   present any other evidence.  We simply move for a directed

16   verdict of not guilty -- or judgment of acquittal, Your Honor,

17   at this time.

18             THE COURT:  And I'll deny it.

19             MR. LEWIS:  I don't need to rest again, sir?

20             THE COURT:  What?

21             MR. LEWIS:  I don't need to say that I'm resting or

22   anything?

23             THE COURT:  You've rested.

24             MR. LEWIS:  I just want to make sure, sir.

25             THE COURT:  Okay.

STEADHAM - DIRECT - BOWERS

93

```
 1          (End of bench conference.)

 2              THE COURT:  The government has completed the

 3    government's evidence.

 4          The defendant can call their first witness.

 5              MS. BOWERS: At this time defense calls D'Ann Steadham.

 6              THE COURT:  Okay.

 7              MS. BOWERS:  And I believe you swore her this morning.

 8              THE COURT:  You may proceed.

 9              MS. BOWERS:  Your Honor, may it please the Court,

10    counsel.

11                        D'ANN STEADHAM,

12             having been duly sworn, testified as follows:

13                        DIRECT EXAMINATION

14    BY MS. BOWERS:

15    Q.   Would you state your name, please.

16    A.   D'Ann Steadham.

17    Q.   And where do you live, Ms. Steadham?

18    A.   Houston, Texas.

19    Q.   And do you know Randall Wolford?

20    A.   Yes, I do.

21    Q.   Have you ever talked to him, chatted with him online?

22    A.   Yes, I have.

23    Q.   And have you ever done what's called "age play" or "role

24    play" online?

25    A.   Yes, I have.
```

STEADHAM - DIRECT - BOWERS

94

1    Q.   And what does that mean?

2    A.   I'm 40 years old.

3            THE COURT:  I'm sorry.  When you turn away from me --

4    Why don't you just look toward her and answer, and that way we

5    can all hear you.

6    A.   I am 40 years old.

7            THE COURT:  You played like you're how old?

8            THE WITNESS:  Like a teenager or something.  I'm

9    typing, frequently typing.  At 40 years old, you can talk about

10   anything you want to on the Internet.  It's done every day.

11   BY MS. BOWERS:

12   Q.   Well, just let me ask you this:  When you're pretending to

13   be a teenager, do you talk about sex?

14   A.   Sometimes, yes.

15   Q.   And when you get into those chat rooms, do you sign a

16   contract with Yahoo that you are 18 years of age?

17   A.   Absolutely.

18   Q.   So you're aware that you have to be 18 to do that.

19   A.   That's correct.  Everyone that I talk to is -- knows that

20   I'm over the age of 18.

21           THE COURT:  How old did you say you are?

22           THE WITNESS:  I'm 40.

23   BY MS. BOWERS:

24   Q.   Did you ever get into one of these role play/age play with

25   Mr. Wolford?

U.S. DISTRICT COURT

STEADHAM – DIRECT – BOWERS

1   A.   Yes.

2   Q.   One time?  Many times?

3   A.   We met on the Internet, not on that premise necessarily.

4   We've known each other for a long time, and we discussed all

5   kinds of things.  We've known each other for a long time.

6   Q.   But you did talk sexually and do some of this role playing

7   on the Internet.

8   A.   Yes.

9          THE COURT:  Let me be sure I understand what happened.

10  How did you meet the defendant, Mr. Wolford?  Did you meet him

11  over the Internet?

12         THE WITNESS:  That is correct, on an adult website,

13  yes.

14         THE COURT:  So he knew you were an adult from the

15  beginning.

16         THE WITNESS:  Yes.

17         THE COURT:  Pardon?

18         THE WITNESS:  Yes.  Still to this day, he hasn't

19  talked to anyone that was not of legal age.

20         THE COURT:  You didn't fool him into thinking you were

21  not an adult; is that correct?

22         THE WITNESS:  No.

23         THE COURT:  Okay.

24  BY MS. BOWERS:

25  Q.   And do you often chat with people, and when I say "chat," I

STEADHAM - DIRECT - BOWERS

1  don't mean necessarily in a chat room, but, say, in a private

2  conversation, do you often --

3          THE COURT:  You can go ahead.  He's thinking about it

4  while she's thinking.

5  A.   Yes, it's very common.

6  BY MS. BOWERS:

7  Q.   Is that a common thing to do?

8  A.   It's very common for people.  It's very common.

9          THE COURT:  Well, I don't --

10         MR. LEWIS:  I'll object at this point in time.

11  A.   It's very common for people to engage in --

12         THE COURT:  Pardon me.

13         MR. LEWIS:  I'm going to object to this.

14         THE COURT:  Are you objecting she's not an expert on

15  what is common?

16         MR. LEWIS:  Yes, sir.  She's not an expert as well,

17  and it would be just speculation on what other people would do

18  on the Internet, as well as --

19         THE COURT:  I sustain the objection.  You can talk

20  about what you do but not what other people do.

21  BY MS. BOWERS:

22  Q.   Okay.  And I didn't catch this, but how long would you say

23  you've known Randy Wolford?

24  A.   Years.  Three, maybe four years.

25         THE COURT:  Have you personally met him other than

U.S. DISTRICT COURT

STEADHAM - CROSS - LEWIS

1  over the Internet?

2          THE WITNESS:  That's correct, many times.

3  BY MS. BOWERS:

4  Q.   That was my next question:  Have you just met him over the

5  Internet, or have you met him face-to-face?

6  A.   In person.  Many times in person, yes.

7          MS. BOWERS:  Pass the witness.

8          THE COURT:  Do you have any questions of this witness?

9          MR. LEWIS:  Just briefly, Judge.

10                     CROSS-EXAMINATION

11  BY MR. LEWIS:

12  Q.   Ma'am, whenever you're role playing, how old do you say you

13  are?

14  A.   We never say an age, actually.  I'm just talking about

15  being younger.  There's entire websites, entire chat rooms,

16  devoted to people who are playing a younger age.

17  Q.   Well, are you saying school age, high school, junior high,

18  ten years old?

19  A.   Could be high school, could be college age.

20  Q.   So we're thinking 17, 18, 19, 20.

21  A.   Sure.

22  Q.   Have you ever portrayed yourself as a 12 year old?

23  A.   Um, no.

24  Q.   Do you have any chats that you had with the defendant to

25  provide us today to see what exactly you talked about?

1    A.   The defendant and I haven't talked on the Internet in a

2    long time.  No, I cannot produce what he and I talked about.  We

3    were adult people, and we've talked about every kind of thing.

4    We're in the same kind of industry.  There's all kinds of things

5    we talked about.

6    Q.   But you knew him and he knew how old you were, roughly,

7    before you started role playing on the Internet.

8    A.   That's correct.

9    Q.   So he knew that you weren't 12 or 13.

10          THE COURT:  Let's don't repeat the same thing.

11   A.   That's very correct.  He knew that I was, at the time, in

12   my 30s.  I'm 40 now.

13   BY MR. LEWIS:

14   Q.   Well, have you ever chatted online with someone who was

15   portraying themselves out to be 12 or 13 years old?

16   A.   Hum. . .

17   Q.   And talk about sexual activities that they would like to do

18   with you?

19   A.   No, I've never talked to anyone -- Okay.

20   Q.   Have you ever traveled to meet someone who got online with

21   you and said, yeah, they're 12 or 13?

22   A.   No.

23          MR. LEWIS:  No further questions.

24          THE COURT:  Can she be excused as a witness?

25          MR. LEWIS:  From the government, sir, yes.

1          MS. BOWERS:  On redirect, may I ask one thing, Your

2  Honor?

3          THE COURT:  You can ask her another question if you

4  would like.

5                        REDIRECT EXAMINATION

6  BY MS. BOWERS:

7  Q.   Ms. Steadham, have you role played/age played being a

8  teenager, say, 15, 16?

9  A.   Sure.

10  Q.   On the Internet?

11  A.   Sure.

12  Q.   With people other than Randy?

13  A.   Oh, yes.

14  Q.   And with Randy.

15  A.   And with Randy.

16          MS. BOWERS:  Thank you.  No further questions.

17          THE COURT:  Why do you do that, out of curiosity?

18          THE WITNESS:  Why do people have sex in the woods?

19  Why do people -- why do people do anything?  Why do people dress

20  up whenever they have sex?  Why do men go to prostitutes dressed

21  like anything?  Why do men spend ten billion dollars a year on

22  porn that's labeled barely legal?  Why do anything?  Why do --

23  why do women always want to look younger?  Why do -- That's a

24  good -- I mean, I'm not sure what you're asking me.  I mean,

25  there are a lot of preferences that people have.

1    Are you asking me why I would want to portray someone

2  younger?

3         THE COURT:  Well, no.  I was asking what you did

4  making out like you were a child or an adolescent.

5         THE WITNESS:  It could be many things.  I could have

6  pink hair bows in my hair.

7         THE COURT:  Okay.  That's fine.

8    You can step down.

9    I think she can be excused.

10         MR. LEWIS:  Nothing from the government, sir.

11         THE COURT:  Can she be excused?

12         MS. BOWERS:  Yes, Your Honor.

13         THE COURT:  You're excused.

14    Do you have any other witnesses?

15         MR. BURNS:  Defense will rest, Your Honor.

16         THE COURT:  Okay.  Does the government close?

17         MR. LEWIS:  I'm sorry.  Nothing further from the

18  government, sir.

19         THE COURT:  The defendant close?

20         MR. BURNS:  Defense will close.

21         THE COURT:  Okay.  Let me have you come up here a

22  again.

23    (Bench conference with lead attorneys:)

24         THE COURT:  Did I sustain objections to any exhibits?

25  I don't think I did, did I?

```
 1                MR. LEWIS:  No, sir, although I did not offer all of

 2   them.

 3                THE COURT:  But I didn't sustain --

 4                MR. LEWIS:  Correct.

 5                THE COURT:  I'm talking about the exhibits.  I'm going

 6   to take out the reference on page 4 to exhibits.  I did sustain

 7   objections to questions.

 8                MR. LEWIS:  Yes, sir.

 9                THE COURT:  Okay.  Let's see if there's any other

10   cleaning up we need to do.

11        (Brief pause.)

12                THE COURT:  Let me get -- I didn't order anything

13   stricken from the record, did I?

14                MR. LEWIS:  No, sir, I don't think so.

15                THE COURT:  I did tell them to disregard something.

16   No, I did tell them to disregard it, but it's not something I

17   struck from the record.

18                MR. LEWIS:  Okay.

19                THE COURT:  Okay.  So I've taken out in the second

20   paragraph on page 4 all reference to things that I struck from

21   the record and exhibits that I sustained objections to because

22   that's not applicable.

23        Now, someplace it's in here, something about whether the

24   defendant testifies or not.  So help me find that.

25                MR. BURNS:  Your Honor, it's on page 7, 6 to 7.
```

U.S. DISTRICT COURT

```
1   Mostly it's 7.

2           THE COURT:  If I take out the first paragraph --

3           MR. BURNS:  Yes, Your Honor.

4           THE COURT:  -- and leave the second one in.

5           MR. BURNS:  Yes, sir.

6           THE COURT:  Is that the only thing I need to do to get

7   the charge lined up?

8           MR. LEWIS:  I believe so.

9           MR. BURNS:  Yes, Your Honor.  You're not taking

10  objections to the charge at this time, are you?

11          THE COURT:  I'll do that after y'all argue.

12          MR. BURNS:  Yes, sir.

13          THE COURT:  After I read it to the jury.

14          MR. BURNS:  Okay.

15          THE COURT:  Five minutes enough?  Ten minutes?  How

16  much?

17          MR. LEWIS:  Yes, sir.  I don't know how you want me to

18  split it up, five and three, or something like that.

19          THE COURT:  Is five minutes enough?

20          MR. LEWIS:  Five and three would be fine, sir.

21          THE COURT:  Well, I didn't mean five and three.  I

22  meant five.

23          MR. LEWIS:  Oh, five total.

24          THE COURT:  You're suggesting you might even use

25  eight.  Why don't we compromise at seven.
```

```
1          Is that enough for you?

2               MR. BURNS:  Yeah.  I'm long winded, Judge, and I've

3    been real short in this one.

4               THE COURT:  Okay.  Well, we'll use seven each.  I'll

5    give you plenty of time this time.

6               MR. BURNS:  You couldn't give us a whole ten?

7               THE COURT:  Oh, you don't need ten minutes.

8               MR. LEWIS:  Seven would be fine.

9               THE COURT:  Okay.  I'll give him ten minutes.  Give

10   you seven and him ten.  He's got to labor an oar to win this

11   case.

12              MR. BURNS:  That's true.

13              THE COURT:  And I'll warn you after you've used four?

14              MR. LEWIS:  Yes, sir.

15              THE COURT:  And I'm going to warn you after you've

16   used eight.

17              MR. BURNS:  Thank you, Your Honor.

18              THE COURT:  Okay.

19         (End of bench conference.)

20              THE COURT:  Okay.  The evidence is concluded, and the

21   lawyers are going to make their closing statements now.  I've

22   given the government seven minutes to make its closing

23   statement, and I've given the defendant ten minutes.

24         You may proceed.

25              MR. LEWIS:  Thank you, Judge.
```

1    Ladies and gentlemen, after the closing arguments are done

2   today, you're going to have the jury instructions read to you.

3   And while not one of those jury instructions is more important

4   than any of the other instructions that you'll have today, I'm

5   going to focus my first part of time with you on elements of the

6   case, elements that the government has proven beyond a

7   reasonable doubt.  And you're going to have this read to you in

8   a second.

9    But the first element that the government must prove is

10  that on or about the date set forth out in the indictment, the

11  defendant knowingly attempted to persuade, induce, or entice an

12  individual who he believed to be under the age of 18 years to

13  engage in any sexual activity for which any person can be

14  charged with a criminal offense.  That's the first element.

15   The second element is that when engaging in the conduct

16  described, what we just talked about in the first element, the

17  defendant engaged in conduct that constituted a substantial step

18  towards the commission of the criminal offense of the kind

19  referred to in the first element that strongly corroborates the

20  defendant's intent to commit such criminal offense.  We'll talk

21  about that in just a second.

22   Third element, third and last element:  The defendant

23  knowingly used a facility of interstate commerce when engaging

24  in the conduct described in the first element that we've already

25  talked about.

1       Let's talk about the last element first.  Using a facility
2   of interstate commerce means you get on the Internet.  You get
3   on the Internet and you're connected world wide and you connect
4   with people and you communicate with people.  So that using the
5   facility, computer, getting on the Internet, qualifies as using
6   a facility of interstate commerce.  Sergeant Milner testified
7   that, well, the only way if I'm online, using Yahoo, the only
8   way that somebody can contact me is through the Internet and
9   using a computer.  That third element has been satisfied.
10      Let's talk about the first element.  On or about the date
11  set out in the indictment, and we talked about that.  He started
12  talking with the defendant -- Sergeant Milner started talking
13  with the defendant on March 20th of this year; had several
14  conversations with him and ended up being at his arrest on April
15  30th, 2008.  That's the date, that's the evidence that's been
16  presented.  That element has been met.
17      The defendant knowingly attempted to persuade, induce, or
18  entice an individual.  All right.  So how did he do this?  How
19  did he persuade, induce, or entice somebody?  When you're an
20  older man and you use words that are in the chat, talking to
21  someone who you believe is 13 and you use the words, "I would
22  like to do this to you.  I'd like to taste you.  I'd like to do
23  this.  I'd like to insert my penis inside you.  I would like to
24  do all these things."  That's a form of enticement.  That's a
25  term of persuasion.

1          Now, the evidence, government exhibit -- and you can look

2     at all of the evidence and the exhibits whenever you are

3     deliberating.  Please do.  The screen captures that we talked

4     about, the screen captures of the defendant, the defendant while

5     he's masturbating online, showing the 13-year-old girl and

6     talking at the same time on what all sexual activities that he

7     would like to do.  What other intent could he have by showing

8     his penis and masturbating with it and showing a 13-year-old

9     girl?  What other intent could there be?

10         A picture is worth a thousand words.  A picture is worth a

11    thousand words.  Those pictures of this man's genitals, worth a

12    thousand words.  It shows you what he wanted to do.

13         Who he believed to be under 18 years of age.  Right off the

14    bat, he asks, "You're not with the law enforcement, are you?

15    You're not with Perverted-Justice or any other watchdog group,

16    are you?"  Why did he say that?  Because in 2006 he was on

17    Dateline predator.  He appeared in a home in Murphy, Texas, to

18    meet a 13-year-old girl, less than two years ago.  Who he

19    believed to be under 13 because if you're almost 13, then that's

20    bad for me.  So are you sure you're not with a watchdog group?

21    Are you sure you're not with Dateline?  Are you sure you're not

22    an officer?  Not just once.  You can read through the chats.

23    Several times he mentions it.  Now, I can get in a lot of

24    trouble for this because you're 13.  I can get in a lot of

25    trouble for this.  I can get in a lot of trouble.  Are you

1    sure --

2              THE COURT:  You've used four minutes of your time.

3              MR. LEWIS:  Yes, sir.

4       Are you sure?  Are you sure?  Are you sure?  Send me a nude

5    photograph.  Get a web cam so I can make sure you are.  That's

6    why the phone call is made.  He's not going to meet until he

7    hears a female voice on the line.  And once that happens, it's a

8    wonderful thing because now he knows it's a real 13 year old.

9    Forget about school.  Meet me in the morning.  Forget about

10   school.

11      And what happens when a decoy comes up?  What happens when

12   the decoy shows up at McDonald's, and he says, "Hey, Jenn, it's

13   me."  She turns, walks to him, and as she gets closer, "Get in.

14   Get in the car."  He realizes that she's no 13 year old.  She's

15   much too old.  She's 19.  He's not interested in 19 year olds.

16   If this is all role play and fantasy, why didn't he stay and

17   talk to the 19 year old?  He didn't.  He left.  He left.  That's

18   how you know he believed that he was talking to a 13 year old.

19      Now, criminal activity is -- it's testified that criminal

20   activity is when an adult has oral sex or genital sex with a

21   minor.  That's an offense in Texas.  That element has been

22   satisfied.

23      The second element, substantial step.  Substantial step.

24   Well, when he picked up his car keys that morning and put in the

25   ignition and pressed go, we all know where he was going.  When

1  he typed in the GPS to McDonald's -- There's not a McDonald's

2  close by?  He had to go to that one?  We all know that was a

3  substantial step.  He believed she was 13.  That's why he went

4  there that day.  All the elements have been met.  I'll have a

5  chance to address you shortly again, and I will ask you then, as

6  I ask you now, to find him guilty.  Thank you.

7          THE COURT:  Okay.  You may make your argument.

8          MR. BURNS:  Thank you.

9      Ladies and gentlemen of the jury, I come before you,

10  Mr. Wolford comes before you, and there was a sting in this

11  operation, but they caught an innocent man.  If you've heard the

12  testimony and listened to it and you read the transcripts,

13  ladies and gentlemen, you will see that Mr. Wolford did not

14  believe he was dealing with a 13-year-old child.  He even tells

15  you in one of the transcripts, "I didn't believe she was 13."

16  You can read those transcripts.

17      The ones that are his, ladies and gentlemen, the government

18  offered you Government's Exhibit 32 through 36.  Look at those

19  transcripts, ladies and gentlemen.  They don't know how many

20  times or who those people were, and they have different sign-on

21  names than the one used by Mr. Randall Wolford when he was

22  talking with this young person on the Internet.  She was not,

23  however, a young person in the sense of being underage.

24      I submit to you, ladies and gentlemen, he went there.  He

25  tried to get a web cam to make sure that, in fact, she was an

1    adult he was talking to.  This is an adult website.  You swear

2    or you sign on and you certify to Yahoo and the website managers

3    that you're over 18 years of age.  They should be, but you can

4    role play.  You can pretend that you're younger.  It may not be

5    the most wonderful thing in the world to do, but, ladies and

6    gentlemen, it's not illegal to talk to an adult in dirty

7    language.

8         And I submit to you, ladies and gentlemen, that that's what

9    we have here.  You see that Mr. Wolford, when the lady came up,

10   he talked to her, and she walked -- she said -- she was

11   obviously -- You saw her.  She was obviously over 13 years of

12   age.  She was obviously an adult.  And when he saw her that day,

13   he said, "Hey, come on."  She said, "No.  I'm going to go in,"

14   and she was still, even though she is an adult, a little younger

15   than he wanted, and he started to leave.  He didn't want any

16   more of that.  He didn't want any more of the problems that he

17   suffered as they showed you in their extraneous deal with the

18   Murphy case.  He says in the Murphy deal, you know, the same

19   thing.  "I was going to stay here and talk to her mother and

20   tell her she needs not to be doing this sort of thing."

21        Look at what's there, ladies and gentlemen, and remember

22   the Court's charge that you're going to have -- and I anticipate

23   he's going to tell you -- you're going to have to find and

24   believe from the evidence beyond a reasonable doubt, to the

25   degree of doubt that would cause you to hesitate.  You wouldn't

1    act, but you would hesitate before acting in the most important

2    of your own affairs, ladies and gentlemen.  And think about

3    that.

4        You've got to have a hesitation here because everything

5    that you've seen shows you that Randy Wolford thought he was

6    talking to a person above the age of 18.  They certified it to

7    get onto the website, and everybody puts stuff up there.

8        The pornographic pictures of the kids, even the state's own

9    expert told you they don't know if that was just somebody

10   sending somebody something, opening it up and then getting rid

11   of it immediately, not looking at it, not going on.  What do you

12   do?  Do you sit there and you spend time doing things or do you

13   just get rid of it?  I submit to you that it's just as possible

14   and just as likely that that happened there.

15       Randy Wolford, ladies and gentlemen, is a man who was

16   caught up in a situation that he tried to get out of.  When he

17   saw that she was in her teens, she really was a teenager.  She

18   wasn't underage, but she was definitely teens or early 20s, and

19   at his age he didn't want to be involved in it and so he started

20   to leave.

21       Remember, even the officer tells you that nobody gives

22   their right names or ages on the Internet.  Randy Wolford

23   himself gave a wrong, false age.  I ask you to consider that.  I

24   ask you to consider, ladies and gentlemen, the last officer who

25   testified, read the transcript.  You don't see Randy Wolford

1   asking her to do it on a pool table.  In fact, she asked him,

2   "Have you ever done it on a pool table?"  He says, "Yeah, I did

3   it once."  That was her question to him, and he responded to it.

4   He didn't ask her to do it there.  He was there, as he tells

5   them and tells you in that transcript, ladies and gentlemen, to

6   talk to her mother when he saw that she was, although an adult,

7   she was somebody that shouldn't be talking and being on those

8   chat rooms that way.  And he was going to do something about it.

9       Randy Wolford, ladies and gentlemen, is not guilty of

10  online solicitation of a child.  Listen to the wording as the

11  Judge reads it to you.  He has to encourage and he has to

12  solicit, not just talk.  That's all he did.  Talk, ladies and

13  gentlemen.  I submit to you if you look at it all, Randy Wolford

14  proves to you through the testimony and the statements and the

15  evidence put here that he's not guilty of online solicitation of

16  a child.  And I ask you to hold to your verdict, ladies and

17  gentlemen, and return a proper verdict in this case, a verdict

18  of not guilty.

19      Thank you, Your Honor.

20          THE COURT:  Okay.  You have probably less than 30

21  seconds.  I'm going to let you make a sentence or two, but

22  you're about through.

23          MR. LEWIS:  Yes, sir.

24      You get caught on national TV, on a show that is online

25  solicitation of minors, and it happens again in two years.  It's

1  obvious he likes children.  Take a look at all the evidence,

2  ladies and gentlemen.  Child pornography is on there.  He shows

3  up again.  Find him guilty because that's exactly what he is.

4  Thank you.

5          THE COURT:  Okay.  Now that you've heard the

6  summations of the attorneys, I'm going to give you the legal

7  instructions that will guide you in your deliberations.  You

8  won't have these instructions I'm getting ready to read to you

9  in the jury room.  You'll have the verdict form, and I'll

10 explain that to you in a minute.  Of course, you'll have all

11 these exhibits, too.  But listen closely to these instructions

12 because they'll define for you the findings you have to make, or

13 the facts that you have to find, in order for there to be a

14 guilty verdict.

15     In any jury trial there are, in effect, two judges.  I am

16 one of the judges; the other is the jury.  It is my duty to

17 preside over the trial and to decide what evidence is proper for

18 your consideration.  It is also my duty at the end of the trial

19 to explain to you the rules of law that you must follow and

20 apply in arriving at your verdict.

21     First, I will give you some general instructions which

22 apply in every case, for example, instructions about burden of

23 proof and how to judge the believability of witnesses.  Then I

24 will give you some specific rules of law about this particular

25 case.  And, finally, I will explain to you the procedures you

1    should follow in your deliberations.

2        You, as jurors, are the judges of the facts.  But in

3    determining what actually happened, that is, in reaching your

4    decision as to the facts, it is your sworn duty to follow all of

5    the rules of law as I explain them to you.

6        You have no right to disregard or give special attention to

7    any one instruction, or to question the wisdom or correctness of

8    any rule I may state to you.  You must not substitute or follow

9    your own notion or opinion as to what the law is or ought to be.

10   It is your duty to apply the law as I explain it to you,

11   regardless of the consequences.

12       It is also your duty to base your verdict solely upon the

13   evidence received during the trial and the law as given and

14   explained to you by the Court, without prejudice or sympathy for

15   or against the defendant.  That was the promise you made and the

16   oath you took before being accepted by the parties as jurors,

17   and the Court and the parties have the right to expect nothing

18   less.

19       The indictment or formal charge against a defendant is not

20   evidence of guilt.  Indeed, the defendant is presumed by the law

21   to be innocent.  The law does not require a defendant to prove

22   his innocence or produce any evidence at all.  The government

23   has the burden of proving the defendant guilty beyond a

24   reasonable doubt, and if it fails to do so, you must find the

25   defendant not guilty.

While the government's burden of proof is a strict or heavy burden, it is not necessary that the defendant's guilt be proved beyond all possible doubt.  It is only required that the government's proof exclude any "reasonable doubt" concerning the defendant's guilt.

A "reasonable doubt" is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case.  Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your affairs.  If you are convinced that the accused has been proved guilty beyond a reasonable doubt, say so.  If you are not convinced, say so.

You will note the indictment charges that the offense was committed on or about beginning and ending dates.  The government does not have to prove that the crime was committed during that exact time period, so long as the government proves beyond a reasonable doubt that the defendant committed the crime during a time reasonably near the dates stated in the indictment.

As I told you earlier, it is your duty to determine the facts.  In doing so, you must consider only the evidence presented during the trial, including the sworn testimony of the witnesses and exhibits.  Remember any statements, objections, or arguments made by the lawyers are not evidence.  The function of

1  the lawyers is to point out those things that are most

2  significant or most helpful to their side of the case, and in so

3  doing to call your attention to certain facts or inferences that

4  might otherwise escape your notice.  In the final analysis,

5  however, it is your own recollection and interpretation of the

6  evidence that controls in the case.  What the lawyers say is not

7  binding on you.

8      Now, during the trial I sustained objections to certain

9  questions.  You must disregard those questions.  Do not

10  speculate as to what the witness would have said if permitted to

11  answer the question.  Your verdict must be based solely on the

12  legally admissible evidence and testimony.

13      Also, do not assume from anything I may have said or done

14  during the trial that I have any opinion concerning any of the

15  issues in the case.  Except for the instructions to you on the

16  law, you should disregard anything I may have said during the

17  trial in arriving at your own finding as to the facts.

18      You are to decide whether the government has proved beyond

19  a reasonable doubt that the defendant is guilty of the crime

20  charged.  The defendant is not on trial for any act, conduct, or

21  offense not alleged in the indictment.  Neither are you

22  concerned with the guilt of any other person or persons not on

23  trial as a defendant in this case.

24      While you should consider only the evidence, you are

25  permitted to draw such reasonable inferences from the testimony

1   and exhibits as you feel are justified in the light of common

2   experience.  In other words, you may make deductions and reach

3   conclusions that reason and common sense lead you to draw from

4   the facts which have been established by the evidence.

5        You should not be concerned about whether the evidence is

6   direct or circumstantial evidence.  "Direct evidence" is the

7   testimony of one who asserts actual knowledge of a fact, such as

8   an eyewitness.  "Circumstantial evidence" is proof of a chain of

9   facts and circumstances indicating that something is or is not a

10  fact.  The law makes no distinction between the weight you may

11  give to either direct or circumstantial evidence.

12       I remind you that it is your job to decide whether the

13  government has proved the guilt of the defendant beyond a

14  reasonable doubt.  In doing so, you must consider all of the

15  evidence.  That does not mean, however, that you must accept all

16  of the evidence as true or accurate.

17       You are the judges of the credibility or "believability" of

18  each witness and the weight to be given the witness's testimony.

19  An important part of your job will be making judgments about the

20  testimony of the witnesses who testified in this case.  You

21  should decide whether you believe all or any part of what each

22  person had to say and how important that testimony was.

23       In making that decision, I suggest that you ask yourself a

24  few questions:  Did the person impress you as honest?  Did the

25  witness have any particular reason not to tell the truth?  Did

1  the witness have a personal interest in outcome of the case?

2  Did the witness have any relationship with either the government

3  or the defense?  Did the witness seem to have a good memory?

4  Did the witness have the opportunity and ability to understand

5  the questions clearly and answer them directly?  Did the

6  witness's testimony differ from the testimony of other

7  witnesses?  Those are a few of the considerations that will help

8  you determine the accuracy of what each witness said.

9       Now, as I previously explained to you, the law does not

10  require a defendant to prove his innocence or produce any

11  evidence at all.  The defendant has an absolute right not to

12  testify, and no inference whatsoever may be drawn from the

13  election of the defendant not to testify.

14       During the trial you heard the testimony of witnesses who

15  expressed opinions concerning certain matters.  If scientific,

16  technical, or other specialized knowledge might assist the jury

17  in understanding the evidence or in determining a fact in issue,

18  a witness qualified as an expert by knowledge, skill,

19  experience, training, or education may testify and state an

20  opinion concerning such matters.

21       Merely because such a witness has expressed an opinion does

22  not mean, however, that you must accept that opinion.  You

23  should judge such testimony like any other testimony.  You may

24  accept or reject it and give it such weight as you think it

25  deserves, considering the witness's education, experience, his

1   soundness of the reasons given for the opinion, and all other

2   evidence in the case.

3       Your job is to think about the testimony of each witness

4   you have heard and decide how much you believe of what each

5   witness had to say.  In making up your mind and reaching a

6   verdict, do not make any decisions simply because there were

7   more witnesses on one side than the other.  Do not reach a

8   conclusion on a particular point just because there were more

9   witnesses testifying for one side on that point.

10      Okay.  So far I've given you some rather general

11  instructions on how to judge the believability of witnesses and

12  evaluate the credibility of the testimony.  I'm to the point now

13  where I'm going to explain exactly what the government has to

14  prove to cause the defendant to be found guilty of the offense

15  charged by the indictment.

16      The defendant is charged in the indictment with attempted

17  enticement of a child, in violation of Section 2422(b) of Title

18  18 of the United States Code.  Title 18, United States Code,

19  Section 2422(b), makes it a crime for anyone knowingly to use

20  any mail or facility or means of interstate commerce to attempt

21  to persuade, induce, or entice any individual who has not

22  attained the age of 18 years to engage in any sexual activity

23  for which any person can be charged with a criminal offense.

24      Now, for you to find the defendant guilty of this crime, as

25  alleged in the indictment, you must be convinced the government

1    has proved each of the following beyond a reasonable doubt.   And

2    I'm going to list first element, second element, third element,

3    the things the government was obligated to prove during this

4    trial for the defendant to be convicted of the offense charged

5    by the indictment.   After I list those elements, then I'm going

6    to give you some further explanations explaining what some of

7    the terminology in those elements means.

8        The first element that the government has to prove is that

9    on or about the date set out in the indictment, which is a range

10   of dates, the defendant knowingly attempted to persuade, induce,

11   or entice an individual who he believed to be under the age of

12   18 years to engage in any sexual activity for which any person

13   can be charged with a criminal offense.   And I'm going to come

14   back to that in a minute and explain what that means.

15       And the second element:   that when engaging in the conduct

16   described in the first element that I've just described, the

17   defendant engaged in conduct that constituted a substantial step

18   towards the commission of a criminal offense of the kind

19   referred to in such first element that strongly corroborates the

20   defendant's intent to commit such criminal offense.

21       And, then the third element:   that the defendant knowingly

22   used a facility of interstate commerce when engaging in the

23   conduct described in the first element the Court just described.

24       I'm going to go over those again, the three elements.

25   First element:   that on or about the range of dates set forth in

1   the indictment, the defendant knowingly attempted to persuade,

2   induce, or entice an individual who he believed to be under the

3   age of 18 years to engage in any sexual activity for which any

4   person can be charged with a criminal offense.

5        And, second element:  that when engaging in the conduct

6   described in the first element, the defendant engaged in conduct

7   that constituted a substantial step towards the commission of a

8   criminal offense of the kind referred to in such first element

9   that strongly corroborates the defendant's intent to commit such

10  criminal offense.

11       And third element:  that the defendant knowingly used a

12  facility of interstate commerce when engaging in the conduct

13  described in the first element.

14       Okay.  Now I'm going to explain some of the terminology.

15  The term "any sexual activity for any which any person can be

16  charged with a criminal offense," as used in the first element,

17  refers to the crime described in Section 22.011(a)(2) of the

18  Texas Penal Code, which states that a person commits an offense

19  if the person intentionally or knowingly (a) causes the

20  penetration of the anus or sexual organ of a child by any means;

21  (b) causes the penetration of the mouth of a child by the sexual

22  organ of the actor; (c) causes the sexual organ of a child to

23  contact or penetrate the mouth, anus, or sexual organ of another

24  person, including the actor; (d) causes the anus of a child to

25  contact the mouth, anus, or sexual organ of another person,

1    including the actor; or (e) causes the mouth of a child to

2    contact the anus or sexual organ of another person, including

3    the actor.

4        Now, the word "child," as that term is used in Section

5    22.011(a)(2) of the Texas Penal Code, which is the statute that

6    I just read from, means any person younger than 17 years of age

7    who is not the spouse of the defendant.

8        Okay.  The term "using any facility or means of interstate

9    commerce," means employing or utilizing any instrumentality used

10   for transmission of communications, such as the Internet, from

11   one state to another state in the United States.  The government

12   must prove that the defendant used a facility or means of

13   interstate commerce, but the government is not required to prove

14   that the defendant's use of such facility was to transmit a

15   communication from one state to another state.  Using a computer

16   connected to the Internet, particularly using Internet chat

17   rooms, constitutes "the use of a facility or means of interstate

18   commerce," even though the communications in question may have

19   actually been intrastate, that is, within the state, in

20   character.  Use of telephone networks and the Internet

21   constitute use of facilities of interstate commerce and do not

22   require any evidence that the conversations were routed through

23   an interstate system.

24       Now, the word "knowingly" was used in the elements, and

25   this is the definition of that:  An act is done "knowingly" if

1   done voluntarily and intentionally and not because of a mistake

2   or accident or some other innocent reason.

3        Now, I'm going to repeat one of the instructions I gave you

4   during the trial.  It's important.  You have heard evidence of

5   acts of the defendant which may be similar to those charged in

6   the indictment but which were committed on other occasions.  And

7   you heard evidence of images that were on his computer that are

8   not charged in the indictment.  You must not consider any of

9   that evidence in deciding if the defendant committed the acts

10  charged in the indictment.  However, you may consider that

11  evidence for other, very limited, purposes.

12       If you find beyond a reasonable doubt from other evidence

13  in the case that the defendant committed the acts charged in the

14  indictment, then you may consider the evidence of those other

15  acts allegedly committed on other occasions to determine whether

16  the defendant had the state of mind or intent necessary to

17  commit the crime charged in the indictment, or whether the

18  defendant had the motive or the opportunity to commit the acts

19  charged in the indictment, or whether the defendant acted

20  according to a plan or in preparation for a commission of a

21  crime, or whether the defendant committed the acts for which he

22  is on trial by accident or mistake.  These are the limited

23  purposes for which any evidence of other acts may be considered,

24  that is, acts that are not charged in the indictment.

25       You are here to decide whether the government has proved

beyond a reasonable doubt that the defendant is guilty of the crime charged in the indictment.  The defendant is not on trial for any act, conduct, or offense not alleged in the indictment. Neither are you concerned with the guilt of any other person or persons not on trial as a defendant in this case, except as you are otherwise instructed.

Keep constantly in mind that it would be a violation of your sworn duty to base your verdict upon anything other than the evidence in this case.

Now, if the defendant is found guilty, it will be my duty to decide what the punishment will be.  You should not be concerned with punishment in any way.  It should not enter into your consideration or discussion.

Now, to reach a verdict, whether it is guilty or not guilty, all of you must agree.  Your verdict must be unanimous on the count of the indictment.  Other than the possibility that the Court could make an inquiry into whether deliberations were conducted properly, your deliberations will be secret and you will never have to explain your verdict to anyone.

It is your duty to consult with one another and to deliberate in an effort to reach agreement if you can do so. You must individually decide the case for yourselves, but only after an impartial consideration of the evidence with your fellow jurors.  During your deliberations, do not hesitate to reexamine your own opinions and change your mind if convinced

1  that you were wrong.  But do not give up your honest beliefs as

2  to the weight or effect of the evidence solely because of the

3  opinion of your fellow jurors, or for the mere purpose of

4  returning a verdict.

5      Remember at all times, you are the judges, judges of the

6  facts.  Your interest is to seek the truth from the evidence in

7  the case, to decide whether the government has proved the

8  defendant guilty beyond a reasonable doubt.

9      Now, when you go to the jury room, the first thing you

10  should do is to select one of your number as your foreperson who

11  will help to guide you in your deliberations and will speak for

12  you here in the courtroom.

13      And I might mention there are several lengthy transcripts

14  of Internet communications and telephone communications in the

15  record as exhibits.  And one of the functions a foreperson

16  frequently serves is if there's something like that, reading it

17  aloud, so all of you can hear what you think is important to

18  hear to reach a decision in the case.  It's up to the jury to

19  decide how much weight to give to all of the evidence, but I'm

20  just suggesting that can be a function of the foreperson to read

21  those, so everybody separately won't be required to read it out

22  loud.

23      Now, a form of verdict has been prepared for your

24  convenience, and I'll explain that to you in a minute.  The

25  foreperson will write the unanimous answer of the jury in the

1  space provided for in the indictment, whether guilty or not

2  guilty.  At the conclusion of your deliberations, the foreperson

3  should date and sign the verdict.

4      If you need to communicate with me during your

5  deliberations, the foreperson should write the message and give

6  it to the court security officer.  I will either reply in

7  writing or bring you back into court to answer your message.

8      Bear in mind that you are never to reveal to any person,

9  not even to the Court, how the jury stands, numerically or

10  otherwise, on any count of the indictment until after you have

11  reached a unanimous verdict.

12      Now, the verdict form that I mentioned is really just a

13  one-sentence document.  It has a sentence that says, "We, the

14  jury, find the defendant, Randall Wolford," then it has a blank

15  space.  And then it goes on to say, "as to Count 1 of the

16  indictment."  It's only a one-count indictment, so that's the

17  only count of the indictment.

18      The foreperson, after a unanimous verdict has been reached,

19  then the foreperson will either write in the word "guilty" or

20  the words "not guilty" in that blank.  The word "guilty" will be

21  put in that blank if the unanimous decision of the jury is that

22  the defendant committed the offense charged by the indictment.

23  The words "not guilty" will be placed in that blank if the jury

24  unanimously concludes that the government has failed to prove

25  beyond a reasonable doubt that the defendant committed that

1    offense.

2         Once the blank has been filled out, based on the unanimous

3    decision of the jury, the foreperson will sign and date the

4    verdict form.  And it has a place below that for my signature to

5    indicate my acceptance of the verdict form.  If I'm satisfied,

6    once it's returned, that it's in proper form, then I'll sign to

7    indicate my acceptance.

8         Now, stapled to the verdict form is the wording of the

9    indictment itself.  And I want to emphasize that that's not

10   evidence of anything.  That's just a reminder to you what the

11   government has accused the defendant of.  In your deliberations,

12   you'll have that available.

13        Let me have the attorneys come up here a minute.

14        (Bench conference with lead attorneys:)

15             THE COURT:  Does the government have any objection to

16   the Court's charge or verdict form as I've read and explained

17   them to the jury?

18             MR. LEWIS:  No, Your Honor.

19             THE COURT:  Does the defendant?

20             MR. BURNS:  Yes, Your Honor.  We'd ask the Court to

21   give the First Amendment request we made earlier and would ask

22   that the Court consider putting back in the rest of the

23   definition of "knowingly."

24             THE COURT:  Okay.  And the First Amendment instruction

25   you're talking about is what was in the agreed verdict form

1    y'all submitted to the Court?

2            MR. BURNS:  Yes, Your Honor.

3            THE COURT:  It's already on file?

4            MR. BURNS:  Yes, sir.

5            THE COURT:  And the language you want me to insert is

6    the long sentence I struck out on "knowledge" or "knowingly"?

7            MR. BURNS:  Yes, sir.

8            THE COURT:  And I'll overrule those objections -- or

9    deny your requests.

10       (End of bench conference.)

11            THE COURT:  Okay.  You'll start your deliberations.

12   You'll have in the jury room the verdict form.  I'm going to

13   have all of the exhibits taken into the jury room.

14       Let me see if there's anything else that you'll have.  No,

15   those will be the things you'll have in the jury room.

16       From this point forward, you sort of decide on your own

17   schedule.  If you want to take a recess, that's fine with me.

18   Just let the court security officer -- he'll be right outside

19   the jury room door at all times.  Let him know if you decide to

20   take a recess, when you're going to take it, and how long it's

21   going to be.  The foreperson will tell him that.  We sort of

22   stand by here, waiting for y'all to decide the case.  So if

23   y'all take a recess or the like, let us know so we can know we

24   can be at ease while you're at ease.

25       Okay.  With that in mind, you'll retire to deliberate on

```
 1   your verdict.
 2        (Jury out, 3:25 p.m.)
 3            THE COURT:  I'm going to have the attorneys get
 4   together and go through the exhibits that are going to the jury
 5   room.  Be sure that only the exhibits that should be there are
 6   there, and be sure where we've talked about some redacting, that
 7   that's done.  I want both of you to satisfy yourself that that's
 8   done.  I don't want the jury to get anything it shouldn't get,
 9   so y'all go through the exhibits and be sure that they're in
10   proper form.
11        And I'll ask that the attorneys stay close at hand, either
12   in or around the courtroom, so if the jury has a note or returns
13   a verdict, at least the lead attorneys, you'll be available to
14   participate.
15            MR. LEWIS:  Your Honor, I only have one quick question
16   to ask.  When Mr. Burns and I go through the exhibits, do we
17   give that exhibit folder -- Who do we give it to, Your Honor?
18            THE COURT:  The court security officer.  He'll take it
19   to the jury room.
20            MR. LEWIS:  Yes, sir.  No problem.
21            THE COURT:  Okay.
22        (Court in recess, 3:28 p.m. until 4:10 p.m.)
23        (Verdict, 4:10 p.m.)
24        (Jury in, 4:21 p.m.)
25            THE COURT.  Ms. Hale, I understand you're the
```

1   foreperson of the jury?

2            JUROR HALE:  I am.

3            THE COURT:  Okay.  And the jury has reached a verdict?

4            JUROR HALE:  We have.

5            THE COURT:  Okay.  Hand it to the court security

6   officer so he can hand it up.

7       (Brief pause.)

8            THE COURT:  Okay.  The verdict appears to be in proper

9   form.  I'll have the defendant stand while the court coordinator

10  reads the verdict of the jury.

11           THE COURT COORDINATOR:  Verdict of the jury:  We, the

12  jury, find the defendant, Randall Wolford, guilty as to Count 1

13  of the indictment.

14           THE COURT:  Okay.  You can be seated.

15      Because the law does require the verdict to be the

16  unanimous verdict of the jury, I'm going to call the name of

17  each person on the jury and ask that you stand and tell me if

18  the verdict that was just read is your verdict.

19      Nancy Loyd, is the verdict of guilty that was just read

20  your verdict?

21           JUROR LOYD:  Yes, sir.

22           THE COURT:  Thank you.

23      Robert Lemley, is the verdict of guilty that was just read

24  your verdict?

25           JUROR LEMLEY:  Yes, sir.

```
 1              THE COURT:  Thank you.
 2       Sandra Martinez, was the verdict that was just read, the
 3  verdict of guilty, your verdict?
 4              JUROR MARTINEZ:  Yes, sir.
 5              THE COURT:  Thank you.
 6       Pamela Askins, is the verdict of guilty that was just read
 7  your verdict?
 8              JUROR ASKINS:  Yes, sir.
 9              THE COURT:  Thank you.
10       Gretchen Green, is the verdict that was just read, guilty,
11  your verdict?
12              JUROR GREEN:  Yes, sir.
13              THE COURT:  Okay.
14       Martin Puente, is the verdict that was just read, guilty,
15  your verdict?
16              JUROR PUENTE:  Yes, sir.
17              THE COURT:  Thank you.
18       Joy Allmon, is the verdict of guilty that was just read
19  your verdict?
20              JUROR ALLMON:  Yes, sir.
21              THE COURT:  Thank you.
22       Gil Johnson, is the verdict of guilty that was just read
23  your verdict?
24              JUROR JOHNSON:  Yes, sir.
25              THE COURT:  Thank you.
```

1    Lucy Hale, is the verdict of guilty that was just read your

2  verdict?

3         JUROR HALE:  Yes, sir.

4         THE COURT:  Thank you.

5    Jan Hall, is the verdict of guilty that was just read your

6  verdict?

7         JUROR HALL:  Yes, sir.

8         THE COURT:  April Summerhill, is the verdict of guilty

9  that was just read your verdict?

10         JUROR SUMMERHILL:  Yes, sir.

11         THE COURT:  And, Benjamin Perry, is the verdict that

12  was just read your verdict?

13         JUROR PERRY:  Yes, sir.

14         THE COURT:  Okay.  I'm satisfied that the verdict not

15  only is in proper form, but is the unanimous verdict of the

16  jury.  I'm accepting the verdict and indicating my acceptance by

17  signing at the place provided on the verdict form.  And I'll

18  order it filed as the verdict of the jury.

19    Sometimes jurors want to know when the sentencing will be,

20  just briefly something about the sentencing process, and I'm

21  going to tell you that in case some of you want to know.

22    The sentencing in this case will be conducted before me in

23  this courtroom at 9:00 o'clock a.m. on April 17, 2009.  It's a

24  public -- and I'm signing an order now that fixes that time and

25  date for sentencing and establishes a timetable for

1    accomplishment of the things that have to be accomplished

2    between now and then.  It's a public proceeding, just like this

3    trial has been, so if any of you would be curious and would want

4    to attend that, you're certainly entitled to.

5         But the reason it's so far off in the future is that a lot

6    of things have to be done to evaluate what an appropriate

7    sentence in a case would be.  Your verdict establishes that the

8    defendant committed the offense charged by the indictment, that

9    he's guilty of that.  There are other factors the Court

10   considers, such as other criminal conduct on the part of the

11   defendant, and other things.

12        A probation officer is assigned to the case -- will be

13   assigned to the case today, probably, and will start an

14   investigation to find out what those other facts are that might

15   be relevant to sentencing.  And once the probation officer

16   learns of those facts and -- Let me back up.

17        The federal court has a set of sentencing guidelines that

18   recommend a range that we should impose the sentence in.  The

19   statute will fix a top range, the highest it can be, and then

20   the advisory guidelines will give a range recommended, based on

21   experience in other cases, of what the Sentencing Commission

22   thinks we should sentence.  So the main activity of the

23   probation officer is to get enough information to figure out

24   which of the guidelines apply to this case and what the

25   recommended ranges are.

1       And the probation officer will put those -- his or her

2   opinions on those subjects in a written report called a

3   presentence report and will put in there the facts that those

4   opinions are based on.  And the reason it takes so long, that

5   takes a little while for that to happen.  And then the probation

6   officer gives the defendant, the defendant's attorney, and the

7   government's attorney copies of that report.  And then they have

8   an opportunity to object to it if they think anything in it is

9   wrong or if something is left out that should have been in it.

10  And then after those objections are made, the other side has the

11  right to respond to those objections -- Well, not only a right,

12  has an obligation to respond to those objections.

13      And then the probation officer, once the probation officer

14  gets the objections and the response to it, the probation

15  officer does another report that deals with the objections and

16  the responses.  And that goes on -- it seems like sometimes it

17  goes on two or three times.  So it takes a while to do all that.

18      We try to be as scientific and as accurate as we can be in

19  the federal court in sentencing because in the federal court

20  system there's no such thing as parole.  People simply don't get

21  out on parole.  They serve the sentence that's imposed on them,

22  with the exception of you get a 55-day credit for each year of

23  your sentence, as you serve it, if you have good time.  The

24  inmate can do things that would cause him to lose all that

25  credit if he conducted himself or herself improperly.  But

1   that's the most you get off.

2       And then after you've served the sentence -- not only do

3   you have a sentence of imprisonment, but then you have a period

4   of time when you're under supervision by a probation officer.

5   So we want to be as accurate as we can because of the

6   significance of the sentence in the federal court.  You know,

7   you'll read in the paper in state court about somebody getting a

8   20-year sentence and maybe be out after three or four or five

9   years on parole.  Well, we don't have that opportunity, so we

10  try to be real scientific about it, and that's why it takes so

11  long.

12      I think that's all you will want to know about the

13  sentencing process, but you certainly are welcome to attend the

14  hearing if you would like.

15      Thank you for your attention.  This has not been a pleasant

16  case to deal with, but I appreciate your being here and dealing

17  with it.  You're excused now.  Thank you.

18      (Jury out, 4:30 p.m.)

19          THE COURT:  Okay.  The defendant's attorney will come

20  to the microphone up here.

21      Mr. Wolford, you heard the explanation I gave the jury

22  about when your sentencing hearing will be and the order I'm

23  signing today -- Come up to the microphone with him.  The order

24  I'm signing that establishes the timetable for the things that

25  need to be done.  As you heard me explain to the jury, I rely

1   very heavily on those presentence reports in determining what

2   sentence to impose in a case, so they need to be as accurate and

3   complete as possible.  So when you get your copy, study it real

4   carefully, and if you think anything in it is wrong or if you

5   think something has been left out of it, tell your lawyer

6   because he'll have the right to -- he or she will have the right

7   to object to it.  And I'll rule on those objections at or before

8   the sentencing hearing.

9       Of course, you and your attorney will be permitted to speak

10  on your behalf at the sentencing hearing.

11      Okay.  Y'all can be seated.

12      The defendant is remanded to custody, and the attorneys are

13  excused.

14      I'm going to give you back these exhibits.

15          MR. LEWIS:  Yes, Your Honor.

16          THE COURT:  Our copies of the exhibits.  Of course,

17  we'll keep the originals.  I don't think there was anything of a

18  bulky nature in the exhibits, was there?

19          MR. LEWIS:  Just a laptop, Judge.

20          THE COURT:  Oh, well, I don't know that we need to

21  keep that.

22      Do y'all mind if the government keeps possession of the

23  laptop?

24          MR. BURNS:  No, Your Honor.

25          THE COURT:  Was there more?

1              MR. BURNS:  There was a laptop and an external hard

2    drive and a camera.

3              MR. LEWIS:  A GPS unit.  I can take those back, sir.

4              THE COURT:  Okay.  What exhibit numbers are they?

5    Someone tell me.

6              MR. LEWIS:  Your Honor, that would be Exhibit 18,

7    Government Exhibit 19, and Government Exhibit 27 and 28.

8              THE COURT:  And I'll let the government keep

9    possession of those exhibits with the understanding they will

10   keep them and will be available --

11             MR. LEWIS:  Yes, sir.

12             THE COURT:  -- if needed, at any future date in

13   connection with this proceeding, or any appeal from this

14   proceeding.

15       Is that okay if those exhibits are kept by the government,

16   Mr. Burns?

17             MR. BURNS:  Yes, Your Honor.

18             THE COURT:  Okay.  The attorneys are excused, and the

19   defendant is remanded to custody.

20        (End of proceedings, 4:34 p.m.)
                              -o0o-
21                          CERTIFICATE
          I certify that the foregoing is a correct transcript from
22   the record of proceedings in the above-entitled matter.  I
     further certify that the transcript fees format comply with
23   those prescribed by the Court and the Judicial Conference of the
     United States.
24
     s/Eileen M. Brewer                    November 3, 2009
25   Eileen M. Brewer                      Date
     Official Court Reporter, Texas CSR No. 3016

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25